# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**EVA ACEVEDO ORTEGA,**
individually and on behalf of all
others similarly situated,

      Plaintiff,

v.

**THE LISINSKI LAW FIRM, LLC,**
an Ohio Limited Liability Company;

**ANGELYNE E. LISINSKI,**
an individual;

**JUAN CHINCHILLA,**
an individual; and

**REA SINGH,**
an individual,

      Defendants,

Case No. 2:26-cv-644

Hon.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Eva Acevedo Ortega ("Plaintiff" or "Ms. Acevedo Ortega"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint and Jury Demand against Defendants The Lisinski Law Firm, LLC (the "Lisinski Law Firm"), Angelyne E. Lisinski ("Attorney Lisinski"), Juan Chinchilla ("Defendant Chinchilla"), and Rea Singh ("Defendant Singh") (collectively, "Defendants") challenging a uniform, standardized system through which Defendants operated a high-volume immigration practice that: (a) concealed from clients that their immigration petitions were VAWA self-petitions requiring allegations of domestic abuse or extreme cruelty, or "T Visa" applications that required

allegations of forced labor or involuntary servitude, among other things; (b) delegated all substantive legal work to non-attorney staff; (c) used non-attorney drafting personnel and template-driven processes to generate abuse narratives without meaningful client participation; (d) prepared and/or filed petitions with United States Citizenship and Immigration Services ("USCIS") containing allegations that clients say they never made, and without attorney contact, review or client understanding; (e) charged thousands of dollars for this process while failing to disclose material additional costs; and (f) unreasonably withheld client files and case information when clients discovered or questioned what had been prepared or filed in their names. Plaintiff is requesting equitable fee forfeiture, disgorgement, restitution, and damages arising from Defendants' systematic scheme to defraud vulnerable immigrants through a high-volume immigration filing operation disguised as a legitimate law practice.

The Lisinski Law Firm operates as a high-volume VAWA (Violence Against Women Act) and T Visa filing mill, processing hundreds of immigration petitions every month through a standardized, assembly-line system designed to maximize revenue while providing no meaningful legal representation. The firm built its business model on fabrication, the systematic exploitation of vulnerable, predominantly Spanish-speaking immigrants, and the deliberate recharacterization of federal statutory eligibility standards to manufacture USCIS filings for clients who did not qualify.

Lisinski did not develop this operation independently. In or around 2021/2, Defendant Angelyne E. Lisinski paid an undisclosed sum to acquire and/or license the proprietary operational model and assembly-line "Arreglar Sin Salir" method (A.S.S.) from Washington based attorney Alexandra Lozano, whose competing firm claimed to have pioneered the departmentalized, high-volume VAWA and T Visa filing structure and marketed it to Spanish-speaking immigrants. In

acquiring that model, Lisinski imported not only Lozano's organizational template and forms but its most dangerous attribute: ***the capacity to certify and submit mass immigration filings under an attorney's signature, at industrial scale, without any meaningful attorney-client contact or individualized eligibility review***.

Lisinski's A.S.S. operation placed profit above client loyalty, ethical representation, and the fundamental safety of vulnerable immigrants. The firm's business model was an assembly-line system designed to maximize revenue, converting prospective clients into fee-paying contracts through commissioned non-attorney staff who were given individual monthly revenue targets and monthly conversion quotas. This structure prioritized volume over quality, processing upwards of 800 to 1200 cases per month at a per case fee of at least $12,000. This revenue focus necessitated the systemic fabrication of client declarations and immigration histories by non-attorney staff, the implementation of a sham attorney consultation protocol, and the automatic affixing of Lisinski's signature to petitions she had not reviewed for clients she never met. The goal was not legal service, but profit, leading to the deliberate concealment of the permanent inadmissibility risk that these fraudulent filings created for every class member.

This action does not seek to review, overturn, or interfere with any administrative eligibility determinations made by United States Citizenship and Immigration Services (USCIS) or the Executive Office for Immigration Review (EOIR). Adjudication of the claims requires no interpretation of federal immigration law or individual petition merits; rather, it focuses exclusively on Defendants' systemic business conduct in marketing, contract execution, non-attorney operations, unvetted document logistics, and commercial fund handling.

### Introduction

1.      This is a federal class action brought to dismantle and seek comprehensive civil remedies for a multi-million-dollar industrialized immigration factory disguised as a legitimate law

practice.

2.      Operating out of its corporate headquarters in Powell, Ohio, the Lisinski Law Firm has systematically extracted tens of millions of dollars from thousands of the most vulnerable, low-income, monolingual Spanish-speaking undocumented consumers across the United States.

3.      The core of this action does not address any individual legal malpractice or the standalone technical merits of individual petitions; rather, the Class seeks redress for an intentional, systemic business architecture designed by Defendants to maximize corporate revenue through the complete abdication of an attorney's sacred oath of loyalty.

4.      The gravamen of this case centers on the execution of a fundamentally flawed system engineered by Defendants, a conveyor-belt model that is structurally incapable of delivering individualized legal representation, deliberately substituting a high-velocity sales pipeline for legitimate, licensed attorney engagement.

5.      The fatal flaw embedded across the entirety of Defendants' operational framework is that *at no point* during the intake, screening, contract execution, narrative generation, or document checkout phases *does an actual licensed attorney engage* in an evaluation of the potential client's case, let alone provide a meaningful legal review.

6.      Substantive legal determinations are systematically delegated to non-attorney sales staff driven by aggressive monthly quotas and commission payments, while the firm's licensed attorneys are structurally walled off from client interaction under threat of corporate disciplinary action.

7.      To maintain this high-volume operation, Defendant Attorney Lisinski systematically executes, via an automated digital workflow or signature stamp, official certifications

under penalty of perjury on thousands of complex immigration applications, primarily petitions under the Violence Against Women Act ("VAWA") (Form I-360) and Victims of Human Trafficking Visas ("T-Visas") (Form I-914), and accompanying personal declarations.

8. Defendant Lisinski submits these solemn certifications to the United States government despite the fact that *she has never met with, spoken to, or consulted the clients* whose applications and declarations she purports to verify, establishing a total failure to adhere to the oath of loyalty to the client overall and the advancement of a system that furthered that breach.

9. Under Ohio law, the attorney-client relationship is one of the highest trust and confidence known to law.

10. When an attorney commits a clear and serious violation of that duty, the client is entitled to forfeiture of fees paid, without the need to prove that the breach caused actual damages.

11. This action does not depend on the merits or outcomes of any individual immigration petition.

12. Plaintiff's claims are based on the uniform process through which Defendants marketed, sold, documented, and filed immigration petitions, a process that allegedly failed to provide informed consent, meaningful attorney involvement, accurate disclosures, or meaningful client review before submitting sworn immigration filings.

13. The enterprise relies upon a standardized methodology of "narrative engineering" to generate non-viable or structurally fabricated humanitarian claims at scale.

14. In public broadcasts to over a million social media viewers, Attorney Lisinski explicitly advertised that "*typical or normal*" family arguments or standard workplace friction

automatically qualify individuals for federal protection.

15. Once a consumer enters the pipeline, offshore writing teams systematically distort, mischaracterize, and exaggerate ordinary childhood milestones and life events into fabricated grounds for domestic abuse and human trafficking claims, keeping clients in the dark by forcing them to execute signature blocks on completely blank pages or document packets overlaid with bright warning stickers or highlighted signature lines.

16. The consequences of this systemic breach are catastrophic. While Defendants collect massive corporate flat fees ranging between $12,000 and $25,000 per case, their unreviewed, rubber-stamped filings routinely trigger immediate administrative rejections or denials, exposing unsuspecting clients to statutory bars on future immigration benefits, and placing them directly into active federal removal proceedings.

17. Defendants' conduct was not the product of isolated errors or poor judgment in individual cases. It was a deliberate, profit-driven enterprise that exploited immigrants' desperation for legal status, their limited English proficiency, and their inability to navigate complex immigration law.

18. Since its founding in 2020, Lisinski Law Firm has grown to 15 offices across 11 states, employs over 1,500 professionals including more than 60 attorneys, and claims to have assisted over 55,000 individuals.

19. The Firm welcomes "high volumes of new clients each month."

20. Plaintiff brings this action individually and on behalf of a Nationwide Master Class and State Subclasses to halt Defendants' ongoing fraudulent operations, compel complete equitable fee forfeiture and disgorgement for the uniform violation of the duty of loyalty, and recover actual, treble, exemplary, and statutory damages for the severe financial and

proprietary injuries inflicted by this predatory system.

**Jurisdiction and Venue**

21. This Court has subject matter jurisdiction over the federal claims asserted in this action pursuant to 28 U.S.C. Section 1331 (federal question jurisdiction) because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961, 1962(c), and 1962(d).

22. This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) the proposed class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed class is a citizen of a state different from any defendant.

23. This Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. Section 1367(a) because the common law and statutory consumer protection claims arise out of a common nucleus of operative facts, are part of the same case or controversy, and form an integral part of the overarching racketeering scheme to defraud.

24. Plaintiff Eva Acevedo Ortega is a citizen of Mexico. Defendant Lisinski Law is an Ohio limited liability company with its principal place of business in Ohio. Defendants Attorney Lisinski and Chinchilla are individuals domiciled in Ohio or Florida. Defendant Singh is an individual domiciled in Ohio. Minimal diversity exists under CAFA.

25. Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District, and under § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, where Defendants maintain their principal place of business and headquarters.

**Parties**

A.      **Plaintiff**

26.    Plaintiff Eva Acevedo Ortega is a natural person and citizen of Mexico who retained The Lisinski Law Firm for immigration representation.

27.    Ms. Acevedo Ortega made payments to Defendants via debit card and through electronic withdrawals by Lisinski Law from her bank account.

28.    Ms. Acevedo Ortega is a highly vulnerable consumer who was trapped in Defendants' high-volume sales pipeline, induced to pay a total of $10,500 in flat fees based on false legal assurances, and subjected to systemic narrative fabrication and deceptive signature protocols that resulted in the loss of her employment and severe federal immigration exposure.

B.      **Defendants**

29.    Defendant Lisinski Law is an Ohio limited liability company with its corporate headquarters and principal place of business located at 3982 Powell Road, Suite 330, Powell, Ohio 43065. The Lisinski Law Firm is a citizen of the State of Ohio.

30.    The firm acts as the operational entity through which the high-volume legal mill is executed, managing the billing apparatus, employment structures, and social media platforms used to distribute deceptive commercial content.

31.    Lisinski Law is an immigration law practice that entered into representation agreements with Plaintiff and putative class members, collected fees, and prepared and/or filed immigration petitions on their behalf.

32.    The firm maintains 15 offices in 11 states: Arizona (Phoenix), California (Riverside, Pasadena), Colorado (Denver), Florida (Tampa, Miami), Georgia (Atlanta), Illinois

(Chicago), North Carolina (Charlotte), Ohio (Columbus/Dublin), Tennessee (Nashville), Texas (Austin, Dallas, Houston), and Virginia/Washington D.C.

33. It states that it employs over 1,500 professionals, including more than 60 immigration attorneys, and states that it has helped over 55,000 individuals pursue pathways to legal status since its founding in 2020.

34. Defendant Angelyne E. Lisinski is an attorney licensed to practice law in the States of Ohio and Colorado.

35. Attorney Lisinski is a resident of the State of Ohio and acts as the sole owner, managing member, and principal figurehead of the Lisinski Law Firm.

36. She directs the firm's macro-marketing strategies, operates the @AbogadaAngel TikTok channel, and serves as the primary certifying authority whose signature stamp or electronic mark is automatically affixed to thousands of federal immigration filings that *she does not personally review*.

37. Prior to founding the firm, she had no stated immigration law experience.

38. She directed and implemented the policies, procedures, and systems through which the business operates, including the standardized process challenged in this action.

39. Defendant Juan Chinchilla is an individual residing in the State of Ohio or Florida.

40. Defendant Chinchilla is the husband of Attorney Lisinski and serves as a high-level executive officer, operator, and enforcer within the Lisinski Law Firm enterprise whose official job title is Business Manager.

41. Defendant Chinchilla directly manages post-fraud liability mitigation, corporate operations, and client relations, personally placing coercive and deceptive telephone communications to aggrieved clients to suppress complaints and obstruct civil remedies.

42. Defendant Rea Singh is an attorney licensed to practice law in the State of Ohio.

43. She is an individual residing in the State of Ohio.

44. During the Class Period, Defendant Singh served as an in-house associate and ethics/compliance trainer for Lisinski Law.

45. Defendant Singh is a primary operational architect of the firm's deceptive intake procedures and personally instructed staff to execute the fraudulent "Consultation Charade Protocol" described herein, making her personally liable for racketeering activity, conspiracy, and egregious breaches of fiduciary duties.

### Statutory, Regulatory, and Industry Framework

46. This action is situated against a backdrop of strict federal statutory requirements governing humanitarian immigration benefits under the Immigration and Nationality Act ("INA"). Congress enacted the Violence Against Women Act ("VAWA") self-petition framework and the Victims of Human Trafficking Visa framework ("T-Visa") to protect bona fide victims of severe domestic violence and human trafficking from deportation while providing a safe path to lawful immigration status.

47. Because these humanitarian benefits provide highly sought-after employment authorization documents ("EADs") and adjustment of status to that of lawful permanent resident inside the United States without requiring a lawful entry or consular exit, they are heavily guarded by federal adjudicators.

48. The Violence Against Women Act, originally enacted in 1994 and reauthorized multiple times, provides a pathway for certain abused immigrants to self-petition for immigration benefits without the knowledge or consent of their abuser. VAWA self-petitions are filed using USCIS Form I-360.

49. VAWA self-petitions are available to spouses, children, and parents of abusive U.S.

citizens or lawful permanent residents. Under INA § 204(a)(1)(A)(iii), a parent of a U.S. citizen son or daughter who is twenty-one years of age or older may self-petition if the parent demonstrates that he or she has been battered or subjected to extreme cruelty by the U.S. citizen son or daughter.

50. A parent-based VAWA petition requires the petitioner to demonstrate: (a) a qualifying relationship with a U.S. citizen child who is at least 21 years old; (b) that the petitioner resided with the abusive child; (c) that the petitioner was subjected to battery or extreme cruelty by the child; (d) good moral character; and (e) residence in the United States with their abuser.

51. In recent years, federal agencies have documented a catastrophic 2,239% surge in parent-child Form I-360 filings nationwide.

52. A T visa (T nonimmigrant status) is for victims of severe human trafficking who are physically present in the U.S. on account of the trafficking, cooperate with law enforcement (with important exceptions), and would face unusual and severe harm if removed.

53. Between FY 2021 and FY 2024, a FOIA-based analysis calculates an 801% increase in T-1 filings.

54. This unprecedented spike has triggered immense structural scrutiny and immediate security audits by United States Citizenship and Immigration Services ("USCIS") fraud detection units to identify assembly-line immigration firms and ghost-written declarations.

55. Upon approval of a VAWA self-petition, the petitioner receives deferred action status. The simple act of filing the I-360 allows the concurrent filing of an I-485 form for adjustment of status to that of a lawful permanent resident and, thus, the filing of I-765 form to obtain

employment authorization and the I-131 form to obtain advance parole which allows the individual to travel outside the country and return lawfully.

56. These tangible, immediate benefits make VAWA petitions particularly attractive to undocumented immigrants who have limited avenues for obtaining legal status.

57. The combination of a relatively low evidentiary threshold, immediate tangible benefits upon approval, and the desperation of undocumented immigrants for lawful status makes the VAWA self-petition process uniquely susceptible to exploitation by high-volume immigration practices that prioritize case volume over the accuracy and integrity of individual filings.

58. Upon approval of a T-visa, the principal applicant receives lawful temporary immigration status and is generally eligible for employment authorization. These concrete, near-term protections and work privileges make T-visa relief particularly attractive to undocumented trafficking survivors who otherwise have few viable paths to lawful status.

**Federal Consequences of False Filings**

59. VAWA self petitions and T visa applications are submitted under penalty of perjury. The applicant declarations that accompany them are sworn statements to a federal agency.

60. An applicant/petitioner who signs a declaration containing false statements is exposed to serious legal consequences, whether or not the applicant/petitioner was aware that the statements were false at the time of signing.

61. Submitting an unvetted, rubber-stamped, or fabricated application to a federal immigration agency carries terminal legal and administrative consequences.

62. Under federal criminal law, specifically 18 U.S.C. Section 1546(a), it is a felony offense to knowingly present or submit an immigration petition knowing it to contain any false

statement under penalty of perjury.

63.     Furthermore, a formal finding of fraud or wilful misrepresentation made in an attempt to obtain an immigration benefit triggers a ground of inadmissibility requiring a formal and discretionary waiver to overcome.

## Factual Allegations

### A. The Corporate Architecture and the Alexandra Lozano Licensing Scheme

64.     In or around 2021, Attorney Lisinski sought to rapidly expand her immigration law practice into a high-margin commercial enterprise. To achieve this, Attorney Lisinski entered into a formal licensing and mentorship agreement with Alexandra Lozano, a Washington-based attorney[1] who operates a controversial, high-volume immigration factory model under the corporate banner of Alexandra Lozano Immigration Law, PLLC ("ALIL")[2] and the "AMIGA" networking group.

65.     Attorney Lisinski paid a significant amount of capital to Alexandra Lozano to purchase the operational blueprints, pre-packaged training templates, and case-processing workflows of Lozano's assembly-line methodology.

66.     Under this licensed structure, the law firm was deliberately departmentalized into siloed corporate units such as scheduling, legal intake (sales), drafting, collections, and offshore writing teams, a system which was expressly designed to replace traditional, individualized legal advocacy with an automated, algorithmic data processing machine built for throughput.

---

[1] On May 26, 2026 Alexandra Lozano officially resigned her license to practice law in the State of Washington in lieu of facing disciplinary charges.

[2] Due to Lozano recently resigning and permanently giving up her license to practice law in lieu of disciplinary action, the business now operates under the name Luz Legal del Camino Legal, PLLC.

67. In September 2020, a prominent human trafficking legal expert provided foundational T visa training to Attorney Lisinski and her staff.

68. Immediately following the training, Attorney Lisinski was explicitly warned that her proposed high-volume business model which was eerily similar to controversial program being operated by Alexandra Lozano.

69. Defendant Lisinski categorically rejected the warning and asserted that she had "cleared everything with her ethics attorneys and was not doing anything wrong."

70. Having suppressed internal and external ethical pushback, Defendants fully operationalized their high-volume mill.

71. By 2023, the Lisinski Law Firm was processing an estimated 800 humanitarian visa applications per month. On average corporate fees exceeding $13,000 per transaction, the enterprise established a massive sales apparatus generating tens of millions of dollars in recurring pipeline revenue, entirely dependent on ***non-attorney processing*** and a systematic violation of the oath of loyalty.

**B. Deceptive Mass Marketing and Systemic Statutory Dilution**

72. _Industrialized Scale and Corpus Expansion_: Defendants' predatory business architecture was built for standardized, high-volume production rather than individualized legal advocacy.

73. A detailed forensic investigation into the Lisinski Law Firm's social media advertising pipeline demonstrates that its fraudulent activities were not incidental, but rather the result of a deliberate, institutionalized corporate strategy directed from the top to optimize institutional volume.

74. While the firm previously claimed its marketing was limited, a forensic analysis of the

firm's broader public broadcasting operation reveals a massive body consisting of 2,254 distinct immigration-related videos distributed across platforms like TikTok under the professional brand "Abogada Angel."

75. This multi-year marketing catalog amassed a staggering 82,205,434 cumulative views, establishing an aggressive commercial funnel designed to systematically exploit the legal vulnerabilities and enforcement anxieties of low-income, monolingual Spanish-speaking undocumented consumers across the United States.

76. Forensic Statistical Tactic Breakdown: The forensic audit of the 2,254-video dataset exposes a calculated formula used by the Enterprise to systematically dilute federal statutory standards, minimize evidentiary burdens, and manufacture false hope to induce contract signings. The following chart details the statistical prevalence, reach, and primary operational mechanisms of fraud executed uniformly across the firm's mass-marketing catalog:

| Deceptive Marketing Category | Prevalence in Corpus | Cumulative Reach (Views) | Primary Operational Mechanism of Fraud |
|---|---|---|---|
| Emotional Exploitation | 96.9% (2,185 videos) | 79,943,465 views | Bypasses rational consumer decision-making by utilizing high-production emotional imagery (e.g., tearful families hugging the attorney) to promise an absolute "future with papers". |
| False Guarantee and Outcome Claims | 79.8% (1,798 videos) | 68,591,220 views | Delivers absolute verbal promises of positive legal residency outcomes while burying legally required disclaimers in microscopic, unreadable on-screen text. |
| Miracle Promises and Severe Bar | 62.2% (1,403 videos) | 57,665,887 views | Falsely assures consumers that severe immigration violations, such as prior deportations, arrests, and the 10-year |

| Deceptive Marketing Category | Prevalence in Corpus | Cumulative Reach (Views) | Primary Operational Mechanism of Fraud |
|---|---|---|---|
| Deception | | | permanent bar, can be easily resolved inside the United States without leaving the country. |
| VAWA and Humanitarian Misrepresentati-on | 40.4% (911 videos) | 35,493,322 views | Intentionally dilutes federal law by reframing the strict statutory requirement of "battery or extreme cruelty" as everyday domestic arguments, "toxic relationships," or minor generational friction. |
| Manufactured Urgency and Rapid Timelines | 35.7% (804 videos) | 32,809,143 views | Pushes immediate retention by promising that clients will receive work authorization and protection "muy muy rápido" or "en tan solo meses," downplaying massive multi-year USCIS backlogs. |
| Fear-Based Marketing and Political Anxiety | 22.8% (514 videos) | 20,818,797 views | Exploits intense community fear surrounding executive administrations and policy changes to induce panic and drive immediate, high-volume contract intake. |
| Competitor Discrediting and False Exclusivity | 17.4% (392 videos) | 18,787,953 views | Maliciously discredits ethical attorneys who gave honest, negative assessments of weak cases, deceptively positioning the firm as possessing a "secret" legal loophole. |
| The "100% Protection" Notice Trap | 7.4% (166 videos) | 6,960,114 views | Markets standard USCIS administrative receipt notices as absolute shields against arrest, while hiding that filing unreviewed or meritless applications exposes individuals directly to active removal proceedings via automatic Notice to Appear (NTA) referrals. |
| Evidentiary Minimization ("Your Word is Enough") | 0.4% (9 videos) | 288,059 views | Falsely claims that "nothing more than your word" is required to win complex humanitarian cases, lower consumer friction, and induce high retainer fees for non-viable cases. |

79.    **Systemic Insulation Against Deportation and Notice to Appear Exposure:** To insulate

the Enterprise from the catastrophic legal fallout of its high-volume denial rates, Defendants systematically executed a coordinated digital damage-control campaign to downplay the extreme dangers of federal removal proceedings and Notice to Appear ("NTA") issuance.

80. For example, despite a client receiving an active NTA to appear in immigration court on November 19, 2025, Attorney Lisinski looked directly into a broadcast camera on December 12, 2025, in an official promotional video and explicitly stated to viewers in Spanish: *"The truth is this: IS THERE REALLY A RISK OF AN NTA WHEN FILING A VAWA CASE? Filing a case does not put you at risk of receiving an NTA... we have never seen a person receive an NTA for filing a case. At my firm we help more clients than almost any other firm in the country. If this were happening, we would know."*

81. This statement was a direct, calculated misrepresentation designed to suppress client panic, reframe systemic deportation risks as mere "rumors," and preserve the firm's lucrative intake pipeline.

82. Similarly, on November 20, 2025, literally one day after the same client was placed in removal proceedings, Defendants released a video falsely asserting that concurrent USCIS filings could unilaterally stop deportations and terminate active immigration court proceedings.

83. As of May 26, 2026, Attorney Lisinski continues to assert this position.

84. Defendants further minimized federal enforcement risks in a January 29, 2026 video, delivering a dangerous and false guarantee that appearing virtually at an immigration hearing completely shields an undocumented client from physical arrest by Immigration and Customs Enforcement (ICE).

79. ***Emotional Exploitation***: Defendants systematically designed and executed video marketing campaigns engineered to bypass a consumer's rational evaluation of legal risks by replacing objective case assessments with emotionally manipulative psychological anchors.

80. This rhetorical strategy is exemplified in video, which relies entirely on highly curated, high-production emotional imagery of pregnant women and tearful families embracing the attorney while holding flowers, accompanied by a voiceover promising an absolute "future with papers."

81. Within the context of Plaintiff's common law fraud and consumer protection claims, this tactic functions as an unconscionable business practice. The Enterprise intentionally utilized these handpicked, positive emotional outcomes to establish unearned trust and obscure the severe legal realities of their assembly-line intake pipeline, while deliberately burying the legally required disclaimer that "results vary" in microscopic, low-contrast, fast-scrolling text entirely unreadable to the target monolingual consumer base.

85. ***False Guarantee and Outcome Claims***: To maximize corporate throughput and induce immediate contract signings, Defendants uniformly broadcasted direct, verbal guarantees of successful legal outcomes that stood in stark, fraudulent contradiction to federal immigration realities.

86. On February 19, 2024, Defendants published a calculated "bait-and-switch" campaign via video, which visually features firm office staff holding manufactured signs reading "¡NOSOTROS DECIMOS QUE SÍ!" (We say YES!) while the script delivers an absolute verbal promise of a guaranteed residency outcome.

87. This deceptive tactic forms a core pillar of Plaintiff's fraudulent inducement and common

law fraud counts; the Enterprise deployed these explicit verbal promises of a guaranteed "yes" to override consumer caution and extract high retainer fees, while masking the deceptive nature of the transaction behind an illegible screen crawl stating that "results cannot be guaranteed" and "not everyone qualifies."

77. ***Miracle Promises and Severe Deception regarding certain immigration consequences***: Defendants continuously targeted highly vulnerable immigrants by airing absolute, unqualified guarantees that the firm possessed specialized methods capable of easily resolving severe federal statutory bars entirely within the United States. In one video from May 4, 2024, the Attorney Lisinski looked directly into the camera and explicitly delivered a direct guarantee to individuals subject to severe immigration violations, stating: "It also serves you if you have deportations, arrests, or more than one entry into the country without permission. And we fix all your papers without leaving."

78. This representation is deeply fraudulent and directly underpins Plaintiff's claims.

79. Promising to easily resolve cases involving multiple illegal entries and prior removal orders without requiring consular processing or departure directly misrepresents federal law, as these complex violations automatically trigger the severe 10-year permanent bar under INA § 212(a)(9)(C), the exact statutory reality that Defendants consciously ignored when steering Ms. Acevedo Ortega into a non-viable, high-fee humanitarian pipeline.

80. ***VAWA and Humanitarian Misrepresentation***: To artificially expand their consumer intake funnel, Defendants systematically diluted strict federal statutory thresholds by deceptively reframing narrow, victim-based humanitarian pathways as everyday domestic occurrences. This dangerous misrepresentation occurred in November 29, 2023, wherein the attorney explicitly states in Spanish that a VAWA self-petition allows undocumented

individuals to secure papers based on "situaciones de maltratos muy comunes en muchos hogares" (mistreatment situations very common in many homes).

81. Within the context of Plaintiff's claims, this tactic represents an intentional perversion of federal law.

82. By conditioning low-education consumers to believe that minor relationship arguments, standard domestic friction, or ordinary "toxic relationships" meet the stringent federal requirement of "battery or extreme cruelty," the Enterprise successfully induced non-qualifying individuals to pay exorbitant fees for meritless petitions, directly mirroring the exact intake mechanism used to defraud Ms. Acevedo Ortega over her objections regarding her minor son.

83. ***Manufactured Urgency and Rapid Timelines***: Defendants systematically manufactured imaginary legal shortcuts and accelerated procedural timelines to exploit client desperation and force immediate financial retentions. For example, on March 23, 2026, Defendants released a video that delivered the severe legal misrepresentation that an applicant could significantly accelerate and bypass standard federal statutory three-year waiting periods for permanent residency simply by having the firm submit a personal letter to the United States Department of Justice.

84. This tactic directly substantiates Plaintiff's claims for breach of the professional standard of care and legal malpractice. By presenting fabricated administrative workarounds as legitimate, high-velocity shortcuts, the Enterprise deliberately induced consumers into signing agreements under an artificial sense of urgency, while completely concealing massive multi-year federal backlogs and standard regulatory constraints.

85. ***Fear-Based Marketing and Political Anxiety***: Directly advancing the Enterprise's

racketeering activity and unconscionable business practices, Defendants routinely weaponized the intense political anxieties of the undocumented immigrant community to spark panic and drive high-volume contract intake. On May 20, 2025, Defendants published a video wherein the Attorney Lisinski explicitly exploited community fear surrounding shifting presidential administrations to pressure viewers into immediately calling her firm to file cases.

86. Within the context of Plaintiff's consumer fraud and fraudulent inducement claims, this video functions as a calculated trap by delivering a dangerously oversimplified explanation of executive power and falsely asserting that administrative shifts cannot impact filed applications. The firm actively concealed how executive policy adjustments, including heightened USCIS evidentiary scrutiny and changing local deportation priorities, can severely and catastrophically impact a client's case outcome.

87. ***Competitor Discrediting and False Exclusivity***: To isolate vulnerable consumers from ethical legal networks and capture individuals whose weak or non-existent cases were properly rejected by competent counsel, Defendants executed aggressive public campaigns designed to discredit the broader legal community.

88. In a November 22, 2023 video, the script explicitly manipulates the emotional despair of previously rejected applicants by stating in Spanish: "And many people have lost hope of fixing their immigration status because others have told them they don't qualify. But here at Lisinski Law Firm, we work with different types of cases." The Enterprise maliciously framed the honest case rejections provided by ethical attorneys as mere incompetence, deceptively positioning the Lisinski firm as possessing a "secret" or exclusive loophole to bypass federal statutory blocks, thereby inducing consumers to hand over their life savings

for legally non-viable cases.

89. ***The "100% Protection" Notice Trap***: Defendants routinely executed a severe and highly dangerous legal misrepresentation by marketing affirmative application filings as absolute shields against federal enforcement, while intentionally obscuring the catastrophic consequences of an agency denial. On May 13, 2025, Defendants distributed a video wherein Attorney Lisinski addresses federal Notice to Appear ("NTA") referral policies and delivers the absolute guarantee that filing an affirmative case with her firm constitutes a mechanism to secure "protection forever."

90. Within the context of Plaintiff's RICO predicate acts and consumer protection violations, this represents an intentional, predatory fraud. Under strict federal immigration guidelines, filing weak, uncorroborated, or manufactured affirmative applications directly exposes an undocumented individual to automatic NTA referral and active removal proceedings upon denial. A severe operational hazard that the Enterprise actively concealed to preserve its lucrative intake pipeline.

91. ***Evidence Minimization and the "Your Word Is Enough" Doctrine***: To systematically lower consumer resistance and induce contract signings from individuals lacking any corroborating legal evidence of trauma, Defendants heavily promoted the deceptive "Your Word is Enough" doctrine.

92. Federal immigration law does not require that every VAWA self-petitioner or T visa applicant produce police reports, medical records, or third-party affidavits in every case. USCIS policy expressly recognizes that victims of domestic violence and human trafficking may lack traditional documentary evidence due to the nature of abuse, coercion, trauma, fear, isolation, or control by the perpetrator. Accordingly, both VAWA and T visa

adjudications permit applicants to submit "any credible evidence" relevant to the claim, including sworn personal declarations.

93. However, Defendants systematically distorted and oversimplified this legal standard into the false commercial representation that "your word alone is enough" or that "proof does not matter." In reality, the applicant still bears the burden of establishing eligibility by a preponderance of the evidence, and USCIS evaluates the totality of the record, including credibility, specificity, consistency, plausibility, corroborating documentation when reasonably available, and the overall reliability of the submission.

94. Defendants weaponized the existence of the "any credible evidence" framework to convince vulnerable consumers that no meaningful corroboration or evidentiary support was necessary, thereby inducing legally weak or non-viable filings into the Enterprise's high-volume pipeline.

95. On February 13, 2024, Defendants published a video explicitly declaring to their target audience that under their humanitarian pathways, *"it doesn't matter if it was a long time ago, or if you don't have proof. It's still possible to qualify."*

96. This intentional simplification directly underpins Plaintiff's fraud counts. The Enterprise utilized this alleged baseline rule to falsely convince low-education consumers that complex discretionary benefits require no independent physical or documentary proof.

97. This intentional downplaying of statutory burdens served as the foundation for the Enterprise's offshore drafting apparatus. When a client's actual circumstances, such as those of Named Plaintiff Acevedo Ortega, failed to meet the rigorous legal criteria for relief, this assembly-line system routinely manufactured and engineered fraudulent accounts of mistreatment to fill the evidentiary void.

**C. The Total Absence of Attorney Review and Automated Signature Practices**

98. Once a consumer calls the number displayed on the social media funnel, they are routed through call centers where ***non-attorney*** "Legal Intake Specialists" are driven by a strict individual and team revenue quota as well as other incentives.

99. To incentivize aggressive sales tactics, these ***non-attorney*** intake specialists receive up to a 3% cash commission on any client deposits collected on the same day (requiring a minimum immediate down payment of $2,500), and up to 1.5% on follow-up collections.

100. To maintain the illusion of a legitimate law firm while executing these ***non-attorney*** sales transactions, Defendants institutionalized the consultation charade protocol.

101. Taught by the firm's in-house ethics and compliance trainer, Defendant Rea Singh, this protocol trained sales staff to weave phrases like "in your attorney's review" or "in the attorney's opinion" into their sales pitches.

102. Most critically, Defendant Singh institutionalized a deceptive staging practice that involved instructing sales representatives to present a high-fee visa strategy, abruptly excuse themselves from the room, and spend approximately ten to fifteen minutes walking the office hallways to simulate an authentic file evaluation, before returning to inform the client that the attorney had reviewed the case and personally vetted their eligibility.

103. In reality, sales personnel were strictly prohibited from speaking with or contacting firm attorneys under threat of immediate disciplinary write-ups or termination.

104. The ***non-attorney*** intake specialists were themselves making the determination that the client was eligible for either a VAWA or T visa process.

105. At no point did an actual U.S. licensed attorney engage in a review of the intake notes or questionnaire, let alone a meaningful review, during the intake process.

106. At no point did an actual U.S. licensed attorney engage with the potential client directly to provide any meaningful review, advice or information during the intake process.

107. This total absence of attorney oversight extends to the final document execution and filing phases.

108. Once a contract is signed, non-attorney staff compile the file, offshore teams draft the text of the declaration, and the final application packages are routed through an automated electronic workflow.

**D. Attorney Lisinski Signed All Applications Despite Never Meeting with Clients**

109. On July 26, 2023, Lisinski explicitly confirmed that she could not possibly review all applications which carried her signature, posting on Facebook: "Looking for contract attorney support for final review of VAWA and/or T-Visa cases before filing."

110. None of the other attorneys retained by Defendants ever met with the clients and certainly did not review the applications or the declarations with the clients personally.

111. To execute filings at scale without executing basic fiduciary duties, Attorney Lisinski systematically authorizes the application of her signature stamp or electronic mark onto the preparer's certification of the Form I-360 or Form I-914 and accompanying forms, certifying under penalty of perjury that the facts contained within the petition and supporting client declarations are complete, true, correct, and verified by the client to her specifically as well as that the client authorized its filing.

112. Defendant Lisinski executes these solemn federal certifications despite the fact that she has never met with, spoken to, or consulted the clients to review their applications or herself verify the truthfulness of the declarations prepared by her staff, constituting a wholesale abdication of the attorney's professional oath of loyalty and a structural flaw in the model

itself.

113.    For example, Attorney Lisinski signed the Preparer's Certification for Ms. Acevedo Ortega on June 11, 2025 wherein she certified under penalty of perjury that "***petitioner has reviewed*** the completed petition, including the Declaration and Certification…and ***informed me*** that all of this information in the form and in the supporting documents was complete, true and correct."

**Preparer's Certification**

By my signature, I certify, under penalty of perjury, that I prepared this petition at the request of the petitioner or authorized signatory. The petitioner has reviewed this completed petition, including the **Petitioner's Declaration and Certification,** or **Petitioner's or Authorized Signatory's Declaration and Certification,** and informed me that all of this information in the form and in the supporting documents is complete, true, and correct.

**Preparer's Signature**

8.    Preparer's Signature (sign in ink)

Date of Signature (mm/dd/yyyy)
06/11/2025

Form I-360  Edition 01/20/25                                                   Page 18 of 19

114.    However, Attorney Lisinski never met with or spoke with Ms. Acevedo Ortega regarding the form.

115.    Additonally, Attorney Lisinski never met with or spoke with Ms. Acevedo Ortega regarding the supporting documents including the Declaration drafted by Lisinski's staff.

116.    Ms. Acevedo Ortega never confirmed to Attorney Lisinski that the information contained in the form and supporting declaration was complete, true and correct.

117.    In fact, Ms. Acevedo Ortega signed the form on June 5, 2025 at her home in Colorado.

I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

**Petitioner's Signature**

6. Petitioner's Signature

➡️ Eva Acevedo Ortega

Date of Signature (mm/dd/yyyy)

06-05, 2025

118. Ms. Acevedo Ortega never spoke with Attorney Lisinski either in person or over the phone and only ever spoke with Defendants' **non-attorney** staff despite her many requests to speak directly with Attorney Lisinski.

119. It is a best practice for an attorney, especially the one signing the preparer's certification, to review the immigration application with the client personally.

120. It is a best practice for an attorney, especially the one signing the preparer's certification, to review the declaration to be submitted in support of an immigration application, with the client personally.

121. Attorney Lisinski did not follow this best practice with every client for whom she signed the preparer's certification.

122. In fact, Attorney Lisinski has not personally reviewed an application or supporting declaration with a client since she moved to Florida several years ago.

123. To keep clients from discovering that their official federal submissions contain unvetted or engineered assertions, Defendants deployed deceptive document execution workflows.

124. On January 30, 2024, Defendant Lisinski openly detailed her mechanics for collecting client signatures blindly, posting on Facebook: "We spend A TON of time putting colored flags on forms to mail to clients to sign and then removing them... I'm wondering if we can do something quicker like use a highlighter to note where the client needs to sign, and whether if we submit the original signatures to USCIS, because that's what we do to not

have to keep the original signatures in our file... I prefer to use Adobe highlighting because it's much easier and *we can just print the signature pages with highlighting* from Adobe and send them to the client."

125. Through these protocols, intake specialists and managers systematically forced clients and independent interpreters to sign entirely blank sheets of paper or isolated signature sheets overlaid with bright neon stickers, ordering them to blindly sign highlighted blocks in English without receiving line-by-line translations and/or attorney explanations.

**E. Post-Filing Fraud and USCIS Investigation Tampering**

126. Because the applications submitted by Lisinski Law are structurally unvetted, USCIS regularly issues comprehensive Requests for Evidence ("RFEs") or immediate rejections.

127. Rather than remediating their errors, Defendants utilize the RFE stage as a secondary revenue stream.

128. Representatives of the firm contact clients upon receipt of an RFE and attempt to charge an additional $1,500 fee to "help create and make" false evidence, pressuring family members to author letters detailing fabricated abuse that never occurred.

129. Upon information and belief, in or around late 2024, the structural fraud perpetrated by the Lisinski Law Firm triggered an active, multi-case federal investigation by USCIS adjudicators.

130. Upon realizing that federal authorities had flagged their operational pattern, Defendants engaged in an extraordinary campaign of investigation tampering and cover-up.

131. The firm flew numerous clients from across the country directly to its corporate headquarters in Powell, Ohio, heavily coached them to memorize the fabricated narratives contained in their unreviewed declarations, and deployed firm employees to attend official

USCIS interviews with the clients, surreptitiously acting as Spanish-language interpreters with an undisclosed connection to Attorney Lisinski to insulate her from professional accountability and obscure the firm's systemic fraud from federal oversight.

**E. Direct Post-Fraud Concealment and Broad Pattern Evidence**

132. As the structural deficiencies of the Defendants' immigration mill began resulting in widespread federal pushback, the Enterprise actively deployed Defendant Juan Chinchilla to engage in direct post-fraud concealment, financial narrative control, and proactive witness intimidation across state lines.

133. Specifically, on or about May 1, 2026, an aggrieved client placed a comprehensive complaint call to the firm, challenging the Enterprise's pattern of narrative fabrication, missing filing receipts, and the extraction of unearned fees.

134. Defendant Chinchilla personally intervened on behalf of the corporate mill.

135. Rather than exercising basic fiduciary care, Defendant Chinchilla utilized the communication to actively mislead the caller regarding application statuses, provide pretextual administrative excuses for billing and operational breakdowns, and deploy coercive rhetoric to suppress complaints.

136. Defendant Chinchilla's conduct on the May 1, 2026 communication serves as direct, illustrative pattern evidence of the Enterprise's operational architecture.

137. It demonstrates a coordinated, top-down execution of liability control designed to corruptly persuade victims to abandon their legal remedies, insulate Attorney Lisinski from scrutiny, and actively discourage consumers from cooperating with or participating in impending class action litigation against the firm, constituting active witness tampering and obstruction under federal racketeering definitions.

138. Such interference and attempted intimidation continues today.

**The Experience of Named Plaintiff Eva Acevedo Ortega**

139. In or around August 2024, Plaintiff Eva Acevedo Ortega, a monolingual Spanish-speaking undocumented individual, was facing an immediate threat to her livelihood. She had been employed at a stable job where her employer explicitly warned her that upcoming corporate document audits required her to present a renewed valid Employment Authorization Document ("EAD").

140. Specifically, Ms. Acevedo Ortega's reliance chain commenced on or about August 20, 2024, when she viewed a specific, date-stamped '@AbogadaAngel' TikTok video broadcast across interstate wires, which delivered false outcome guarantees and minimized the statutory requirements for humanitarian relief.

141. Driven by this digital inducement, she initiated a telephonic intake call over interstate wires on August 28, 2024, which routed her to the enterprise's high-volume pipeline and resulted in her formal intake consultation at the Denver office on August 29, 2024.

142. Shortly thereafter, Ms. Acevedo Ortega underwent a formal intake consultation at the Denver office of Lisinski Law.

143. In strict compliance with the firm's standardized workflows and the charade protocol she never spoke to an attorney.

144. Instead, a male sales representative conducted a one-hour screening. Ms. Acevedo Ortega explicitly informed the representative that she needed an immediate renewal of her asylum-based work permit to save her job.

145. The sales representative completely ignored her request. Upon learning that Ms. Acevedo Ortega had a U.S. citizen son who would soon turn 21, the representative deployed the pre-

rehearsed scripts.

146. He assured her that a routine work permit renewal was an inferior option and that the firm's principal attorney had a specialized, confidential "humanitarian strategy" that would guarantee her an EAD within six to eight months and a green card within three years.

147. The sales representative abruptly exited the consultation room, claiming he was required to submit her file for immediate attorney review down the hall.

148. After executing the hallway-walking sequence as taught by Defendant Singh to simulate an authentic legal evaluation, he returned and stated that Attorney Lisinski had personally vetted her file and authorized a VAWA strategy.

149. Ms. Acevedo Ortega was shocked and repeatedly informed the representative that she did not qualify for a VAWA petition because she had suffered absolutely no abuse or extreme cruelty from her son, and that her son was not yet 21 years of age.

150. The representative overrode her objections, stating that under the firm's specialized method, "typical family problems" were entirely sufficient, and that the firm would simply hold the application until her son reached the statutory age of 21.

151. Driven by desperation to preserve her employment and relying entirely on the firm's false legal assurances, Ms. Acevedo Ortega executed a Contract for Legal Services with the Lisinski Law Firm for a total of $12,000 on August 29, 2024.

152. Ms. Acevedo Ortega made the following payments via electronic processing to Lisinski Law:

   a.

| 9/3/2024 | $2,500.00 |
|---|---|
| 9/11/2024 | $2,500.00 |

| Date | Amount |
|---|---|
| 10/11/2024 | $389.00 |
| 11/12/2024 | $389.00 |
| 12/12/2024 | $389.00 |
| 1/13/2025 | $389.00 |
| 2/11/2025 | $389.00 |
| 3/11/2025 | $389.00 |
| 4/11/2025 | $389.00 |
| 5/13/2025 | $389.00 |
| 6/11/2025 | $389.00 |
| 7/11/2025 | $389.00 |
| 8/11/2025 | $389.00 |
| 9/11/2025 | $389.00 |
| 10/14/2025 | $389.00 |
| 11/12/2025 | $389.00 |
| 12/10/2025 | $389.00 |
| 1/10/2026 | $389.00 |
| 2/10/2026 | $389.00 |
| 3/10/2026 | $387.00 |

153. Following the execution of the contract, the Enterprise's offshore declarations team engaged in systemic narrative engineering.

154. To facilitate the submission of this unvetted package, the Enterprise utilized interstate commercial carriers to execute its deceptive signature protocols.

155. On or about May 28, 2025, Defendants transmitted a document packet containing entirely blank or isolated signature pages overlaid with bright neon 'ALTO' stickers via the United States Postal Service (USPS) to Ms. Acevedo Ortega's residence in Colorado.

156. Following her blind execution of the highlighted lines under false legal assurances, she returned the unvetted signature block to Defendants' Ohio headquarters on June 2, 2025,

using a private commercial carrier (FedEx).

157.   Ms. Acevedo Ortega only discovered the staggering depth of this deception after the application package had already been compiled and mailed to immigration authorities.

158.   Representatives of the firm transmitted a translated copy of the already filed declaration directly to her email.

159.   Upon reading the text in her native language, she was horrified to discover that the Enterprise had systematically twisted and re-engineered minor, historic incidents from when her son was a young minor to construct a fraudulent, fabricated narrative of adult domestic abuse, including:

   a.   **The Childhood Smashed Door Fabrication:** The declaration claimed her son smashed a glass door during a violent argument, resulting in a hospital trip for stitches. In reality, Ms. Acevedo Ortega clarified that this was an accidental incident that occurred while he was a *young child at play*.

   b.   **The Childhood Homework Mischaracterization:** The declaration asserted that her son maliciously jeopardized her employment by refusing to complete his schoolwork, forcing her to leave work early. In reality, this referred to standard childhood behavioral friction when her son was an *elementary school minor*.

   c.   **The "Forced Illegal Acts" Lie:** The declaration claimed her son coerced and forced her to perform illegal acts, such as driving him to medical therapy without a valid license. In reality, Ms. Acevedo Ortega noted that he never forced her to do anything, as he was simply a *young minor* requiring parental transportation to childhood therapy.

   d.   **The Falsified Verbal Abuse Claim:** The declaration alleged that her son verbally

abused her and explicitly blamed her immigration status for denying him vacations. In reality, Ms. Acevedo Ortega clarified that her son merely exhibited normal childhood sadness because their financial and legal status prevented them from going on family vacations.

160. In addition to twisting childhood events into a narrative of domestic abuse, the Lisinski Law Firm completely falsified Ms. Acevedo Ortega's immigration background, submitting official statements to USCIS under penalty of perjury that were entirely false and incorrect as it relates to her history of entries and returns to the United States.

161. To facilitate the submission of this unvetted, perjurious package, representatives forced her to sign completely blank pages and mailed her document packets overlaid with bright "ALTO" (STOP) stickers, ordering her to blindly execute highlighted signature blocks in English without ever providing an explanation or detailed review of the text by an attorney.

162. In June 2025, the firm submitted the Form I-360 VAWA package.

163. Due to the Enterprise not including Plaintiff's address on the application, she was scheduled for a mandatory USCIS biometrics appointment at an agency office in Ohio, causing her extreme logistical distress, severe anxiety, and an intense fear of federal border enforcement.

164. The practical effect of utilizing the Enterprise's address on applications was that clients would not receive notices, receipts or other correspondence from USCIS.

165. On February 12, 2026, Ms. Acevedo Ortega received formal Rejection Notices from USCIS for her Form I-485 (Adjustment of Status), Form I-765 (Work Authorization), and Form I-131 (Travel Document) applications.

166. As a direct, proximate, and foreseeable result of Defendants' racketeering pattern and

mechanized business architecture, Ms. Acevedo Ortega suffered severe, concrete economic and proprietary injuries.

167. The causal chain flows uninterrupted from the deceptive marketing inducements to the non-attorney intake protocol, the extraction of $10,500 in flat fees, and the submission of a fabricated narrative package to federal authorities.

168. This unreviewed filing directly triggered formal USCIS Rejection Notices dated February 12, 2026, which immediately stripped Ms. Acevedo Ortega of her employment authorization, resulting in the direct loss of her stable job and total forfeiture of her life savings.

**Confirmed Anecdotal Evidence of widespread harm among Lisinski clients**

169. **Stuck in Mexico on VAWA Advanced Parole**: Father traveled to Mexico with his child on VAWA advance parole (AP). When Father attempted to re-enter the U.S., Customs & Border Patrol (CBP) questioned him as to the origins of his AP. Father stated that is through a petition that his child filed for him. The CBP officer stated that it is a VAWA case, and asked if his child abused him. Father did not know what VAWA was and stated that he was traveling with his child who petitioned for him. He was denied re-entry based on fraudulently obtained AP.

170. **I-601A denial due to VAWA filing**: Daughter was the beneficiary of an approved I-130 by her oldest U.S. citizen son, and she has a single entry without inspection to the U.S. Her Legal Permanent Resident mother was the qualifying relative for her I-601A provisional waiver application. Daughter filed I-601A waiver with local attorney. While the I-601A was pending, the Daughter went to Lisinski Law for a second opinion. She told Lisinski Law she had an I-601A waiver pending. They told her that she should file for VAWA, as

it would have no impact on her I-601A process, and she could file for her undocumented husband with this too. She agreed and they filed a VAWA petition (based on abuse by her oldest U.S. citizen son) with an I-485 Adjustment of Status application. USCIS subsequently denied Daughter's I-601A waiver because people with pending I-485 Adjustment of Status applications are ineligible for I-601A approval. Daughter was unable to refile. Daughter was unable to refile her I-601A waiver because her qualifying relative mother passed away, so there is no option to refile. Lisinki Law filed a VAWA for Daughter based on supposed abuse by her oldest son, who had filed the I-130 petition for her. She said the worst incident of "abuse" she experienced from him was when he was applying to college and struggled with the FAFSA. He said "I hate having undocumented parents" because he could not get financial aid. However, Daughter's second oldest child had actually physically abused her. She has had to call the police because of this, and she could be well suited for a U visa as a result as a crime victim. She told Lisinski Law about him, but was told that the VAWA needed to be based on the child who filed the I-130 petition.

171. **T Applicant has dementia, but signs affidavit**: Applicant files for a T visa, with his spouse as a derivative. The T visa claim itself is valid, but none of the critical details were included (specifically, nothing about forced labor) in the application. The T visa was denied due to digital signatures being used. Lisinski Law sent signature pages for the applicant and wife to sign so that they could refile the same application. Applicant's daughter stepped in and told Lisinki Law that her father, the principal applicant, had dementia and could not sign anything. Lisinski Law insisted that he sign anyway. The applicant's daughter refuses. The applicant ends up signing without the daughter's knowledge. The same T visa, still missing critical elements, was refiled with new signatures. However, the original denied T

visa caused the applicant's wife to receive an Notice To Appear. The Applicant is already subject to a final order of removal. Applicant's wife is now in removal proceedings. She is not eligible for any relief in immigration court to remain in the United States.

172. **<u>Alias from FOIA included in T application without applicant knowledge</u>**: Lisinski Law files T visa application for applicant who told them he entered the U.S. once without inspection in 2003 near Brownsville. Applicant stated that he once *attempted* to enter without inspection but was caught immediately, at which time he gave his real name to immigration authorities. He successfully entered the U.S. a couple of days later. The T visa application filed by Lisinski stated that the applicant was known by another name, had an Alien number assigned to him, and was subject to a final order of removal in front of an Immigration Judge. The applicant only learned this information after another attorney obtained a copy of the file and reviewed it with him. Applicant had never heard of the alias nor has he ever used it. The alias, A number, and removal information matches an FBI FOIA found in the Lisinski Law file. None of this vital information was ever reviewed with applicant before it was filed with USCIS. Due to his removal order, he was apprehended and removed, and he is now back in Mexico.

**Class Action Allegations**

173. Plaintiff brings this action individually and on behalf of a Nationwide Master Class and State Subclasses pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

**A. Class Definitions**

174. Plaintiff seeks certification of the following Master Class and Subclasses:

    a. **THE NATIONWIDE MASTER CLASS:** All individuals residing in the United States

who, during the period from four years prior to the filing of this complaint, through the date of class certification (the "Class Period"), retained The Lisinski Law Firm, LLC and paid fees for the processing of any humanitarian immigration benefit (including VAWA, T-Visa, or U-Visa applications).

b. **THE OHIO SUBCLASS:** All members of the Nationwide Master Class who retained Defendants within the State of Ohio, or whose deceptive contracts and transactions flowed from operational decisions executed at Defendants' corporate headquarters in Powell, Ohio.

c. **THE COLORADO SUBCLASS:** All members of the Nationwide Master Class who resided in the State of Colorado at the time of retention, or who entered into contracts for legal services managed through Defendants' brick-and-mortar office infrastructure located in Denver, Colorado.

175. Excluded from the Class and Subclasses are the Defendants; any entities in which Defendants have a controlling interest; the Defendants' legal representatives, heirs, successors, and assigns; and any judge to whom this case is assigned, including their immediate judicial staff.

### B. Rule 23(a) Prerequisites

176. Numerosity (Fed. R. Civ. P. 23(a)(1)): The members of the Nationwide Master Class and Subclasses are so numerous that joinder of all members is impracticable. Forensic data analysis reveals that Defendants' immigration mill enterprise processed up to 800 application packets per month, establishing that the proposed classes encompass thousands of geographically dispersed consumers across the United States.

177. Commonality (Fed. R. Civ. P. 23(a)(2)): There are numerous, uniform questions of law and fact that are common to the claims of Plaintiff and the classes, which predominate over

any questions affecting only individual members. These common questions include:

  a. whether Defendants operated an association-in-fact Civil RICO enterprise designed to extract fees through a pattern of mail and wire fraud;

  b. whether the licensing architecture was engineered to systematically replace individual attorney review with non-attorney sales processing;

  c. whether the consultation charade was institutionalized by Defendant Singh to mislead consumers regarding attorney vetting;

  d. whether Defendants' social media marketing campaigns systematically misrepresented federal statutory eligibility standards;

  e. whether Defendants engaged in deceptive trade practices by shunting unearned flat client fees directly into general operating accounts rather than secure IOLTA client trust accounts; and

  f. whether Defendant Juan Chinchilla engaged in a coordinated pattern of witness tampering to suppress client claims.

178. Adjudication of liability and remedies will rely exclusively on common, standardized corporate proof that is completely uniform across the entire class. This common proof includes: the unified social media marketing corpus, the standardized training scripts taught by Defendant Singh, the electronic logs of automated signature stamps, the structured commission and quota records for intake staff, and the centralized offshore drafting protocols. Because the primary remedy is system-wide fee forfeiture for a uniform breach of loyalty, no individualized inquiry into individual petition merits or immigration outcomes is required.

179. Typicality (Fed. R. Civ. P. 23(a)(3)): Plaintiff's claims are entirely typical of the claims of

the members of the Master Class and Subclasses. Plaintiff and all class members were subjected to the exact same industrialized assembly line, targeted by the same deceptive social media funnel, routed through the same non-attorney sales quotas, subjected to the same narrative fabrication protocols, and suffered identical economic injuries consisting of the loss of corporate legal fees and severe immigration exposure.

180. Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)): Plaintiff will fairly and adequately protect and represent the interests of the Class and Subclasses. Plaintiff has no interests that are antagonistic to or in conflict with those of the class. Furthermore, Plaintiff has retained counsel who are highly experienced in complex civil rights impact litigation, consumer protection class actions, and removal defense.

## C. Rule 23(b) Pleading Criteria

181. Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)): A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The central legal and fact questions surrounding Defendants' corporate architecture, specifically the absolute failure to provide licensed attorney review and the systematic execution of signatures under penalty of perjury without client contact, predominate over any individual variations.

182. Because the primary damages theory relies upon equitable fee forfeiture for a uniform breach of the duty of loyalty, the Court is removed from examining individual case outcomes, creating an unassailable foundation for class certification. Joinder is impossible, and separate actions would create a severe risk of inconsistent and contradictory adjudications.

183. Injunctive and Declaratory Relief (Fed. R. Civ. P. 23(b)(2)): Defendants have acted and

refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole. Plaintiff seeks a permanent injunction halting Defendants' deceptive non-attorney sales operations, stopping the automated signature workflows, and compelling the immediate release of complete client files to all class members.

**D. Statute of Limitations and Fraudulent Concealment Equitable Tolling**

184. Any applicable statute of limitations has been conclusively tolled by operation of the doctrine of fraudulent concealment.

185. Defendants actively, affirmatively, and continuously concealed the true nature of their non-attorney assembly line, utilized the charade protocol to fake attorney file evaluations, and deployed Defendant Juan Chinchilla to actively mislead and intimidate aggrieved consumers.

186. Plaintiff and class members could not have discovered the underlying fraud through the exercise of reasonable diligence because Defendants maintained absolute control over the physical files, restricted client access to receipts, and threatened critics with defamation lawsuits.

<u>**Legal Counts and Causes of Action**</u>

**COUNT I**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. Section 1962(c)**
**Against Defendant Lisinski)**

187. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

188. At all times relevant to this litigation, Defendants functioned as an "Enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c). Specifically, Defendants operated an association-in-fact enterprise composed of:

   a. The Lisinski Law Firm, LLC;

   b. Defendant Angelyne E. Lisinski;

   c. Defendant Juan Chinchilla;

   d. Defendant Rea Singh;

   e. All employees of Lisinski Law in the United States;

   f. All employees of Lisinski Law or related entities located outside of the U.S.;

   g. All entities related to and/or owned/operated by Attorney Lisinski or Lisinski Law whether in the United States or abroad;

   h. All contract attorneys retained by Lisinski Law;

   i. Upstream co-conspirators, including Alexandra Lozano and her related entities.

189. The association-in-fact enterprise is separate, distinct, and independent from the legal identity of Defendant Lisinski as a RICO person.

190. The Enterprise spans a multi-layered hierarchy including the corporate entity, individual executives, independent contract attorneys, offshore drafting personnel, and separate non-party licensing entities (such as Alexandra Lozano's 'AMIGA' infrastructure), each operating through separate lines of commercial authority, distinct decision-making workflows, and segregated corporate functions.

191. The Enterprise functions with a common shared purpose: to maximize corporate revenue by extracting tens of thousands of dollars in legal fees from vulnerable, undocumented

immigrants through an assembly-line processing framework structurally devoid of licensed attorney oversight.

192. Attorney Lisinski was associated with, employed by, and actively participated in the conduct of the Enterprise's affairs, directly or indirectly, through a "pattern of racketeering activity" as defined under 18 U.S.C. Section 1961(5).

193. The threat of long-term continuity is open-ended, active, and persistent. As of the current date (May 28, 2026), Defendants continue to broadcast identical deceptive marketing claims across digital platforms, maintain their rigid non-attorney sales quotas, and actively funnel hundreds of vulnerable consumers monthly through the exact same unreviewed signature and automated filing pipelines, creating a persistent and ongoing danger of severe immigration exposure and financial fraud.

194. This racketeering activity encompassed the coordinated, multi-year commission of dozens of distinct federal predicate acts, including:

   a. wire fraud (18 U.S.C. Section 1343) by:

      i. transmitting deceptive marketing broadcasts, false legal assurances, and scripted sales representations across wires via TikTok and cellular communications to induce fee payments; and

      ii. The receipt and processing of payments from clients through wire transfers and/or electronic payment methods.

   b. mail fraud (18 U.S.C. Section 1341) by utilizing interstate postal carriers to transmit immigration packets that were not reviewed by a U.S. licensed attorney; and

   c. witness tampering (18 U.S.C. Section 1512) by utilizing interstate cellular

transmissions, specifically executed by Defendant Juan Chinchilla, to intimidate aggrieved clients, provide pretextual excuses for operational fraud, and corruptly influence victims to withhold testimony and decline civil participation.

195. The predicate acts committed by the Defendants are directly related, possess identical commercial targets of victims, deploy identical operational methodologies, and carry a distinct threat of long-term continuity because the Enterprise continues to broadcast deceptive content and process thousands of immigrant consumers through its assembly-line infrastructure daily.

196. As a direct and proximate result of the Defendants' racketeering activity and management of the Enterprise, Plaintiff and the members of the Nationwide Master Class suffered concrete financial and proprietary injuries, including the forfeiture of thousands of dollars in corporate flat fees and the complete loss of lawful employment.

## COUNT II
### CONSPIRACY TO VIOLATE CIVIL RICO (18 U.S.C. Section 1962(d) — Against All Defendants)

197. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

198. Defendants, through their executive leadership, corporate ownership, and employment actions, knowingly, willfully, and intentionally conspired, combined, and agreed together with each other, and with upstream co-conspirators Alexandra Lozano, to violate 18 U.S.C. Section 1962(c).

199. Each Defendant explicitly agreed to the overall structure of the racketeering conspiracy and knew that the success of the multi-million-dollar immigration mill depended entirely

upon the coordinated commission of federal wire fraud, mail fraud, and post-fraud witness tampering.

200. In furtherance of the conspiracy, the individual Defendants executed clear operational tasks:

    a. Attorney Lisinski managed the macro-marketing redefinitions on TikTok and executed unreviewed federal filings;

    b. Defendant Rea Singh institutionalized, and executed the deceptive consultation charade protocol to weaponize non-attorney staff; and

    c. Defendant Juan Chinchilla executed direct witness intimidation to insulate the conspiracy from civil exposure.

201. As a direct and proximate result of the Defendants' racketeering conspiracy, Plaintiff and the members of the Nationwide Master Class suffered severe financial and proprietary injuries within the meaning of 18 U.S.C. Section 1964(c).

## COUNT III
### BREACH OF FIDUCIARY DUTY / BREACH OF THE DUTY OF LOYALTY

**(Ohio Common Law — Against Defendants Lisinski and Lisinski Law — On Behalf of the Nationwide Master Class and Ohio Subclass)**

202. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

203. An attorney-client relationship existed between each class member and Defendants throughout the Class Period.

204. Under Ohio law, an attorney owes every client an absolute, non-delegable fiduciary duty of loyalty.

205. This sacred obligation requires that an attorney act with scrupulous honesty, maintain

undivided loyalty, and protect the client's vital legal interests.

206. Crucially, the duty of loyalty flatly prohibits an attorney from designing or advancing an automated, entrepreneurial system that is structurally incapable of delivering individualized legal representation while charging substantial legal fees for it.

207. Defendants committed a clear, serious, and uniform breach of the duty of loyalty to every member of the Class.

208. The gravamen of this count does not rest on an individualized inquiry into the specific technical merits or outcomes of any single filing, nor does it allege professional malpractice.

209. Instead, the breach is the execution of the flawed system itself.

210. Defendants engineered an operational architecture that systematically separates the client from licensed counsel, completely abdicating the professional standard of care by ensuring that at no point during the process does an actual licensed attorney engage in an evaluation of the file, let alone a meaningful one on one review with the client.

211. Defendants further advanced this systemic breach of loyalty by utilizing an automated protocol where Attorney Lisinski applies her electronic or stamped signature to official federal preparer certifications and supporting declarations under penalty of perjury.

212. Defendant Lisinski executes these certifications despite the fact that she has never met with, spoken to, or consulted the clients to review their applications or verify the truthfulness of the underlying text, using her licensed credentials as a mechanism to advance a pipeline that completely furthers the uniform betrayal of client loyalty.

213. Under long-standing Ohio common law an attorney or law firm that engages in a clear and serious violation of the duty of loyalty is subject to the equitable remedy of complete fee

forfeiture and disgorgement.

214. Because this breach was built into the firm's foundational workflows, was executed in bad faith, and placed thousands of clients at risk of severe administrative fraud penalties, Plaintiff and the Class are entitled to an equitable order compelling the complete forfeiture, disgorgement, and restitution of all fees collected by Defendants during the Class Period, without offset for the purported value of any services rendered, and without requiring individual proof of harm.

## COUNT IV
## VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (OCSPA)
### (R.C. Section 1345.01 et seq. - Against Defendants Lisinski and Lisinski Law)

215. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

216. Plaintiff and the members of the Ohio Subclass are "consumers" as defined under R.C. Section 1345.01(D).

217. Defendants are "suppliers" as defined under R.C. Section 1345.01(C), and the transactions executed between the parties constitute "consumer transactions" within the meaning of R.C. Section 1345.01(A).

218. Defendants engaged in numerous unfair, deceptive, and unconscionable acts and practices in connection with these consumer transactions, in direct violation of R.C. Sections 1345.02 and 1345.03, by: representing that their industrialized assembly line constituted a legitimate, individualized law practice under attorney supervision; actively misrepresenting federal statutory eligibility criteria across public social media platforms to induce ineligible consumers to execute contracts; utilizing the deceptive consultation protocol to actively mislead consumers into believing an attorney had vetted their file; and

taking unconscionable advantage of the absolute dependency, lack of legal education, and language barriers of monolingual immigrants to extract thousands of dollars for non-viable, unreviewed legal filings.

219. For the avoidance of doubt, the unfair, deceptive, and unconscionable acts challenged under this Count do not concern core legal advice, privileged strategic decisions, or standard attorney malpractice.

220. Instead, this claim is strictly limited to the purely commercial, entrepreneurial, and administrative aspects of Defendants' operation, specifically a mass-market social media broadcasts, high-pressure sales intake procedures, non-attorney commission-driven conversion quotas, unconscionable flat-fee routing protocols, and mechanized signature logistics.

221. Pursuant to R.C. Section 1345.09, Plaintiff and the Ohio Subclass are entitled to recover rescission of their unconscionable contracts, actual economic damages, statutory damages, reasonable attorney's fees, and class-wide treble damages.

## COUNT V
### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (CCPA) (C.R.S. Section 6-1-101 et seq. — Against Defendants Lisinski and Lisinski Law — On Behalf of the Colorado Subclass)

222. Plaintiff realleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

223. Colorado law applies conclusively to the claims of the Colorado Subclass because the consumer transactions were executed within Colorado, the physical storefront infrastructure was maintained in Denver, and the economic injuries were sustained by Colorado residents.

224. Furthermore, the deceptive contracts executed by Colorado consumers utilized unconscionable fee routing provisions engineered to bypass traditional attorney trust protocols (IOLTA), shunting unearned client funds directly from Colorado into general operating accounts managed by the enterprise.

225. The Colorado Consumer Protection Act, C.R.S. Section 6-1-101 et seq. (the "CCPA"), applies downstream to the conduct of Defendants within this litigation because Defendants established a continuous, systematic, and highly lucrative business nexus within the State of Colorado throughout the Class Period.

226. Defendants deliberately targeted Colorado's low-income, monolingual Spanish-speaking consumer population through broadcast-style, nationally accessible social media campaigns via the @AbogadaAngel TikTok account, pulling vulnerable consumers into their industrialized sales pipeline. To service this pipeline, Defendants maintained physical office infrastructures in Denver, Colorado, which generated over $1,000,000 in monthly sales through the execution of the firm's rigid corporate sales quotas.

227. Under Ohio's choice-of-law principles, which follow the Restatement (Second) of Conflict of Laws, Colorado law applies to the deceptive trade practices and fiduciary injuries inflicted upon the Colorado Subclass because the economic injuries were sustained in Colorado, the storefronts were operated in Colorado, and the deceptive client contracts executed by Colorado consumers contained unconscionable fee routing provisions explicitly designed to bypass traditional lawyer trust account (IOLTA) protocols to shunt unearned client funds directly into the firm's general operating accounts.

228. Defendants knowingly engaged in deceptive trade practices in the course of their business within the meaning of C.R.S. Section 6-1-105 by committing, among other acts:

a. knowingly misrepresenting the characteristics, uses, and benefits of the legal services they offered for sale, in violation of C.R.S. Section 6-1-105(1)(g);

b. advertising services with the intent not to sell them as advertised, in violation of C.R.S. Section 6-1-105(1)(e), by holding out a licensed firm providing attorney oversight while operating an intake pipeline staffed entirely by quota-compensated non-attorneys; and

c. knowingly engaging in unconscionable, deliberately misleading, and fraudulent acts within the meaning of C.R.S. Section 6-1-105(1)(rrr), by authorizing specialists to fake attorney evaluations and automatically affixing digital signatures to penalty-of-perjury certifications without attorney file review or client contact.

229. Defendants' deceptive practices possess a significant and devastating public impact.

a. the fraudulent scheme targeted a massive, distinct, and uniquely vulnerable pool of undocumented consumers across the State of Colorado;

b. the deceptive content was distributed via broad, broadcast-style public media channels; and

c. the immense disparity in legal sophistication was deliberately engineered by the firm's architecture to prevent consumers from recognizing the underlying fraud. Pursuant to C.R.S. Section 6-1-113, the Colorado Subclass is entitled to recover class-wide actual economic damages, statutory treble damages upon proof of bad faith, mandatory costs of suit, and reasonable attorney's fees.

## Prayer for Relief

WHEREFORE, Plaintiff Eva Acevedo Ortega, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment in her favor and against the Defendants, granting the following comprehensive relief:

A. An Order certifying the Nationwide Master Class, the Ohio Subclass, and the Colorado Subclass under Federal Rule of Civil Procedure 23, designating Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel;

B. An Order entered under Civil RICO (18 U.S.C. Section 1964(c)) awarding Plaintiff and the Nationwide Master Class **threefold (treble) their actual economic damages**, along with all costs of suit and reasonable attorney's fees;

C. An Order compelling complete **fee forfeiture, disgorgement, and restitution** of every dollar collected by Defendants from class members during the Class Period under equitable breach of fiduciary duty and breach of the duty of loyalty principles, without offset or reduction;

D. An Order awarding class-wide **treble damages and statutory penalties** under the Ohio Consumer Sales Practices Act and the Colorado Consumer Protection Act for Defendants' bad-faith and intentional deceptive trade practices;

E. A Permanent Injunction immediately halting Defendants' non-attorney sales pipelines, prohibiting the automated electronic execution of unreviewed signature blocks, and compelling Defendants to immediately produce complete client files to all class members;

F. Pre-judgment and post-judgment interest at the maximum statutory rate allowed by law; and

G. All other and further relief, at law or in equity, to which Plaintiff and the classes may be justly entitled.

## Jury Demand

Plaintiff Eva Acevedo Ortega, individually and on behalf of all others similarly situated, hereby demands a trial by jury on all counts and issues so triable as a matter of right.

Dated: May 28, 2026

Respectfully submitted,


*/s/ Rachel Zupan*

Rachel Zupan (OH 99694)


**AVANTI LAW GROUP, PLLC**

By: */s/ Robert Anthony Alvarez, Sr.*
Robert Anthony Alvarez, Sr. (Pro Hac Vice Anticipated)
Attorneys for Plaintiff and the Putative Classes