**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

EVA ACEVEDO ORTEGA, VERONICA ALEJANDRA LOPEZ GUZMAN, and ERIK DAVID MARTINEZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**THE LISINSKI LAW FIRM, LLC,**
an Ohio Limited Liability Company;

**ANGELYNE E. LISINSKI,**
an individual;

**JUAN CHINCHILLA,**
an individual; and

**REA SINGH,**
an individual,

Defendants,

Case No. 2:26-cv-644

Chief District Judge Sarah D. Morrison

Magistrate Judge Kimberly A. Jolson

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Eva Acevedo Ortega, Veronica Alejandra Lopez Guzman, and Erik David Martinez ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint and Jury Demand against Defendants The Lisinski Law Firm, LLC (the "Lisinski Law Firm"), Angelyne E. Lisinski ("Attorney Lisinski"), Juan Chinchilla ("Defendant Chinchilla"), and Rea Singh ("Defendant Singh") (collectively, "Defendants") challenging a uniform, standardized system through which Defendants operated a high-volume immigration practice that: (a) concealed from clients that their immigration petitions were VAWA self-petitions requiring allegations of domestic abuse or

extreme cruelty, or “T Visa” applications that required allegations of forced labor or involuntary servitude, among other things; (b) delegated all substantive legal work to non-attorney staff; (c) used non-attorney drafting personnel and template-driven processes to generate abuse narratives without meaningful client participation; (d) prepared and/or filed petitions with United States Citizenship and Immigration Services ("USCIS") containing allegations that clients say they never made, and without attorney contact, review or client understanding; (e) charged thousands of dollars for this process while failing to disclose material additional costs; and (f) unreasonably withheld client files and case information when clients discovered or questioned what had been prepared or filed in their names. Plaintiffs are requesting equitable fee forfeiture, disgorgement, restitution, and damages arising from Defendants' systematic scheme to defraud vulnerable immigrants through a high-volume immigration filing operation disguised as a legitimate law practice.

The Lisinski Law Firm operates as a high-volume VAWA (Violence Against Women Act) and T Visa filing mill, processing hundreds of immigration petitions every month through a standardized, assembly-line system designed to maximize revenue while providing no meaningful legal representation. The firm built its business model on fabrication, the systematic exploitation of vulnerable, predominantly Spanish-speaking immigrants, and the deliberate recharacterization of federal statutory eligibility standards to manufacture USCIS filings for clients who did not qualify.

Attorney Lisinski did not develop this operation independently. In or around 2021/2, Attorney Lisinski paid an undisclosed sum to acquire and/or license the proprietary operational model and assembly-line "Arreglar Sin Salir" method (A.S.S.) from Washington based attorney Alexandra Lozano, whose competing firm claimed to have pioneered the departmentalized, high-

volume VAWA and T Visa filing structure and marketed it to Spanish-speaking immigrants. In acquiring that model, Attorney Lisinski imported not only Lozano's organizational template and forms but its most dangerous attribute: ***the capacity to certify and submit mass immigration filings under an attorney's signature, at industrial scale, without any meaningful attorney-client contact or individualized eligibility review***.

Attorney Lisinski's A.S.S. operation placed profit above client loyalty, ethical representation, and the fundamental safety of vulnerable immigrants. The firm's business model was an assembly-line system designed to maximize revenue, converting prospective clients into fee-paying contracts through commissioned non-attorney staff who were given individual monthly revenue targets and monthly conversion quotas. This structure prioritized volume over quality, processing upwards of 800 to 1200 cases per month at a per case fee of at least $12,000. This revenue focus necessitated the systemic fabrication of client declarations and immigration histories by non-attorney staff, the implementation of a sham attorney consultation protocol, and the automatic affixing of Attorney Lisinski's signature to petitions she had not reviewed for clients she never met. The goal was not legal service, but profit, leading to the deliberate concealment of the permanent inadmissibility risk that these fraudulent filings created for every class member.

This action does not seek to review, overturn, or interfere with any administrative eligibility determinations made by United States Citizenship and Immigration Services (USCIS) or the Executive Office for Immigration Review (EOIR). Adjudication of the claims requires no interpretation of federal immigration law or individual petition merits; rather, it focuses exclusively on Defendants' systemic business conduct in marketing, contract execution, non-attorney operations, unvetted document logistics, and commercial fund handling.

## Introduction

1. This is a federal class action brought to dismantle and seek comprehensive civil remedies

for a multi-million-dollar industrialized immigration factory disguised as a legitimate law practice.

2. Operating out of its corporate headquarters in Powell, Ohio, the Lisinski Law Firm has systematically extracted tens of millions of dollars from thousands of the most vulnerable, low-income, monolingual Spanish-speaking undocumented consumers across the United States.

3. The core of this action does not address any individual legal malpractice or the standalone technical merits of individual petitions; rather, the Class seeks redress for an intentional, systemic business architecture designed by Defendants to maximize corporate revenue through the complete abdication of an attorney's sacred oath of loyalty.

4. The gravamen of this case centers on the execution of a fundamentally flawed system engineered by Defendants, a conveyor-belt model that is structurally incapable of delivering individualized legal representation, deliberately substituting a high-velocity sales pipeline for legitimate, licensed attorney engagement.

5. The fatal flaw embedded across the entirety of Defendants' operational framework is that ***at no point*** during the intake, screening, contract execution, narrative generation, or document checkout phases ***does an actual licensed attorney engage*** in an evaluation of the potential client's case, let alone provide a meaningful legal review.

6. Substantive legal determinations are systematically delegated to non-attorney sales staff driven by aggressive monthly quotas and commission payments, while the firm's licensed attorneys are structurally walled off from client interaction under threat of corporate disciplinary action.

7. To maintain this high-volume operation, Attorney Lisinski systematically executes, via an

automated digital workflow or signature stamp, official certifications under penalty of perjury on thousands of complex immigration applications, primarily petitions under the Violence Against Women Act ("VAWA") (Form I-360) and Victims of Human Trafficking Visas ("T-Visas") (Form I-914), and accompanying personal declarations.

8. Attorney Lisinski submits these solemn certifications to the United States government despite the fact that ***she has never met with, spoken to, or consulted the clients*** whose applications and declarations she purports to verify, establishing a total failure to adhere to the oath of loyalty to the client overall and the advancement of a system that furthered that breach.

9. Under Ohio law, the attorney-client relationship is one of the highest trust and confidence known to law.

10. When an attorney commits a clear and serious violation of that duty, the client is entitled to forfeiture of fees paid, without the need to prove that the breach caused actual damages.

11. This action does not depend on the merits or outcomes of any individual immigration petition.

12. Plaintiffs' claims are based on the uniform process through which Defendants marketed, sold, documented, and filed immigration petitions, a process that allegedly failed to provide informed consent, meaningful attorney involvement, accurate disclosures, or meaningful client review before submitting sworn immigration filings.

13. The enterprise relies upon a standardized methodology of "narrative engineering" to generate non-viable or structurally fabricated humanitarian claims at scale.

14. In public broadcasts to over a million social media viewers, Attorney Lisinski explicitly advertised that "*typical or normal*" family arguments or standard workplace friction

automatically qualify individuals for federal protection.

15. Once a consumer enters the pipeline, offshore writing teams systematically distort, mischaracterize, and exaggerate ordinary childhood milestones and life events into fabricated grounds for domestic abuse and human trafficking claims, keeping clients in the dark by forcing them to execute signature blocks on completely blank pages or document packets overlaid with bright warning stickers or highlighted signature lines.

16. The consequences of this systemic breach are catastrophic. While Defendants collect massive corporate flat fees ranging between $12,000 and $25,000 per case, their unreviewed, rubber-stamped filings routinely trigger immediate administrative rejections or denials, exposing unsuspecting clients to statutory bars on future immigration benefits, and placing them directly into active federal removal proceedings.

17. Defendants' conduct was not the product of isolated errors or poor judgment in individual cases. It was a deliberate, profit-driven enterprise that exploited immigrants' desperation for legal status, their limited English proficiency, and their inability to navigate complex immigration law.

18. Since its founding in 2020, the Lisinski Law Firm has grown to 15 offices across 11 states, employs over 1,500 staff including more than 60 attorneys, and claims to have assisted over 55,000 clients.

19. The Firm welcomes "high volumes of new clients each month.”

20. Plaintiffs bring this action individually and on behalf of a Nationwide Master Class and State Subclasses to halt Defendants' ongoing fraudulent operations, compel complete equitable fee forfeiture and disgorgement for the uniform violation of the duty of loyalty, and recover actual, treble, exemplary, and statutory damages for the severe financial and

proprietary injuries inflicted by this predatory system.

**Jurisdiction and Venue**

21. This Court has subject matter jurisdiction over the federal claims asserted in this action pursuant to 28 U.S.C. Section 1331 (federal question jurisdiction) because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sections 1961, 1962(c), and 1962(d).

22. This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) the proposed class contains more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed class is a citizen of a state different from any defendant.

23. This Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. Section 1367(a) because the common law and statutory consumer protection claims arise out of a common nucleus of operative facts, are part of the same case or controversy, and form an integral part of the overarching racketeering scheme to defraud.

24. Plaintiff Eva Acevedo Ortega is a citizen of Mexico. Defendant Lisinski Law Firm is an Ohio limited liability company with its principal place of business in Ohio. Defendants Attorney Lisinski and Chinchilla are individuals domiciled in Ohio or Florida. Defendant Singh is an individual domiciled in Ohio. Minimal diversity exists under CAFA.

25. Venue is proper in the Southern District of Ohio under 28 U.S.C. § 1391(b)(1) because Defendants reside in this District, and under § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, where Defendants maintain their principal place of business and headquarters.

## Parties

**Plaintiffs**

26. Plaintiff Eva Acevedo Ortega is a natural person and citizen of Mexico who retained the Lisinski Law Firm for immigration representation.

27. Ms. Acevedo Ortega made payments to Defendants via debit card and through electronic withdrawals by the Lisinski Law Firm from her bank account.

28. Ms. Acevedo Ortega is a highly vulnerable consumer who was trapped in Defendants' high-volume sales pipeline, induced to pay a total of $10,500 in flat fees based on false legal assurances, and subjected to systemic narrative fabrication and deceptive signature protocols that resulted in the loss of her employment and severe federal immigration exposure.

29. Plaintiff Veronica Alejandra Lopez Guzman is a natural person and citizen of Mexico who resides in Columbus, Ohio, and who retained the Lisinski Law Firm at its Powell, Ohio headquarters in or around May 11, 2023 for immigration representation.

30. Plaintiff Erik David Martinez is a natural person and citizen of Honduras who resides in Columbus, Ohio. He is married to Ms. Lopez Guzman and was named as the derivative applicant on the petition Defendants prepared and filed. Defendants added his case to hers for an additional $2,000 in flat fees, and the first payment Defendants collected was made by check drawn on his business account.

31. Ms. Lopez Guzman and Mr. Martinez are monolingual Spanish-speaking consumers who do not read English. They relied entirely on Defendants' non-attorney staff for every representation made to them about their legal options, their eligibility for federal humanitarian relief, and the contents of the sworn federal filings submitted in their names.

32. Ms. Lopez Guzman and Mr. Martinez are highly vulnerable consumers who were trapped in Defendants' high-volume sales pipeline. Defendants' non-attorney sales staff induced Ms. Lopez Guzman to abandon a U visa claim supported by a contemporaneous police report in favor of a T visa premised on a decade-old unpaid-wage dispute, induced her to marry in order to increase the fee, and induced both Plaintiffs to pay a $12,500 flat fee and approximately $16,000 in total on the basis of false legal assurances.

33. Defendants repeatedly assured Ms. Lopez Guzman that including Mr. Martinez in her petition would cause his outstanding order of removal to be cancelled and that he was thereby protected. Defendants' own filings disclose that they knew of that order.

34. As a direct result of the petition Defendants prepared, certified, and filed in their names, the petition was denied, Ms. Lopez Guzman was served with a Notice to Appear and placed in removal proceedings, and Mr. Martinez was located and detained by federal immigration authorities on the order of removal Defendants had told them was cancelled.

**Defendants**

35. Defendant Lisinski Law Firm is an Ohio limited liability company with its corporate headquarters and principal place of business located at 3982 Powell Road, Suite 330, Powell, Ohio 43065. The Lisinski Law Firm is a citizen of the State of Ohio.

36. The firm acts as the operational entity through which the high-volume legal mill is executed, managing the billing apparatus, employment structures, and social media platforms used to distribute deceptive commercial content.

37. The Lisinski Law Firm is an immigration law practice that entered into representation agreements with Plaintiff and putative class members, collected fees, and prepared and/or filed immigration petitions on their behalf.

38. The firm maintains 15 offices in 11 states: Arizona (Phoenix), California (Riverside, Pasadena), Colorado (Denver), Florida (Tampa, Miami), Georgia (Atlanta), Illinois (Chicago), North Carolina (Charlotte), Ohio (Columbus/Dublin), Tennessee (Nashville), Texas (Austin, Dallas, Houston), and Virginia/Washington D.C.

39. It states that it employs over 1,500 staff, including more than 60 immigration attorneys, and states that it has helped over 55,000 clients pursue pathways to legal status since its founding in 2020.

40. Attorney Lisinski is an attorney licensed to practice law in the States of Ohio and Colorado.

41. Attorney Lisinski is a resident of the State of Ohio and acts as the sole owner, managing member, and principal figurehead of the Lisinski Law Firm.

42. She directs the firm's macro-marketing strategies, operates the @AbogadaAngel TikTok channel, and serves as the primary certifying authority whose signature stamp or electronic mark is automatically affixed to thousands of federal immigration filings that ***she does not personally review***.

43. Prior to founding the firm, she had no stated immigration law experience.

44. She directed and implemented the policies, procedures, and systems through which the business operates, including the standardized process challenged in this action.

45. Defendant Juan Chinchilla is an individual residing in the State of Ohio or Florida.

46. Defendant Chinchilla is the husband of Attorney Lisinski and serves as a high-level executive officer, operator, and enforcer within the Lisinski Law Firm enterprise whose official job title is Business Manager.

47. Defendant Chinchilla directly manages post-fraud liability mitigation, corporate operations, and client relations, personally placing coercive and deceptive telephone

communications to aggrieved clients to suppress complaints and obstruct civil remedies.

48. Defendant Rea Singh is an attorney licensed to practice law in the State of Ohio.

49. She is an individual residing in the State of Ohio.

50. During the Class Period, Defendant Singh served as an in-house associate and ethics/compliance trainer for the Lisinski Law Firm and is a primary operational architect of the firm's deceptive intake procedures.

51. In her role as the firm's in-house ethics and compliance trainer, Defendant Singh personally designed and taught the sales staff scripted phrases, such as "in your attorney's review" and "in the attorney's opinion," for use during sales pitches, trading on the credibility of her own law license to lend a false appearance of attorney involvement to a process she knew involved no actual attorney review.

52. Defendant Singh personally created and institutionalized the deceptive "Consultation Charade Protocol," under which she instructed non-attorney sales representatives to present a high-fee visa strategy to a prospective client, abruptly excuse themselves from the room, and spend approximately ten to fifteen minutes walking the office hallways to simulate an authentic attorney file evaluation, before returning to falsely inform the client that an attorney had personally reviewed and vetted their case.

53. Defendant Singh knew that the training materials and protocols she developed and enforced were designed to deceive clients into believing that a licensed attorney had evaluated their case when no such review had occurred, and she used her position of trust as the firm's ethics and compliance officer to conceal this practice from clients, regulators, and the public.

**Statutory, Regulatory, and Industry Framework**

54. This action is situated against a backdrop of strict federal statutory requirements governing

humanitarian immigration benefits under the Immigration and Nationality Act ("INA"). Congress enacted the Violence Against Women Act ("VAWA") self-petition framework and the Victims of Human Trafficking Visa framework ("T-Visa") to protect bona fide victims of severe domestic violence and human trafficking from deportation while providing a safe path to lawful immigration status.

55. Because these humanitarian benefits provide highly sought-after employment authorization documents ("EADs") and adjustment of status to that of lawful permanent resident inside the United States without requiring a lawful entry or consular exit, they are heavily guarded by federal adjudicators.

56. The Violence Against Women Act, originally enacted in 1994 and reauthorized multiple times, provides a pathway for certain abused immigrants to self-petition for immigration benefits without the knowledge or consent of their abuser. VAWA self-petitions are filed using USCIS Form I-360.

57. VAWA self-petitions are available to spouses, children, and parents of abusive U.S. citizens or lawful permanent residents. Under INA § 204(a)(1)(A)(iii), a parent of a U.S. citizen son or daughter who is twenty-one years of age or older may self-petition if the parent demonstrates that he or she has been battered or subjected to extreme cruelty by the U.S. citizen son or daughter.

58. A parent-based VAWA petition requires the petitioner to demonstrate: (a) a qualifying relationship with a U.S. citizen child who is at least 21 years old; (b) that the petitioner resided with the abusive child; (c) that the petitioner was subjected to battery or extreme cruelty by the child; (d) good moral character; and (e) residence in the United States with their abuser.

59. In recent years, federal agencies have documented a catastrophic 2,239% surge in parent-child Form I-360 filings nationwide.

60. A T visa (T nonimmigrant status) is for victims of severe human trafficking who are physically present in the U.S. on account of the trafficking, cooperate with law enforcement (with important exceptions), and would face unusual and severe harm if removed.

61. Between FY 2021 and FY 2024, a FOIA-based analysis calculates an 801% increase in T-1 filings.

62. This unprecedented spike has triggered immense structural scrutiny and immediate security audits by United States Citizenship and Immigration Services ("USCIS") fraud detection units to identify assembly-line immigration firms and ghost-written declarations.

63. Upon approval of a VAWA self-petition, the petitioner receives deferred action status. The simple act of filing the I-360 allows the concurrent filing of an I-485 form for adjustment of status to that of a lawful permanent resident and, thus, the filing of I-765 form to obtain employment authorization and the I-131 form to obtain advance parole which allows the individual to travel outside the country and return lawfully.

64. These tangible, immediate benefits make VAWA petitions particularly attractive to undocumented immigrants who have limited avenues for obtaining legal status.

65. The combination of a relatively low evidentiary threshold, immediate tangible benefits upon approval, and the desperation of undocumented immigrants for lawful status makes the VAWA self-petition process uniquely susceptible to exploitation by high-volume immigration practices that prioritize case volume over the accuracy and integrity of individual filings.

66. Although Defendants marketed VAWA and T visa relief as though it were the only or best avenue to legal status, many class members had access to more secure, established paths to relief that Defendants' non-attorney staff steered them away from in favor of the assembly-line product the Enterprise was equipped to sell at scale.

67. Upon approval of a T-visa, the principal applicant receives lawful temporary immigration status and is generally eligible for employment authorization. These concrete, near-term protections and work privileges make T-visa relief particularly attractive to undocumented trafficking survivors who otherwise have few viable paths to lawful status.

**Federal Consequences of False Filings**

68. VAWA self-petitions and T visa applications are submitted under penalty of perjury. The applicant declarations that accompany them are sworn statements to a federal agency.

69. An applicant/petitioner who signs a declaration containing false statements is exposed to serious legal consequences, whether or not the applicant/petitioner was aware that the statements were false at the time of signing.

70. Submitting an unvetted, rubber-stamped, or fabricated application to a federal immigration agency carries terminal legal and administrative consequences.

71. Under federal criminal law, specifically 18 U.S.C. Section 1546(a), it is a felony offense to knowingly present or submit an immigration petition knowing it to contain any false statement under penalty of perjury.

72. Furthermore, a formal finding of fraud or willful misrepresentation made in an attempt to obtain an immigration benefit triggers a ground of inadmissibility requiring a formal and discretionary waiver to overcome.

## Factual Allegations

### A. The Corporate Architecture and the Alexandra Lozano Licensing Scheme

73. In or around 2021, Attorney Lisinski sought to rapidly expand her immigration law practice into a high-margin commercial enterprise. To achieve this, Attorney Lisinski entered into a formal licensing and mentorship agreement with Alexandra Lozano, a Washington-based attorney[1] who operates a controversial, high-volume immigration factory model under the corporate banner of Alexandra Lozano Immigration Law, PLLC ("ALIL")[2] and the "AMIGA" networking group.

74. Attorney Lisinski paid a significant amount of capital to Alexandra Lozano to purchase the operational blueprints, pre-packaged training templates, and case-processing workflows of Lozano's assembly-line methodology.

75. Under this licensed structure, the law firm was deliberately departmentalized into siloed corporate units such as scheduling, legal intake (sales), drafting, collections, and offshore writing teams, a system which was expressly designed to replace traditional, individualized legal advocacy with an automated, algorithmic data processing machine built for throughput.

76. In September 2020, a prominent human trafficking legal expert provided foundational T visa training to Attorney Lisinski and her staff.

77. Immediately following the training, Attorney Lisinski was explicitly warned that her proposed high-volume business model which was eerily similar to controversial program being operated by Alexandra Lozano.

---

[1] On May 26, 2026 Alexandra Lozano officially resigned her license to practice law in the State of Washington in lieu of facing disciplinary charges.

[2] Due to Lozano recently resigning and permanently giving up her license to practice law in lieu of disciplinary action, the business now operates under the name Luz Legal del Camino Legal, PLLC.

78. Attorney Lisinski categorically rejected the warning and asserted that she had "cleared everything with her ethics attorneys and was not doing anything wrong."

79. Having suppressed internal and external ethical pushback, Defendants fully operationalized their high-volume mill.

80. By 2023, the Lisinski Law Firm was processing an estimated 800 humanitarian visa applications per month. On average corporate fees exceeding $13,000 per transaction, the enterprise established a massive sales apparatus generating tens of millions of dollars in recurring pipeline revenue, entirely dependent on ***non-attorney processing*** and a systematic violation of the oath of loyalty.

**B. Deceptive Mass Marketing and Systemic Statutory Dilution**

**Industrialized Scale**

81. Defendants' business architecture was built for standardized, high-volume production rather than individualized legal advocacy.

82. Central to that architecture is a multi-year, Spanish-language social-media advertising operation, conducted principally on TikTok and YouTube under the brand "Abogada Ángeles," through which Defendants published a large and continuously expanding catalog of short-form videos directed at low-income, monolingual Spanish-speaking, undocumented consumers throughout the United States.

83. The videos are not incidental or improvised. They are scripted, branded, and recurring, and they deploy the same limited set of persuasive devices again and again across the catalog. Upon information and belief, the catalog was produced and disseminated pursuant to a

deliberate, institutionalized marketing strategy, directed by Attorney Lisinski, whose object was to maximize contract intake rather than to inform prospective clients.

84. Plaintiffs have preserved and transcribed Defendants' videos. The transcripts reveal nine recurring categories of deceptive representation, which Defendants frequently combine within a single clip of approximately sixty seconds. Each category is illustrated below by Defendants' own published words.

**Emotional Exploitation**

85. Defendants cultivate a maternal, communal persona—through staff testimonials emphasizing shared immigrant identity and through holiday tributes—to lower the commercial defenses of traumatized and undocumented viewers and to present a high-volume enterprise as a compassionate community advocate. For example:

(a) *"...me encanta mi trabajo porque me permite conocer día a día de cerca las historias de personas como yo, que venimos a este país a buscar un sueño... en busca de poder cambiar nuestras vidas..."* [Translation: "I love my job because it lets me get to know, up close and day by day, the stories of people like me, who come to this country looking for a dream... seeking to change our lives."] (video published Feb. 2, 2024).

(b) *"...ser mamá es lo más hermoso pero también lo más difícil. Yo sé lo que es hacer todo por el bienestar de nuestros hijos... Muchas de ustedes han enfrentando desafíos enormes..."* [Translation: "Being a mom is the most beautiful thing but also the hardest. I know what it is to do everything for the well-being of our children... Many of you have faced enormous challenges..."] (video published May 11, 2025).

**False Guarantees and Outcome Claims**

86. Defendants represent that they routinely obtain immigration status for persons whom other attorneys have correctly advised do not qualify, adopting a "we say yes when others say no" standard that implies a near-certain favorable outcome. For example:

(a) *"Somos [Lisinski Law Firm], por supuesto [ar]reglamos a personas que ya han escuchado de millones de abogadas antes que no calificaron para nada."* [Translation: "We are Lisinski Law Firm; of course we fix [the status of] people who have already heard from millions of lawyers before that they did not qualify for anything."] (video published Feb. 19, 2024).

(b) *"Y cuando otros dicen que es imposible de arreglar, que no hay solución, muchas veces nosotros decimos que sí... No nos importa cuántas veces ha escuchado que no."* [Translation: "And when others say it is impossible to fix, that there is no solution, many times we say yes... We don't care how many times you have heard no."] (video published May 19, 2024).

**Miracle Promises and Concealment of Severe Statutory Bars**

87. Defendants represent that prior removal orders, multiple unlawful entries (which can trigger the permanent bar under INA § 212(a)(9)(C)), and criminal history can be readily resolved from inside the United States, without disclosing that such matters present some of the most serious obstacles in immigration law, that any available relief is discretionary, and that approval is far from routine. For example:

(a) *"...podemos arreglar sus papeles dentro de los Estados Unidos sin salir del país y a pesar de cosas negativas en su récord, como entradas ilegales, cargos de deportaciones y más."* [Translation: "We can fix your papers inside the United States without leaving the country, and despite negative things on your record, such as illegal entries, deportation charges, and more."] (video published Dec. 31, 2024).

(b) *"También le sirve si tiene deportaciones agarradas más de una entrada al país sin permiso u otras cosas negativas en su historia migratoria y también cosas en su récord criminal."* [Translation: "It also works for you if you have deportations, more than one entry into the country without permission, or other negative things in your immigration history, and also things on your criminal record."] (video published 2024).

**Dilution of VAWA and Humanitarian Visa Standards**

88. Defendants reframe the strict statutory prerequisites for humanitarian relief so that ordinary, non-qualifying circumstances appear to qualify. A VAWA self-petition requires

battery or extreme cruelty by a qualifying relative; Defendants describe qualifying circumstances as things that "may seem very typical in families." A T visa requires that the applicant be a victim of a severe form of trafficking in persons; Defendants describe an unpaid-overtime dispute with an employer as a potential basis for a T visa. For example:

(a) *"El caso se basa en los problemas o dificultades de esta relación, pero no se preocupe, hablamos de cosas que pueden parecer muy típicas en las familias."* [Translation: "The case is based on the problems or difficulties in this relationship, but don't worry, we are talking about things that may seem very typical in families."] (video published Sept. 19, 2025).

(b) *"...si su patrón lo maltrata, especialmente con cuestiones que tienen que ver con el pago... por ejemplo, si su patrón no le pago por todo su trabajo, no le pago por horas extras... podría calificar [para la Visa T]."* [Translation: "If your boss mistreats you, especially in matters having to do with pay... for example, if your boss did not pay you for all your work, did not pay you for overtime... you could qualify [for the T visa]."] (video published Feb. 2, 2024).

**Manufactured Urgency and Rapid Timelines**

89. Defendants promise work authorization and other benefits on aggressive timelines measured in months, and permanent residence in approximately three years, without disclosing USCIS processing backlogs, the frequency of Requests for Evidence, or the likelihood of multi-year delay, in order to induce viewers to sign fee agreements before investigating those realities. For example:

(a) *"Y con VAWA ganamos su permiso de trabajo y, seguro social, muy rápido, en como 8, 9, 10 meses... Y también llega la residencia con VAWA en como 3 años, 3 años y medio."* [Translation: "And with VAWA we win your work permit and social security very fast, in about 8, 9, 10 months... And residency also comes with VAWA in about 3 years, 3 and a half years."] (video published Feb. 29, 2024).

(b) *"...con VAWA arreglamos su permiso de trabajo, su seguro social y su permiso de viaje, muy, muy rápido."* [Translation: "With VAWA we get your work permit, your social security, and your travel permit, very, very fast."] (video published Feb.

3, 2025).

**Fear-Based Marketing**

90. Defendants invoke the current presidential administration, immigration enforcement, detention, and jail to induce panic, and they represent that immediately filing a case with Defendants is the means of avoiding those outcomes. For example:

> (a) *"...pero además de eso, podría darle protección contra detención en este tiempo tan difícil, bajo el presidente Trump."* [Translation: "But besides that, it could give you protection against detention in this very difficult time, under President Trump."] (video published Sept. 19, 2025).

> (b) *"Tener un caso pendiente con USCIS es una forma de protección... Por favor, no espere más. Eso podría ser la diferencia entre estar en la cárcel, detenido, deportado y estar con su familia en casa."* [Translation: "Having a pending case with USCIS is a form of protection... Please, don't wait any longer. That could be the difference between being in jail, detained, deported, and being at home with your family."] (video published June 25, 2025).

**Competitor Discrediting and False Exclusivity.**

91. Defendants disparage the broader immigration bar as inexperienced or incapable with respect to humanitarian relief, thereby discrediting the honest, negative case assessments that other attorneys have given prospective clients and positioning Defendants as uniquely able to obtain relief. For example:

> (a) *"La mayoría de los abogados de inmigración se enfocan en los casos generales... y simplemente no tienen tanta experiencia con estos casos humanitarios. Entonces, no saben cómo arreglar estas cosas negativas... por eso es tan común escuchar que no hay opción..."* [Translation: "Most immigration lawyers focus on general cases... and they simply don't have as much experience with these humanitarian cases. So they don't know how to fix these negative things... that's why it's so common to hear that there is no option..."] (video published June 10, 2024).

(b) *"Es importante que usted hable con un abogado que tenga experiencia con VAWA, no abogados que no lo hacen, de verdad."* [Translation: "It is important that you speak with a lawyer who has experience with VAWA, not lawyers who don't do it, really."] (video published June 22, 2024).

**The "100% Protection" Receipt-Notice Representation.**

92. Defendants represent that a pending USCIS application, or discretionary deferred action, provides "100%" or "almost 100%" protection from deportation. A pending application does not divest immigration authorities of enforcement discretion, does not vacate an existing removal order, and—where the application is meritless—can itself result in the issuance of a Notice to Appear and the initiation of removal proceedings. For example:

(a) *"...los padres pueden sacar un permiso de trabajo, seguro social y algo que se llama 'acción diferida' que es protección 100% de la deportación."* [Translation: "The parents can get a work permit, social security, and something called 'deferred action,' which is 100% protection from deportation."] (video published May 27, 2024).

(b) *"Tener un caso pendiente con USCIS es una forma de protección... Y eso, amigos, es casi 100% protección."* [Translation: "Having a pending case with USCIS is a form of protection... And that, friends, is almost 100% protection."] (video published June 25, 2025).

**Evidentiary Minimization ("Your Word Is Enough").**

93. Defendants assure viewers that no corroborating evidence—no police reports, medical records, photographs, or third-party statements—is needed to prevail in VAWA or T-visa matters, and that "su palabra es suficiente" ("your word is enough"). Although USCIS applies an "any credible evidence" standard to such petitions, Defendants' representation conceals that uncorroborated petitions are substantially more likely to draw Requests for Evidence and denials, and it is designed to eliminate friction at intake and induce retainer payments for non-viable cases. For example:

(a) *"Pero la verdad es que en la mayoría de los casos su palabra es suficiente... En mi firma hemos ganado muchísimos casos de [VAWA y Visa T] con nada más que la declaración del aplicante..."* [Translation: "But the truth is that in most cases your word is enough... In my firm we have won a great many [VAWA and T-visa] cases with nothing more than the applicant's declaration..."] (video published 2025).

(b) *"Tampoco importa mis amigos si usted no tiene pruebas del maltrato, porque en muchos casos su palabra es suficiente evidencia."* [Translation: "It also doesn't matter, my friends, if you don't have proof of the abuse, because in many cases your word is enough evidence."] (video published 2024).

94. The foregoing statements are representative, not exhaustive. The same devices recur throughout Defendants' catalog, and individual videos routinely stack several of them—political fear, a rapid timeline, a "100% protection" promise, and "your word is enough"—into a single clip. The repetition, uniformity, and volume of these representations demonstrate that they are not isolated statements by an individual attorney but the operative content of a systematic marketing scheme.

95. Taken together, these categories operate as a single commercial funnel: emotional and fear-based content attracts the viewer; false guarantees, diluted statutory standards, and the concealment of severe bars persuade the viewer that a non-viable case is viable; manufactured urgency and the "100% protection" representation induce immediate retention; and evidentiary minimization removes the last practical obstacle to signing a fee agreement. The funnel is engineered to convert vulnerable consumers into paying clients regardless of the merits of their cases.

96. Each of the foregoing statements was made by Attorney Lisinski or by Defendants' agents acting within the scope of their agency, was published to the public for the purpose of soliciting clients, and constitutes an admission of a party opponent. Plaintiffs and members

of the putative class were exposed to and relied upon representations of this kind in deciding to retain Defendants and to pay Defendants' fees.

**C. The Total Absence of Attorney Review and Automated Signature Practices**

97. Once a consumer calls the number displayed on the social media funnel, they are routed through call centers where ***non-attorney*** "Legal Intake Specialists" are driven by a strict individual and team revenue quota as well as other incentives.

98. To incentivize aggressive sales tactics, these ***non-attorney*** intake specialists receive up to a 3% cash commission on any client deposits collected on the same day (requiring a minimum immediate down payment of $2,500), and up to 1.5% on follow-up collections.

99. To maintain the illusion of a legitimate law firm while executing these ***non-attorney*** sales transactions, Defendants institutionalized the consultation charade protocol.

100. Taught by the firm's in-house ethics and compliance trainer, Defendant Rea Singh, this protocol trained sales staff to weave phrases like "in your attorney's review" or "in the attorney's opinion" into their sales pitches.

101. Most critically, Defendant Singh institutionalized a deceptive staging practice that involved instructing sales representatives to present a high-fee visa strategy, abruptly excuse themselves from the room, and spend approximately ten to fifteen minutes walking the office hallways to simulate an authentic file evaluation, before returning to inform the client that the attorney had reviewed the case and personally vetted their eligibility.

102. In reality, sales personnel were strictly prohibited from speaking with or contacting firm attorneys under threat of immediate disciplinary write-ups or termination.

103. The ***non-attorney*** intake specialists were themselves making the determination that the client was eligible for either a VAWA or T visa process.

104. At no point did an actual U.S. licensed attorney engage in a review of the intake notes or questionnaire, let alone a meaningful review, during the intake process.

105. At no point did an actual U.S. licensed attorney engage with the potential client directly to provide any meaningful review, advice or information during the intake process.

106. This total absence of attorney oversight extends to the final document execution and filing phases.

107. Once a contract is signed, non-attorney staff compile the file, offshore teams draft the text of the declaration, and the final application packages are routed through an automated electronic workflow.

**D. Attorney Lisinski Signed All Applications Despite Never Meeting with Clients**

108. On July 26, 2023, Attorney Lisinski explicitly confirmed that she could not possibly review all applications which carried her signature, posting on Facebook: "Looking for contract attorney support for final review of VAWA and/or T-Visa cases before filing."

109. None of the other attorneys retained by Defendants ever met with the clients and certainly did not review the applications or the declarations with the clients personally.

110. To execute filings at scale without executing basic fiduciary duties, Attorney Lisinski systematically authorizes the application of her signature stamp or electronic mark onto the preparer's certification of the Form I-360 or Form I-914 and accompanying forms, certifying under penalty of perjury that the facts contained within the petition and supporting client declarations are complete, true, correct, and verified by the client to her specifically as well as that the client authorized its filing.

111. Attorney Lisinski executes these solemn federal certifications despite the fact that she has never met with, spoken to, or consulted the clients to review their applications or herself

verify the truthfulness of the declarations prepared by her staff, constituting a wholesale abdication of the attorney's professional oath of loyalty and a structural flaw in the model itself.

112. For example, Attorney Lisinski signed the Preparer's Certification for Ms. Acevedo Ortega on June 11, 2025, wherein she certified under penalty of perjury that "***petitioner has reviewed*** the completed petition, including the Declaration and Certification…and ***informed me*** that all of this information in the form and in the supporting documents was complete, true and correct."



***Preparer's Certification***

By my signature, I certify, under penalty of perjury, that I prepared this petition at the request of the petitioner or authorized signatory. The petitioner has reviewed this completed petition, including the **Petitioner's Declaration and Certification**, or **Petitioner's or Authorized Signatory's Declaration and Certification**, and informed me that all of this information in the form and in the supporting documents is complete, true, and correct.

***Preparer's Signature***

8. Preparer's Signature (sign in ink)

Date of Signature (mm/dd/yyyy) 06/11/2025

Form I-360 Edition 01/20/25 Page 18 of 19

113. However, Attorney Lisinski never met with or spoke with Ms. Acevedo Ortega regarding the form.

114. Additionally, Attorney Lisinski never met with or spoke with Ms. Acevedo Ortega regarding the supporting documents including the Declaration drafted by Lisinski's staff.

115. Ms. Acevedo Ortega never confirmed to Attorney Lisinski that the information contained in the form and supporting declaration was complete, true and correct.

116. In fact, Ms. Acevedo Ortega signed the form on June 5, 2025, at her home in Colorado.

I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

***Petitioner's Signature***

| 6. Petitioner's Signature | Date of Signature (mm/dd/yyyy) |
|---|---|
| ➡ Eva Acevedo Ortega | 06-05-2025 |

117. Ms. Acevedo Ortega never spoke with Attorney Lisinski either in person or over the phone and only ever spoke with Defendants' ***non-attorney*** staff despite her many requests to speak directly with Attorney Lisinski.

118. It is a best practice for an attorney, especially the one signing the preparer's certification, to review the immigration application with the client personally.

119. It is a best practice for an attorney, especially the one signing the preparer's certification, to review the declaration to be submitted in support of an immigration application, with the client personally.

120. Attorney Lisinski did not follow this best practice with every client for whom she signed the preparer's certification.

121. In fact, Attorney Lisinski has not personally reviewed an application or supporting declaration with a client since she moved to Florida several years ago.

122. To keep clients from discovering that their official federal submissions contain unvetted or engineered assertions, Defendants deployed deceptive document execution workflows.

123. On January 30, 2024, Attorney Lisinski openly detailed her mechanics for collecting client signatures blindly, posting on Facebook: "We spend A TON of time putting colored flags on forms to mail to clients to sign and then removing them... I'm wondering if we can do something quicker like use a highlighter to note where the client needs to sign, and whether if we submit the original signatures to USCIS, because that's what we do to not have to

keep the original signatures in our file... I prefer to use Adobe highlighting because it's much easier and ***we can just print the signature pages with highlighting*** from Adobe and send them to the client."

124. Through these protocols, intake specialists and managers systematically forced clients and independent interpreters to sign entirely blank sheets of paper or isolated signature sheets overlaid with bright neon stickers, ordering them to blindly sign highlighted blocks in English without receiving line-by-line translations and/or attorney explanations.

### E. The Enterprise’s Second Sale: Pre-Certified Signature Packets

125. The Enterprise’s signature protocol was not an ad hoc practice. Defendants reduced it to standardized, branded, pre-printed instruction sheets that were mailed to clients with the signature pages, in Spanish, over the firm’s letterhead.

126. The packets open with a Lisinski Law Firm cover sheet bearing a large red “ALTO” (STOP) octagon, directing the recipient to “Firme en TODAS las partes marcadas en amarillo” — sign every part marked in yellow.

LISINSKI LAW

ABOGADOS DE INMIGRACION




**ESTOS SON PARA LOS**

***BENEFICIARIOS DE 14 AÑOS O MAS***

*El aplicante principal debe firmar para beneficiarios de 13 años o menores en las hojas que vendrán en su paquete.*

Firme en ***TODAS*** las partes marcadas **en amarillo**.

127. A companion Lisinski Law Firm sheet captioned "¡IMPORTANTE!" directs the recipient to watch a video the firm sent by text message; to use black ink and no other color; to sign "en la línea exacta" (on the exact line, not above and not below); to write the date in every place marked in yellow; and to return the signed papers in the blue envelope "LO MÁS

RÁPIDO POSIBLE.” It illustrates the required result with a sample signature block bearing a black arrow, the words “Su nombre,” and a date. Nothing on either sheet directs the client to read the application, to ask a question, or to speak with an attorney.

LISINSKI LAW

ABOGADOS DE INMIGRACIÓN

**¡IMPORTANTE!**

✓ Debe firmar los documentos que le hemos enviado.

✓ También debe tener en cuenta: 1. Si usted lee y entiende inglés suficiente para leerlos usted mismo o 2. Si necesita un intérprete.

✓ Si necesita intérprete, debe tener a **alguien dispuesto a ayudarle como intérprete y debe firmar los formularios también** donde está indicado.

ALTO

**ANTES QUE EMPIECE**

✓ Vea el video que le enviamos por mensaje de texto. ¡Tiene instrucciones importantes!

✓ Use lapicero de tinta **NEGRA**. ¡No use tinta azul, ni de otro color!

✓ Firme **en la línea exacta** (no por encima, ni por debajo) y **escriba la fecha** en todos lugares que se indica **en amarillo**. **Debe verse así:**

*Signature of Client or Authorized Signatory for an Entity*

2.a. Signature of Client or Authorized Signatory for an Entity

➡ Su nombre

2.b. Date of Signature (mm/dd/yyyy) 1/30/2024

✓ Enviamos un paquete para el **aplicante principal**, para el **intérprete**, y para cada **beneficiario** (si los hay). Cada uno de los paquetes tiene instrucciones.

✓ Envíe los papeles firmados en el sobre **azul** **LO MÁS RÁPIDO POSIBLE**.

128. Defendants' instruction sheets also tell the client which box to check regarding her own command of English — to mark box 1.A if she reads English without difficulty, or box 1.B and write "SPANISH" if she requires an interpreter — and instruct her that if she requires an interpreter she must herself locate "someone willing to help you as an interpreter" who must also sign the forms. Defendants thus outsourced to the client both the selection of the interpreter and the representation to the federal government about her own English proficiency.

129. Because Defendants mailed signature pages only, the interpreter a client recruited under these instructions never saw the application. The interpreter's certification on the federal forms nonetheless recites, under penalty of perjury, that the interpreter read to the applicant "every question and instruction on this application" and the applicant's "answer to every question." The protocol was structurally incapable of producing a truthful interpreter certification.

130. When a filing was rejected or denied, Defendants deployed the same protocol a second time to sell a second filing. The refiling packets Defendants mailed contain federal preparer certifications that Attorney Lisinski had already executed before the packet left the firm — certifying that the applicant had reviewed the responses and confirmed her understanding of them — on pages whose applicant signature blocks were still blank because the client had not yet received them.

5. Preparer's Email Address (if any)

info@lisinskifirm.com

***Preparer's Certification***

I certify, under penalty of perjury, that I prepared this application for the applicant at his or her request and with express consent and that all of the responses and information contained in and submitted with the application is complete, true, and correct and reflects only information provided by the applicant. The applicant reviewed the responses and information and informed me that he or she understands the responses and information in or submitted with the application.

6. Preparer's Signature

Date of Signature (mm/dd/yyyy) 08/25/2025

Form I-192 Edition 01/20/25 Page 8 of 9

131. Defendants mailed pre-certified refiling packets of this kind as late as August 2025, months after the federal scrutiny described above and years after Attorney Lisinski publicly acknowledged the mechanics of collecting client signatures blindly. The practice was ongoing, standardized, and unremediated.

**F. Post-Filing Fraud and USCIS Investigation Tampering**

132. Because the applications submitted by the Lisinski Law Firm are structurally unvetted, USCIS regularly issues comprehensive Requests for Evidence ("RFEs") or immediate rejections.

133. Rather than remediating their errors, Defendants utilize the RFE stage as a secondary revenue stream.

134. Representatives of the firm contact clients upon receipt of an RFE and attempt to charge an additional $1,500 fee to "help create and make" false evidence, pressuring family members to author letters detailing fabricated abuse that never occurred.

135. Upon information and belief, in or around late 2024, the structural fraud perpetrated by the Lisinski Law Firm triggered an active, multi-case federal investigation by USCIS adjudicators.

136. Upon realizing that federal authorities had flagged their operational pattern, Defendants engaged in an extraordinary campaign of investigation tampering and cover-up.

137. The firm flew numerous clients from across the country directly to its corporate headquarters in Powell, Ohio, heavily coached them to memorize the fabricated narratives contained in their unreviewed declarations, and deployed firm employees to attend official USCIS interviews with the clients, surreptitiously acting as Spanish-language interpreters

with an undisclosed connection to Attorney Lisinski to insulate her from professional accountability and obscure the firm's systemic fraud from federal oversight.

**G. Direct Post-Fraud Concealment and Broad Pattern Evidence**

138. As the structural deficiencies of the Defendants’ immigration mill began resulting in widespread federal pushback, the Enterprise actively deployed Defendant Juan Chinchilla to engage in direct post-fraud concealment, financial narrative control, and proactive witness intimidation across state lines.

139. Specifically, on or about May 1, 2026, an aggrieved client placed a comprehensive complaint call to the firm, challenging the Enterprise's pattern of narrative fabrication, missing filing receipts, and the extraction of unearned fees.

140. Defendant Chinchilla personally intervened the client on behalf of the corporate mill.

141. Rather than exercising basic fiduciary care, Defendant Chinchilla utilized the communication to actively mislead the caller regarding application statuses, provide pretextual administrative excuses for billing and operational breakdowns, and deploy coercive rhetoric to suppress complaints.

142. Defendant Chinchilla’s conduct on the May 1, 2026, communication serves as direct, illustrative pattern evidence of the Enterprise's operational architecture.

143. It demonstrates a coordinated, top-down execution of liability control designed to corruptly persuade victims to abandon their legal remedies, insulate Attorney Lisinski from scrutiny, and actively discourage consumers from cooperating with or participating in impending class action litigation against the firm, constituting active witness tampering and obstruction under federal racketeering definitions.

144. Such interference and attempted intimidation continue today.

**H. The Experience of Named Plaintiff Eva Acevedo Ortega**

145. In or around August 2024, Plaintiff Eva Acevedo Ortega, a monolingual Spanish-speaking undocumented individual, was facing an immediate threat to her livelihood. She had been employed at a stable job where her employer explicitly warned her that upcoming corporate document audits required her to present a renewed valid Employment Authorization Document ("EAD").

146. Specifically, Ms. Acevedo Ortega's reliance chain commenced on or about August 20, 2024, when she viewed a specific, date-stamped '@AbogadaAngel' TikTok video broadcast across interstate wires, which delivered false outcome guarantees and minimized the statutory requirements for humanitarian relief.

147. Driven by this digital inducement, she initiated a telephonic intake call over interstate wires on August 28, 2024, which routed her to the enterprise's high-volume pipeline and resulted in her formal intake consultation at the Denver office on August 29, 2024.

148. Shortly thereafter, Ms. Acevedo Ortega underwent a formal intake consultation at the Denver office of the Lisinski Law Firm.

149. In strict compliance with the firm's standardized workflows and the charade protocol she never spoke to an attorney.

150. Instead, a male sales representative conducted a one-hour screening. Ms. Acevedo Ortega explicitly informed the representative that she needed an immediate renewal of her asylum-based work permit to save her job.

151. The sales representative completely ignored her request. Upon learning that Ms. Acevedo Ortega had a U.S. citizen son who would soon turn 21, the representative deployed the pre-rehearsed scripts.

152. He assured her that a routine work permit renewal was an inferior option and that the firm's

principal attorney had a specialized, confidential "humanitarian strategy" that would guarantee her an EAD within six to eight months and a green card within three years.

153. The sales representative abruptly exited the consultation room, claiming he was required to submit her file for immediate attorney review down the hall.

154. After executing the hallway-walking sequence as taught by Defendant Singh to simulate an authentic legal evaluation, he returned and stated that Attorney Lisinski had personally vetted her file and authorized a VAWA strategy.

155. Ms. Acevedo Ortega was shocked and repeatedly informed the representative that she did not qualify for a VAWA petition because she had suffered absolutely no abuse or extreme cruelty from her son, and that her son was not yet 21 years of age.

156. The representative overrode her objections, stating that under the firm's specialized method, "typical family problems" were entirely sufficient, and that the firm would simply hold the application until her son reached the statutory age of 21.

157. Driven by desperation to preserve her employment and relying entirely on the firm's false legal assurances, Ms. Acevedo Ortega executed a Contract for Legal Services with the Lisinski Law Firm for a total of $12,000 on August 29, 2024.

158. Ms. Acevedo Ortega made the following payments via electronic processing to the Lisinski Law Firm:

a.

| | |
|---|---|
| 9/3/2024 | $2,500.00 |
| 9/11/2024 | $2,500.00 |
| 10/11/2024 | $389.00 |
| 11/12/2024 | $389.00 |
| 12/12/2024 | $389.00 |

| | |
|---|---|
| 1/13/2025 | $389.00 |
| 2/11/2025 | $389.00 |
| 3/11/2025 | $389.00 |
| 4/11/2025 | $389.00 |
| 5/13/2025 | $389.00 |
| 6/11/2025 | $389.00 |
| 7/11/2025 | $389.00 |
| 8/11/2025 | $389.00 |
| 9/11/2025 | $389.00 |
| 10/14/2025 | $389.00 |
| 11/12/2025 | $389.00 |
| 12/10/2025 | $389.00 |
| 1/10/2026 | $389.00 |
| 2/10/2026 | $389.00 |
| 3/10/2026 | $387.00 |

159. Following the execution of the contract, the Enterprise's offshore declarations team engaged in systemic narrative engineering.

160. To facilitate the submission of this unvetted package, the Enterprise utilized interstate commercial carriers to execute its deceptive signature protocols.

161. On or about May 28, 2025, Defendants transmitted a document packet containing entirely blank or isolated signature pages overlaid with bright neon 'ALTO' stickers via the United States Postal Service (USPS) to Ms. Acevedo Ortega's residence in Colorado.

162. Following her blind execution of the highlighted lines under false legal assurances, she returned the unvetted signature block to Defendants' Ohio headquarters on June 2, 2025, using a private commercial carrier (FedEx).

163. Ms. Acevedo Ortega only discovered the staggering depth of this deception after the

application package had already been compiled and mailed to immigration authorities.

164. Representatives of the firm transmitted a translated copy of the already filed declaration directly to her email.

165. Upon reading the text in her native language, she was horrified to discover that the Enterprise had systematically twisted and re-engineered minor, historic incidents from when her son was a young minor to construct a fraudulent, fabricated narrative of adult domestic abuse, including:

a. **The Childhood Smashed Door Fabrication:** The declaration claimed her son smashed a glass door during a violent argument, resulting in a hospital trip for stitches. In reality, Ms. Acevedo Ortega clarified that this was an accidental incident that occurred while he was a *young child at play*.

b. **The Childhood Homework Mischaracterization:** The declaration asserted that her son maliciously jeopardized her employment by refusing to complete his schoolwork, forcing her to leave work early. In reality, this referred to standard childhood behavioral friction when her son was an *elementary school minor*.

c. **The "Forced Illegal Acts" Lie:** The declaration claimed her son coerced and forced her to perform illegal acts, such as driving him to medical therapy without a valid license. In reality, Ms. Acevedo Ortega noted that he never forced her to do anything, as he was simply a *young minor* requiring parental transportation to childhood therapy.

d. **The Falsified Verbal Abuse Claim:** The declaration alleged that her son verbally abused her and explicitly blamed her immigration status for denying him vacations. In reality, Ms. Acevedo Ortega clarified that her son merely exhibited normal

childhood sadness because their financial and legal status prevented them from going on family vacations.

166. In addition to twisting childhood events into a narrative of domestic abuse, the Lisinski Law Firm completely falsified Ms. Acevedo Ortega's immigration background, submitting official statements to USCIS under penalty of perjury that were entirely false and incorrect as it relates to her history of entries and returns to the United States.

167. To facilitate the submission of this unvetted, perjurious package, representatives forced her to sign completely blank pages and mailed her document packets overlaid with bright "ALTO" (STOP) stickers, ordering her to blindly execute highlighted signature blocks in English without ever providing an explanation or detailed review of the text by an attorney.

168. In June 2025, the firm submitted the Form I-360 VAWA package.

169. Due to the Enterprise not including Plaintiff's address on the application, she was scheduled for a mandatory USCIS biometrics appointment at an agency office in Ohio, causing her extreme logistical distress, severe anxiety, and an intense fear of federal border enforcement.

170. The practical effect of utilizing the Enterprise's address on applications was that clients would not receive notices, receipts or other correspondence from USCIS.

171. On February 12, 2026, Ms. Acevedo Ortega received formal Rejection Notices from USCIS for her Form I-485 (Adjustment of Status), Form I-765 (Work Authorization), and Form I-131 (Travel Document) applications.

172. As a direct, proximate, and foreseeable result of Defendants' racketeering pattern and mechanized business architecture, Ms. Acevedo Ortega suffered severe, concrete economic and proprietary injuries.

173. The causal chain flows uninterrupted from the deceptive marketing inducements to the non-attorney intake protocol, the extraction of $10,500 in flat fees, and the submission of a fabricated narrative package to federal authorities.

174. This unreviewed filing directly triggered formal USCIS Rejection Notices dated February 12, 2026, which immediately stripped Ms. Acevedo Ortega of her employment authorization, resulting in the direct loss of her stable job and total forfeiture of her life savings.

### I. The Experience of Named Plaintiffs Veronica Alejandra Lopez Guzman and Erik David Martinez

170. Ms. Lopez Guzman did not reach Defendants through a lawyer or a legal consultation. In or around 2023 she was robbed on the street in Columbus, Ohio, together with a friend. Police officers and a detective responded and took her statement. The owner of a nearby business told her that because of the robbery she might be able to obtain lawful status, and a friend referred her to the Lisinski Law Firm as a satisfied client's stepdaughter. When Ms. Lopez Guzman telephoned the firm and explained that she had been robbed, the person who answered told her, in substance, that she had a ready path to status, and scheduled an immediate appointment for an intake consultation.

171. Ms. Lopez Guzman attended her intake consultation in person at the firm's Powell, Ohio location. It lasted less than one hour, in a small interior office. In strict compliance with the firm's standardized workflows, she never spoke to an attorney. Two non-attorney staff members conducted the screening. The one who led it identified herself as "Maggie" or "Margie" and said only that she worked in the offices of Attorney Lisinski; she never identified herself as an attorney. A second staff member, whose name Ms. Lopez Guzman does not recall, urged her to proceed as quickly as possible.

172. Maggie asked Ms. Lopez Guzman whether she had ever been mistreated at a job and whether she had experienced problems crossing the border. Ms. Lopez Guzman answered that she had had no problems crossing the border, but that an employer had once withheld part of her pay and that she had been subjected to offensive comments there.

173. On the basis of that answer and the street robbery, Maggie — a non-attorney — determined that Ms. Lopez Guzman qualified for relief both through the robbery and through the employment incident, and told her that two forms of relief were available: a U visa and a T visa.

174. Maggie steered Ms. Lopez Guzman away from the U visa, telling her that a U visa based on the robbery could take up to ten years, required a great deal of paperwork, and probably would not be granted. Maggie steered her toward the T visa, telling her that it was much easier and much faster, that it was in substance her word against theirs, and that on that basis "we have it won." When Ms. Lopez Guzman objected that the robbery was documented by a police report, Maggie answered that the police-report route was simply too slow.

175. Ms. Lopez Guzman deferred to the firm. As she later described her reasoning: these were the people who were supposed to know, and she was not; because she had been told the employment route was better for her, she took the employment route.

176. No licensed attorney participated in that eligibility determination. No licensed attorney spoke with Ms. Lopez Guzman or Mr. Martinez before Defendants selected the statutory relief they would pursue, quoted a fee, or accepted their money.

177. Ms. Lopez Guzman told Defendants' staff that she was not married — she had lived with her partner for many years, but they were not legally married. Defendants' non-attorney

staff quoted two prices: $10,500 for her case alone, or $12,500 if she married and added her husband. They told her to take advantage of the opportunity to fix her husband's status as well, and gave her the information she needed in order to marry. She and Mr. Martinez married shortly afterward for the lower fee and to protect Mr. Martinez from the removal order as advised by Defendants., and Plaintiffs contracted with Defendants for a $12,500 flat fee covering both cases.

178. Ms. Lopez Guzman had brought only the consultation fee with her. Defendants' staff told her they would wait and gave her one hour to go get the rest; the round trip took approximately fifty minutes. While she was still three to five minutes from the office on her return, Defendants' staff began telephoning her to warn that if she did not arrive within those few minutes the $12,500 "offer" would expire. She arrived and paid the $12,500 in full by check drawn on Mr. Martinez's business account. Defendants' staff took the check, thanked her, said they would be in contact, and the meeting ended.

179. The Contract for Legal Services was presented in Spanish, together with welcome papers stating that the firm would be Plaintiffs' attorneys. The staff member who signed them up told Ms. Lopez Guzman that the firm would be with her at every moment, would be there for anything, and would appear with her.

180. After Plaintiffs paid, in-person contact ended. From that point forward Defendants scheduled Ms. Lopez Guzman only for telephone appointments with non-attorney assistants, to take her information and her declaration. The declaration intake call lasted approximately three hours. She was never transferred to an attorney on that call or on any other call; the staff who called identified themselves by first name and as workers at the Lisinski Law Firm, never as attorneys.

181. The stated purpose of the three-hour call was to assemble a case out of the fact that Ms. Lopez Guzman had not been paid at a former job and had been treated badly there. The questions Defendants asked ranged far beyond that: her childhood, whom she had lived with, who her parents were, whether they drank, whether they smoked, whether they used drugs, the family environment, whether she had children, whether she was married, and her schooling.

182. The declaration filed under penalty of perjury in Ms. Lopez Guzman's name was written neither by her nor by an attorney. The certification Defendants enclosed with the filing states: "I, Favio Mejia, the undersigned, am competent to translate from Spanish to English and from English to Spanish, and I prepared the declaration from notes provided by the applicant. I also interpreted the document for the applicant."

183. What Ms. Lopez Guzman reported to Defendants was a straightforward unpaid-wage dispute. In 2012, she took her second job in the United States at a Mexican restaurant. On one occasion a manager directed her to chop a small onion he had set aside; the onion was rotten and she declined to serve it to customers. The cook agreed with her and himself brought a fresh sack. The manager later confronted her using profanity and told her that next time she would be gone. She collected her belongings and left the job that day. The employer then withheld her final wages, sending her from one affiliated store to another for approximately three months. After a relative who worked for the same company intervened, she recovered approximately $800 of the roughly $1,200 she had earned. That was in 2013 — more than ten years before Defendants filed her petition.

184. What Defendants filed was a federal human-trafficking petition. The cover brief Defendants submitted to the USCIS Vermont Service Center over Attorney Lisinski's

signature states that Ms. Lopez Guzman petitioned "for a T-Visa based on suffering a severe form of human trafficking"; that "Traffickers recruited and induced Applicant into involuntary servitude using fraud and coercion"; that she had been forced "into involuntary servitude and modern-day slavery"; and that her relationship with the restaurant "was one of master and servant, not employer and employee."

185. The declaration Defendants prepared and filed in Ms. Lopez Guzman's name states, among other things, that her cell phone was confiscated and kept under a desk (at best this was an extreme exaggeration); that she was monitored through cameras in the manager's office and could not leave until her shift ended (again, at best an extreme exaggeration); that she was permitted to use the bathroom only when no customers were present (another extreme exaggeration); that she endured months of double shifts exceeding sixteen hours a day and was never granted a single day off (yet another extreme exaggeration); that she sustained repeated cuts to her hands and a fall, and that a bleeding hand injury went untreated until a butcher applied salt and gauze (partially untrue and an exaggeration); that she was told "If you don't do what I say, you'll go to hell!" (which never happened); and that she remains in the United States on account of that trafficking and relies on prescription medication for the anxiety it caused (untrue).

186. Defendants sent Ms. Lopez Guzman the declaration in English and in Spanish. She read the Spanish version and told Defendants' staff, and her husband, that the document felt greatly exaggerated. She disputed in particular the assertion that she had been abandoned by her parents — her father was in the United States working to support the family — and the portrayal of her family as drunks. Despite Ms. Lopez Guzman sharing what was incorrect in her statement, assuming that corrections would be made to reflect the truth of

her experience, the declaration was executed and filed in substantially the form Defendants' personnel had drafted without Ms. Lopez Guzman's knowledge or consent.

187. Eligibility for T nonimmigrant status turns in part on whether the applicant has complied with reasonable requests for assistance from law enforcement. On Form I-914 Defendants checked "Yes" to the statement "I am or have been a victim of a severe form of trafficking in persons" and "Yes" to the statement "I have cooperated with reasonable requests for assistance from law enforcement."

188. The only law-enforcement report in the filing is one Defendants' own firm generated. Attorney Lisinski's signed declaration, enclosed as Exhibit D to the petition, states: "with the consent of and at Applicant's urging, my Firm made an initial report of the trafficking to the Federal Bureau of Investigation on June 13, 2023, via their Electronic Tip Form for reporting human trafficking crimes at https://tips.fbi.gov/." The same declaration states: "We did not hear back in response to our report."

189. The copy of that report Defendants enclosed is a browser printout of the FBI Electronic Tip Form, time-stamped June 13, 2023 at 12:02 p.m. The reporting party is identified as "Angelyne" "Lisinski." The date-of-birth field is declined. The telephone number Defendants entered on the form submitted to the Federal Bureau of Investigation is "123-456-7890." Defendants submitted that form on June 13, 2023; Ms. Lopez Guzman signed the Form G-28 authorizing Defendants' appearance on her behalf on August 14, 2023.


yourself or others may be used for authorized purposes.

First Name

Angelyne

☐ Decline

Last Name

Lisinski

☐ Decline

Date of Birth

mm/dd/yyyy

☑ Decline

Phone

International?

○ Yes ◉ No

Type

190. Defendants' cover brief further represents to USCIS that Ms. Lopez Guzman "has made a report to the National Human Trafficking Hotline through Polaris, who has separately made reports to law enforcement." No documentation of any such report appears in the client file Defendants transmitted.

191. Attorney Lisinski executed four separate certifications under penalty of perjury in connection with Plaintiffs' T visa filing: as attorney of record on Form G-28, as the interpreter on Form I-914, and as the preparer on Form I-914.

192. In Part 7 of Form I-914 Defendants identified the interpreter for Ms. Lopez Guzman's application by name: Interpreter's Family Name, "Lisinski"; Interpreter's Given Name, "Angelyne"; Interpreter's Business or Organization Name, "The Lisinski Law Firm LLC." Attorney Lisinski then signed the Interpreter's Certification, certifying under penalty of perjury that she was fluent in English and Spanish, that "I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question," and that "The applicant informed me that he or she understands every

instruction, question, and answer on the application, including the Applicant's Declaration and Certification, and has verified the accuracy of every answer." She dated that certification August 13, 2023. However, Attorney Lisinski never explained nor translated these documents to Plaintiff.

***Interpreter's Certification***

I certify, under penalty of perjury, that:

I am fluent in English and Spanish, which is the same language specified in **Part 6., Item B.** in **Item Number 1.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question. The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

***Interpreter's Signature***

7. Interpreter's Signature — Date of Signature (mm/dd/yyyy) 8/13/2023

193. Attorney Lisinski also signed the Preparer's Certification on the same form, certifying under penalty of perjury: "By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant. The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the Applicant's Declaration and Certification, and that all of this information is complete, true, and correct." She dated that certification August 13, 2023.

***Preparer's Certification***

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant. The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct. I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

***Preparer's Signature***

8. Preparer's Signature — Date of Signature (mm/dd/yyyy) 8/13/2023

194. Ms. Lopez Guzman signed the Applicant's Signature block of that same Form I-914 on August 14, 2023 — one day after Attorney Lisinski certified to the United States

government that the applicant had already reviewed the completed application and confirmed its accuracy to her. The same one-day sequence appears across the filing: the interpreter and preparer certifications on Mr. Martinez's Form I-914, Supplement A, Form I-192, and Form I-765 are each dated August 13, 2023, and each applicant signature is dated August 14, 2023.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

***Applicant's Signature***

6. Applicant's Signature: Veronica A. Lopez Guzman — Date of Signature (mm/dd/yyyy): 8/14/2023

**NOTE TO ALL APPLICANTS:** If you do not completely fill out this application or fail to submit required documents listed in the

195. Attorney Lisinski never met with nor spoke to Ms. Lopez Guzman nor Mr. Martinez. Neither has ever met her nor spoken with her by telephone, and neither ever received a call from any attorney at the firm to review their documents.

196. Attorney Lisinski never read the application to Ms. Lopez Guzman in Spanish, never reviewed the application with her, and never reviewed with her the declaration prepared by the firm's personnel. Ms. Lopez Guzman never informed Attorney Lisinski that she understood every instruction, question, and answer on the application, and never verified the accuracy of any answer to her. The same is true of Mr. Martinez, whose application and declaration Attorney Lisinski likewise never reviewed with him. Every communication from the firm ran through Ms. Lopez Guzman; no paper ever came to Mr. Martinez directly.

197. Ms. Lopez Guzman's physical address on Form I-914 is her home in Columbus, Ohio. In the field for "Safe Mailing Address" — the alternate address an applicant may designate if she does not want USCIS to send notices about her application to her home — Defendants entered "In Care Of Name: The Lisinski Law Firm LLC," 3982 Powell Road, Suite 330,

Powell, Ohio 43065. The practical effect was that Plaintiffs would not receive notices, receipts, or other correspondence from USCIS directly, and would learn the status of their own federal petition only from Defendants' non-attorney staff.

**4. Safe Mailing Address**

If you do not want U.S. Citizenship and Immigration Services (USCIS) to send notices about this application to your home address, you may provide an alternate safe mailing address.

In Care Of Name: The Lisinski Law Firm LLC

Street Number and Name: 3982 Powell Road

Apt. ☐ Ste. ☒ Flr. ☐ Number: 330

City or Town: Powell

State: OH

ZIP Code: 43065

198. Ms. Lopez Guzman told Defendants' staff, at the first interview and again on every subsequent call, that Mr. Martinez had a prior immigration case and had been told he had an order of removal. She told them expressly that she wanted to be certain about including her husband on the T visa application because she did not want to put him in danger, and that she understood adding him to the application meant giving the government his address and the details of his life.

199. Defendants' non-attorney staff told her it did not matter. They told her that by the very act of including him in the case his order of removal would be withdrawn; that nothing would happen to him; and that he was shielded because the order of removal was cancelled.

200. Defendants' own filings establish that they knew of the order. The Form I-914, Supplement A, that Defendants filed for Mr. Martinez answers "Yes" to whether the family member had ever been in immigration court proceedings and records "Alien inadmissibility under

section 212, 02/27/2013, Columbus, OH, Removal Proceedings." The accompanying Form I-192 recites that he was in removal proceedings on or about February 7, 2013, and had been on an active order of removal. No licensed attorney ever advised Plaintiffs of the actual consequence of adding a spouse under an outstanding order of removal to a humanitarian petition, or of the risk that a denied filing would expose both of them to immigration enforcement.

201. Defendants collected Plaintiffs' signatures almost entirely by electronic signature. Neither Plaintiff ever went to the office to sign the filings submitted in their names. When Defendants did mail physical documents, they mailed signature pages only, fronted by the standardized "ALTO" cover sheet and "¡IMPORTANTE!" instruction sheets described above. Ms. Lopez Guzman was not sent the applications; as she described it, Defendants did nothing to help her complete the forms but put a check mark where she had to sign.

202. On one occasion Defendants mailed Ms. Lopez Guzman a signature page and instructed her that she had to sign exactly like the signature already appearing on the page. The signature was not hers. It was her friend's — another client Defendants had signed up at the same time. Ms. Lopez Guzman refused, telling Defendants that she could not sign her own documents with another person's signature and that in any event she could not reproduce it.

203. Ms. Lopez Guzman repeatedly asked Defendants what she was signing. On one occasion she went to the office in person and Defendants' staff would not attend to her. She asked them to explain the forms — she did not know the form numbers — and to tell her what she was applying for. The only answer she received was that she only had to sign; that these were requirements USCIS was asking for; and that she had to sign them.

204. Defendants directed Plaintiffs to a USCIS biometrics appointment, which they attended together in or around 2024.

205. Defendants then told Ms. Lopez Guzman that her case had been denied but could be appealed, and collected an additional $500 from her for that purpose. She paid it. Shortly afterward Defendants told her she had to appear for biometrics a second time; when she asked why, having already gone, she was told only that they were being requested. She attended alone.

206. The day after that second biometrics appointment, Defendants telephoned Ms. Lopez Guzman and told her that her case had been denied and that a notice had arrived requiring her to appear in immigration court on September 8, 2025. When she asked why the petition had been denied, Defendants' staff told her it was because of her signature. She answered that she had signed nothing except what Defendants had asked her to sign electronically and the papers she had recently returned to them. Defendants' staff told her they could not tell her anything more in depth.

207. Defendants then told Ms. Lopez Guzman that if she wanted them to represent her in the removal proceedings their own filing had produced, she would have to pay $12,500 more. When she objected that they were her attorneys and her representatives and were supposed to defend her, Defendants' staff told her they would have to do work to build a new case in order to represent her, and gave her twenty-four hours to decide.

208. Rather than explain the denial, Defendants prepared to refile. They mailed Ms. Lopez Guzman a second packet consisting again of signature pages only, again fronted by an "ALTO" cover sheet and Lisinski Law Firm instruction sheets, again leaving the interpreter fields blank and highlighted in yellow for her to complete herself, and bearing Attorney

Lisinski's already-executed Preparer's Certification dated August 25, 2025 — certifying that "The applicant reviewed the responses and information and informed me that he or she understands the responses and information in or submitted with the application" — above an applicant signature block that was blank because Ms. Lopez Guzman had not yet signed it. Plaintiffs met with no one at the firm, not an attorney and not a legal assistant, in connection with that second filing.

209. Unsure of what to do, Ms. Lopez Guzman continued to receive calls from Defendants, encouraging her to sign the packet of signature pages and return them to her without reviewing the contents of what would go into the proposed second filing.

210. Defendants provided Plaintiffs no interpreter for the proposed second filing either. When Ms. Lopez Guzman followed Defendants' written instruction and looked for one, no one would sign once they learned the papers were immigration papers; she was told the person who should sign was her own attorney, because that was her representative. She asked Defendants to sign as interpreter and Defendants' staff refused, telling her that they did not work that way, despite the fact that Defendant Angelyne Lisinski had previously signed as the interpreter. She ultimately obtained the signature of a member of her church, an American man who speaks Spanish and English. Because Defendants mailed only the signature pages, the only document he ever saw was the signature page itself, on which the only content requiring translation was name, date, address, and email address — items Ms. Lopez Guzman understood without assistance.

211. Ms. Lopez Guzman did not return the packet. Plaintiffs sought out and retained new counsel instead.

212. Ms. Lopez Guzman walked into Defendants' Ohio headquarters as the victim of a street robbery documented in a police report, which is a predicate for a U visa. She walked out having purchased a T visa premised on a decade-old wage dispute, for which she was not eligible and which was denied. Successor counsel has since filed the U visa petition for which she had been eligible when she first contacted Defendants in 2023, and has included Mr. Martinez in it.

213. Mr. Martinez was not protected by the T visa application. On or about May 7, 2026, federal immigration authorities located and detained him on the outstanding order of removal that Defendants had assured Plaintiffs would be cancelled by his inclusion in the T visa application. He was released after successor counsel intervened. Ms. Lopez Guzman remains in removal proceedings as a direct result of the application Defendants prepared, certified, and filed in her name.

214. Ms. Lopez Guzman asked Defendants to return Plaintiffs' money. Defendants' staff told her they would call her back. No one ever did.

215. As a direct, proximate, and foreseeable result of Defendants' racketeering pattern and mechanized business architecture, Plaintiffs Lopez Guzman and Martinez suffered severe, concrete economic and proprietary injuries. The causal chain runs uninterrupted from the non-attorney intake protocol and the non-attorney eligibility determination, through the extraction of a $12,500 flat fee and an additional $500 "appeal" charge, to the submission of an unreviewed human-trafficking package to federal authorities under attorney certifications that were false when made.

216. Plaintiffs calculate that they paid Defendants approximately $16,000 in total, including charges Defendants imposed repeatedly for mailings. They have since incurred, and

continue to incur, the cost of successor immigration counsel to defend the removal proceedings Defendants' filing produced and to pursue the relief Defendants told them not to seek.

217. Plaintiffs also suffered severe non-economic harm. Ms. Lopez Guzman has experienced anxiety attacks. Plaintiffs have built their lives in the United States — a home, a second property, and a business — and their children have never set foot in another country. When Defendants told Ms. Lopez Guzman she had to appear in immigration court, in her own words, the world came down on her.

**J. Confirmed Anecdotal Evidence of widespread harm among Lisinski clients**

218. **Stuck in Mexico on VAWA related Advanced Parole**: Father traveled to Mexico with his child on VAWA related advance parole (AP). When Father attempted to re-enter the U.S., Customs & Border Patrol (CBP) questioned him as to the origins of his AP. Father stated that is through a petition that his child filed for him. The CBP officer stated that it is a VAWA case, and asked if his child abused him. Father did not know what VAWA was and stated that he was traveling with his child who petitioned for him. He was denied re-entry based on fraudulently obtained AP.

219. **I-601A denial due to VAWA filing**: Daughter was the beneficiary of an approved I-130 by her oldest U.S. citizen son, and she has a single entry without inspection to the U.S. Her Legal Permanent Resident mother was the qualifying relative for her I-601A provisional waiver application. Daughter filed I-601A waiver with local attorney. While the I-601A was pending, the Daughter went to the Lisinski Law Firm for a second opinion. She told the Lisinski Law Firm she had an I-601A waiver pending. They told her that she should

file for VAWA, as it would have no impact on her I-601A process, and she could file for her undocumented husband with this too. She agreed and they filed a VAWA petition (based on abuse by her oldest U.S. citizen son) with an I-485 Adjustment of Status application. USCIS subsequently denied Daughter's I-601A waiver because people with pending I-485 Adjustment of Status applications are ineligible for I-601A approval. Daughter was unable to refile. Daughter was unable to refile her I-601A waiver because her qualifying relative mother passed away, so there is no option to refile. The Lisinski Law Firm filed a VAWA for Daughter based on supposed abuse by her oldest son, who had filed the I-130 petition for her. She said the worst incident of "abuse" she experienced from him was when he was applying to college and struggled with the FAFSA. He said "I hate having undocumented parents" because he could not get financial aid. However, Daughter's second oldest child had actually physically abused her. She has had to call the police because of this, and she could be well suited for a U visa as a result as a crime victim. She told the Lisinski Law Firm about him, but was told that the VAWA needed to be based on the child who filed the I-130 petition.

220. **T Applicant has dementia, but signs affidavit**: Applicant files for a T visa, with his spouse as a derivative. The T visa claim itself is valid, but none of the critical details were included (specifically, nothing about forced labor) in the application. The T visa was denied due to digital signatures being used. The Lisinski Law Firm sent signature pages for the applicant and wife to sign so that they could refile the same application. Applicant's daughter stepped in and told the Lisinski Law Firm that her father, the principal applicant, had dementia and could not sign anything. The Lisinski Law Firm insisted that he sign anyway. The applicant's daughter refuses. The applicant ends up signing without the

daughter's knowledge. The same T visa, still missing critical elements, was refiled with new signatures. However, the original denied T visa caused the applicant's wife to receive a Notice To Appear. The Applicant is already subject to a final order of removal. Applicant's wife is now in removal proceedings. She is not eligible for any relief in immigration court to remain in the United States.

221. **Alias from FOIA included in T application without applicant knowledge**: The Lisinski Law Firm filed a T visa application for applicant who told them he entered the U.S. once without inspection in 2003 near Brownsville. Applicant stated that he once *attempted* to enter without inspection but was caught immediately, at which time he gave his real name to immigration authorities. He successfully entered the U.S. a couple of days later. The T visa application filed by the Lisinski Law Firm stated that the applicant was known by another name, had an Alien number assigned to him, and was subject to a final order of removal in front of an Immigration Judge. The applicant only learned this information after another attorney obtained a copy of the file and reviewed it with him. Applicant had never heard of the alias nor has he ever used it. The alias, Alien number, and removal information matches an FBI FOIA found in the Lisinski Law Firm file. None of this vital information was ever reviewed with applicant before it was filed with USCIS. Due to his removal order, he was apprehended and removed, and he is now back in Mexico.

## Class Action Allegations

222. Plaintiffs bring this action individually and on behalf of a Nationwide Master Class and State Subclasses pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

### A. Class Definitions

223. Plaintiffs seek certification of the following Master Class and Subclasses:

1. **THE NATIONWIDE MASTER CLASS:** All individuals residing in the United States who, during the period from four years prior to the filing of this complaint, through the date of class certification (the "Class Period"), retained The Lisinski Law Firm, LLC and paid fees for the processing of any humanitarian immigration benefit (including VAWA, T-Visa, or U-Visa applications).

2. **THE OHIO SUBCLASS:** All members of the Nationwide Master Class who retained Defendants within the State of Ohio, or whose deceptive contracts and transactions flowed from operational decisions executed at Defendants' corporate headquarters in Powell, Ohio.

3. **THE COLORADO SUBCLASS:** All members of the Nationwide Master Class who resided in the State of Colorado at the time of retention, or who entered into contracts for legal services managed through Defendants' brick-and-mortar office infrastructure located in Denver, Colorado.

224. Excluded from the Class and Subclasses are the Defendants; any entities in which Defendants have a controlling interest; the Defendants' legal representatives, heirs, successors, and assigns; and any judge to whom this case is assigned, including their immediate judicial staff.

**B. Rule 23(a) Prerequisites**

225. Numerosity (Fed. R. Civ. P. 23(a)(1)): The members of the Nationwide Master Class and Subclasses are so numerous that joinder of all members is impracticable. Forensic data analysis reveals that Defendants' immigration mill enterprise processed up to 800 application packets per month, establishing that the proposed classes encompass thousands

of geographically dispersed consumers across the United States.

226. Commonality (Fed. R. Civ. P. 23(a)(2)): There are numerous, uniform questions of law and fact that are common to the claims of Plaintiffs and the classes, which predominate over any questions affecting only individual members. These common questions include:

1. whether Defendants operated an association-in-fact Civil RICO enterprise designed to extract fees through a pattern of mail and wire fraud;
2. whether the licensing architecture was engineered to systematically replace individual attorney review with non-attorney sales processing;
3. whether the consultation charade was institutionalized by Defendant Singh to mislead consumers regarding attorney vetting;
4. whether Defendants' social media marketing campaigns systematically misrepresented federal statutory eligibility standards;
5. whether Defendants engaged in deceptive trade practices by shunting unearned flat client fees directly into general operating accounts rather than secure IOLTA client trust accounts; and
6. whether Defendant Juan Chinchilla engaged in a coordinated pattern of witness tampering to suppress client claims.

227. Adjudication of liability and remedies will rely exclusively on common, standardized corporate proof that is completely uniform across the entire class. This common proof includes: the unified social media marketing corpus, the standardized training scripts taught by Defendant Singh, the electronic logs of automated signature stamps, the structured commission and quota records for intake staff, and the centralized offshore drafting protocols. Because the primary remedy is system-wide fee forfeiture for a uniform breach

of loyalty, no individualized inquiry into individual petition merits or immigration outcomes is required.

228. Typicality (Fed. R. Civ. P. 23(a)(3)): Plaintiffs' claims are entirely typical of the claims of the members of the Master Class and Subclasses. Plaintiffs and all class members were subjected to the exact same industrialized assembly line, targeted by the same deceptive social media funnel, routed through the same non-attorney sales quotas, subjected to the same narrative fabrication protocols, and suffered identical economic injuries consisting of the loss of corporate legal fees and severe immigration exposure.

229. Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)): Plaintiffs will fairly and adequately protect and represent the interests of the Class and Subclasses. Plaintiffs have no interests that are antagonistic to or in conflict with those of the class. Furthermore, Plaintiffs have retained counsel who are highly experienced in complex civil rights impact litigation, consumer protection class actions, and removal defense.

**C. Rule 23(b) Pleading Criteria**

230. Predominance and Superiority (Fed. R. Civ. P. 23(b)(3)): A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The central legal and fact questions surrounding Defendants' corporate architecture, specifically the absolute failure to provide licensed attorney review and the systematic execution of signatures under penalty of perjury without client contact, predominate over any individual variations.

231. Because the primary damages theory relies upon equitable fee forfeiture for a uniform breach of the duty of loyalty, the Court is removed from examining individual case outcomes, creating an unassailable foundation for class certification. Joinder is impossible,

and separate actions would create a severe risk of inconsistent and contradictory adjudications.

232. Injunctive and Declaratory Relief (Fed. R. Civ. P. 23(b)(2)): Defendants have acted and refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole. Plaintiffs seek a permanent injunction halting Defendants' deceptive non-attorney sales operations, stopping the automated signature workflows, and compelling the immediate release of complete client files to all class members.

**D. Statute of Limitations and Fraudulent Concealment Equitable Tolling**

233. Any applicable statute of limitations has been conclusively tolled by operation of the doctrine of fraudulent concealment.

234. Defendants actively, affirmatively, and continuously concealed the true nature of their non-attorney assembly line, utilized the charade protocol to fake attorney file evaluations, and deployed Defendant Juan Chinchilla to actively mislead and intimidate aggrieved consumers.

235. Plaintiffs and class members could not have discovered the underlying fraud through the exercise of reasonable diligence because Defendants maintained absolute control over the physical files, restricted client access to receipts, and threatened critics with defamation lawsuits.

## **<u>Legal Counts and Causes of Action</u>**

### **COUNT I**

### **VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) (18 U.S.C. Section 1962(c)**

**Against Attorney Lisinski)**

236. Plaintiffs reallege and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

237. At all times relevant to this litigation, Defendants functioned as an "Enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c). Specifically, Defendants operated an association-in-fact enterprise composed of:

1. The Lisinski Law Firm, LLC;
2. Attorney Lisinski;
3. Defendant Juan Chinchilla;
4. Defendant Rea Singh;
5. All employees of the Lisinski Law Firm in the United States;
6. All employees of the Lisinski Law Firm or related entities located outside of the U.S.;
7. All entities related to and/or owned/operated by Attorney Lisinski or the Lisinski Law Firm whether in the United States or abroad;
8. All contract attorneys retained by the Lisinski Law Firm;
9. Upstream co-conspirators, including Alexandra Lozano and her related entities.

238. The association-in-fact enterprise is separate, distinct, and independent from the legal identity of Attorney Lisinski as a RICO person.

239. The Enterprise spans a multi-layered hierarchy including the corporate entity, individual executives, independent contract attorneys, offshore drafting personnel, and separate non-party licensing entities (such as Alexandra Lozano's 'AMIGA' infrastructure), each operating through separate lines of commercial authority, distinct decision-making

workflows, and segregated corporate functions.

240. The Enterprise functions with a common shared purpose: to maximize corporate revenue by extracting tens of thousands of dollars in legal fees from vulnerable, undocumented immigrants through an assembly-line processing framework structurally devoid of licensed attorney oversight.

241. Attorney Lisinski was associated with, employed by, and actively participated in the conduct of the Enterprise's affairs, directly or indirectly, through a "pattern of racketeering activity" as defined under 18 U.S.C. Section 1961(5).

242. The threat of long-term continuity is open-ended, active, and persistent. As of the current date (May 28, 2026), Defendants continue to broadcast identical deceptive marketing claims across digital platforms, maintain their rigid non-attorney sales quotas, and actively funnel hundreds of vulnerable consumers monthly through the exact same unreviewed signature and automated filing pipelines, creating a persistent and ongoing danger of severe immigration exposure and financial fraud.

243. This racketeering activity encompassed the coordinated, multi-year commission of dozens of distinct federal predicate acts, including:

1. wire fraud (18 U.S.C. Section 1343) by:
    1. transmitting deceptive marketing broadcasts, false legal assurances, and scripted sales representations across wires via TikTok and cellular communications to induce fee payments; and
    2. The receipt and processing of payments from clients through wire transfers and/or electronic payment methods.
2. mail fraud (18 U.S.C. Section 1341) by utilizing interstate postal carriers to transmit

immigration packets that were not reviewed by a U.S. licensed attorney; and

3. witness tampering (18 U.S.C. Section 1512) by utilizing interstate cellular transmissions, specifically executed by Defendant Juan Chinchilla, to intimidate aggrieved clients, provide pretextual excuses for operational fraud, and corruptly influence victims to withhold testimony and decline civil participation.

244. The predicate acts committed by the Defendants are directly related, possess identical commercial targets of victims, deploy identical operational methodologies, and carry a distinct threat of long-term continuity because the Enterprise continues to broadcast deceptive content and process thousands of immigrant consumers through its assembly-line infrastructure daily.

245. As a direct and proximate result of the Defendants' racketeering activity and management of the Enterprise, Plaintiffs and the members of the Nationwide Master Class suffered concrete financial and proprietary injuries, including the forfeiture of thousands of dollars in corporate flat fees and the complete loss of lawful employment.

**COUNT II**

**CONSPIRACY TO VIOLATE CIVIL RICO (18 U.S.C. Section 1962(d) — Against All Defendants)**

246. Plaintiffs reallege and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

247. Defendants, through their executive leadership, corporate ownership, and employment actions, knowingly, willfully, and intentionally conspired, combined, and agreed together with each other, and with upstream co-conspirators Alexandra Lozano, to violate 18 U.S.C. Section 1962(c).

248. Each Defendant explicitly agreed to the overall structure of the racketeering conspiracy

and knew that the success of the multi-million-dollar immigration mill depended entirely upon the coordinated commission of federal wire fraud, mail fraud, and post-fraud witness tampering.

249. In furtherance of the conspiracy, the individual Defendants executed clear operational tasks:

1. Attorney Lisinski managed the macro-marketing redefinitions on TikTok and executed unreviewed federal filings;
2. Defendant Rea Singh institutionalized, and executed the deceptive consultation charade protocol to weaponize non-attorney staff; and
3. Defendant Juan Chinchilla executed direct witness intimidation to insulate the conspiracy from civil exposure.

250. As a direct and proximate result of the Defendants' racketeering conspiracy, Plaintiffs and the members of the Nationwide Master Class suffered severe financial and proprietary injuries within the meaning of 18 U.S.C. Section 1964(c).

**COUNT III**
**BREACH OF FIDUCIARY DUTY / BREACH OF THE DUTY OF LOYALTY**

**(Ohio Common Law — Against Attorney Lisinski and Lisinski Law — On Behalf of the Nationwide Master Class and Ohio Subclass)**

251. Plaintiffs reallege and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

252. An attorney-client relationship existed between each class member and Defendants throughout the Class Period.

253. Under Ohio law, an attorney owes every client an absolute, non-delegable fiduciary duty of loyalty.

254. This sacred obligation requires that an attorney act with scrupulous honesty, maintain undivided loyalty, and protect the client's vital legal interests.

255. Ohio law applies to the breach of fiduciary duty and breach of the duty of loyalty claims asserted by the Nationwide Master Class and the Ohio Subclass because Defendants' principal place of business and corporate headquarters are located in Powell, Ohio, the operational decisions and policies giving rise to the deceptive contracts and attorney-client engagements were executed and implemented in Ohio, and the attorney-client relationships at issue were governed by the professional and ethical duties imposed on Ohio-licensed attorneys.

256. Crucially, the duty of loyalty flatly prohibits an attorney from knowingly placing her own financial self-interest above her clients by designing or advancing an automated, entrepreneurial system that the attorney knew was structurally incapable of delivering individualized legal representation, while concealing that structural incapacity from clients and charging substantial legal fees for it.

257. Defendants committed a clear, serious, and uniform breach of the duty of loyalty to every member of the Class by knowingly and deliberately subordinating clients' interests to Defendants' own financial self-interest.

258. The gravamen of this count does not rest on an individualized inquiry into the specific technical merits or outcomes of any single filing, nor does it allege professional malpractice.

259. Instead, the breach is Defendants' intentional and self-interested decision to design, implement, and profit from the flawed system itself, notwithstanding their knowledge that it prevented licensed attorneys from reviewing client matters.

260. Defendants knowingly engineered an operational architecture that systematically separates the client from licensed counsel for Defendants' own pecuniary benefit, structurally ensuring that at no point during the process does an actual licensed attorney engage in an evaluation of the file, let alone a meaningful one on one review with the client.

261. Defendants further advanced this systemic breach of loyalty by utilizing an automated protocol where Attorney Lisinski applies her electronic or stamped signature to official federal preparer certifications and supporting declarations under penalty of perjury.

262. Attorney Lisinski knowingly executes these certifications despite the fact that she has never met with, spoken to, or consulted the clients to review their applications or verify the truthfulness of the underlying text, using her licensed credentials for Defendants' financial benefit as a mechanism to advance a pipeline that completely furthers the uniform betrayal of client loyalty.

263. Under long-standing Ohio common law an attorney or law firm that engages in a clear and serious violation of the duty of loyalty is subject to the equitable remedy of complete fee forfeiture and disgorgement.

264. Under long-standing Ohio common law an attorney or law firm that engages in a clear and serious violation of the duty of loyalty is subject to the equitable remedy of complete fee forfeiture and disgorgement. Because this breach was built into the firm's foundational workflows, was executed in bad faith, and placed thousands of clients at risk of severe administrative fraud penalties, Plaintiffs and the Class are entitled to an equitable order compelling the complete forfeiture, disgorgement, and restitution of all fees collected by Defendants during the Class Period, without offset for the purported value of any services rendered, and without requiring individual proof of harm.

**COUNT IV**

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (CCPA) (C.R.S. Section 6-1-101 et seq. — Against Attorney Lisinski and Lisinski Law — On Behalf of the Colorado Subclass)**

265. Plaintiffs reallege and incorporate by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

266. Colorado law applies conclusively to the claims of the Colorado Subclass because the consumer transactions were executed within Colorado, the physical storefront infrastructure was maintained in Denver, and the economic injuries were sustained by Colorado residents.

267. Furthermore, the deceptive contracts executed by Colorado consumers utilized unconscionable fee routing provisions engineered to bypass traditional attorney trust protocols (IOLTA), shunting unearned client funds directly from Colorado into general operating accounts managed by the enterprise.

268. The Colorado Consumer Protection Act, C.R.S. Section 6-1-101 et seq. (the "CCPA"), applies downstream to the conduct of Defendants within this litigation because Defendants established a continuous, systematic, and highly lucrative business nexus within the State of Colorado throughout the Class Period.

269. Defendants deliberately targeted Colorado's low-income, monolingual Spanish-speaking consumer population through broadcast-style, nationally accessible social media campaigns via the @AbogadaAngel TikTok account, pulling vulnerable consumers into their industrialized sales pipeline. To service this pipeline, Defendants maintained physical office infrastructures in Denver, Colorado, which generated over $1,000,000 in monthly sales through the execution of the firm's rigid corporate sales quotas.

270. Under Ohio's choice-of-law principles, which follow the Restatement (Second) of Conflict

of Laws, Colorado law applies to the deceptive trade practices and fiduciary injuries inflicted upon the Colorado Subclass because the economic injuries were sustained in Colorado, the storefronts were operated in Colorado, and the deceptive client contracts executed by Colorado consumers contained unconscionable fee routing provisions explicitly designed to bypass traditional lawyer trust account (IOLTA) protocols to shunt unearned client funds directly into the firm's general operating accounts.

271. Defendants knowingly engaged in deceptive trade practices in the course of their business within the meaning of C.R.S. Section 6-1-105 by committing, among other acts:

1. knowingly misrepresenting the characteristics, uses, and benefits of the legal services they offered for sale, in violation of C.R.S. Section 6-1-105(1)(g);
2. advertising services with the intent not to sell them as advertised, in violation of C.R.S. Section 6-1-105(1)(e), by holding out a licensed firm providing attorney oversight while operating an intake pipeline staffed entirely by quota-compensated non-attorneys; and
3. knowingly engaging in unconscionable, deliberately misleading, and fraudulent acts within the meaning of C.R.S. Section 6-1-105(1)(rrr), by authorizing specialists to fake attorney evaluations and automatically affixing digital signatures to penalty-of-perjury certifications without attorney file review or client contact.

272. Defendants' deceptive practices possess a significant and devastating public impact.

1. the fraudulent scheme targeted a massive, distinct, and uniquely vulnerable pool of undocumented consumers across the State of Colorado;
2. the deceptive content was distributed via broad, broadcast-style public media channels; and

3. the immense disparity in legal sophistication was deliberately engineered by the firm's architecture to prevent consumers from recognizing the underlying fraud. Pursuant to C.R.S. Section 6-1-113, the Colorado Subclass is entitled to recover class-wide actual economic damages, statutory treble damages upon proof of bad faith, mandatory costs of suit, and reasonable attorney's fees.

**Prayer for Relief**

WHEREFORE, Plaintiffs Eva Acevedo Ortega, Veronica Alejandra Lopez Guzman, and Erik David Martinez, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment in their favor and against the Defendants, granting the following comprehensive relief:

A. An Order certifying the Nationwide Master Class, the Ohio Subclass, and the Colorado Subclass under Federal Rule of Civil Procedure 23, designating Plaintiffs as Class Representatives, and appointing undersigned counsel as Class Counsel;

B. An Order entered under Civil RICO (18 U.S.C. Section 1964(c)) awarding Plaintiffs and the Nationwide Master Class threefold (treble) their actual economic damages, along with all costs of suit and reasonable attorney's fees;

C. An Order compelling complete fee forfeiture, disgorgement, and restitution of every dollar collected by Defendants from class members during the Class Period under equitable breach of fiduciary duty and breach of the duty of loyalty principles, without offset or reduction;

D. An Order awarding class-wide treble damages and statutory penalties to the Colorado Subclass under the Colorado Consumer Protection Act for Defendants' bad-faith and intentional deceptive trade practices;

E. A Permanent Injunction pursuant to Rule 23(b)(2) immediately halting Defendants' non-attorney sales pipelines, prohibiting the automated electronic execution of unreviewed signature blocks, and compelling Defendants to immediately produce complete client files to all class members;

F. Pre-judgment and post-judgment interest at the maximum statutory rate allowed by law; and

G. All other and further relief, at law or in equity, to which Plaintiffs and the classes may be justly entitled.

**Jury Demand**

Plaintiffs Eva Acevedo Ortega, Veronica Alejandra Lopez Guzman, and Erik David Martinez, individually and on behalf of all others similarly situated, hereby demand a trial by jury on all counts and issues so triable as a matter of right.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Rachel Zupan (OH 99694)*
Rachel Rose Zupan
**Simakovsky Law**

Robert Anthony Alvarez Sr.
**Avanti Law Group, PLLC**

Perrin Rynders
Gary Mouw
**Varnum LLP**

**ATTORNEYS FOR PLAINTIFFS**

## Certificate of Service

I certify that on August 28, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Rachel Zupan (OH 99694)*
Rachel Rose Zupan
Simakovsky Law