**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **EVA ACEVEDO ORTEGA, VERONICA ALEJANDRA LOPEZ GUZMAN,** and **ERIK DAVID MARTINEZ,** individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**THE LISINSKI LAW FIRM, LLC,** an Ohio Limited Liability Company; **ANGELYNE E. LISINSKI,** an individual; **JUAN CHINCHILLA,** an individual; and **REA SINGH,** an individual,<br><br>*Defendants*. | Case No. 2:26-cv-00644-DRC-KAJ<br><br>District Judge Douglas R. Cole<br><br>Magistrate Judge Kimberly A. Jolson |

**DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants The Lisinski Law Firm, LLC ("LLF"), Angelyne E. Lisinski ("Ms. Lisinski"), and Juan Chinchilla ("Mr. Chinchilla") (collectively, "Defendants")[1], by and through their undersigned counsel, move to dismiss with prejudice the First Amended Class Action Complaint (ECF No. 15, "FAC") filed by Plaintiffs Eva Acevedo Ortega ("Ms. Acevedo Ortega"), Veronica Alejandra Lopez Guzman ("Ms. Lopez Guzman"), and Erik David Martinez ("Mr. Martinez") (collectively, "Plaintiffs"). The FAC fails to state a claim under 18 U.S.C. § 1962(c) or (d), fails to plead its fraud-based predicate acts with

[1] Defendant Rea Singh is separately and simultaneously moving to dismiss the FAC and joins this Motion as to Count II.

the particularity Rule 9(b) requires, fails to state an independent claim for breach of fiduciary duty under Ohio law, and fails to state a claim under the Colorado Consumer Protection Act. Plaintiffs also lack standing to seek permanent injunctive relief. The grounds for this Motion are set forth in the attached Memorandum in Support.

Dated: October 26, 2026

Respectfully submitted,

By: /s/David M. DeVillers
David M. DeVillers
Ohio Bar No. 0059456, Trial Counsel
Barners & Thornburg LLP
41 S. High Street Suite 3300,
Columbus, OH 43215
(614) 628-1446
DDeVillers@btlaw.com

Jason P. Mehta (*pro hac vice* forthcoming)
Florida Bar No. 106110
Foley & Lardner LLP
100 N. Tampa St., Suite 2700
Tampa, FL 33602-5810
813.225.5424
jmehta@foley.com

Tam C. Wheat (*pro hac vice* forthcoming)
California Bar No. 352916
Foley & Lardner LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2418
213.972.4500
twheat@foley.com

Michelle A. Freeman (*pro hac vice* forthcoming)
Michigan Bar No. P79790
Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
313.234.7100
mfreeman@foley.com

*Attorneys for Defendants The Lisinski Law Firm, LLC; Angelyne E. Lisinski and Juan Chinchilla*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ............ v

I. INTRODUCTION ............ 11

II. STATEMENT OF FACTS ............ 12

A. The Parties and LLF's Alleged Organizational Structure. ............ 12

B. Allegations Concerning Ms. Acevedo Ortega. ............ 13

C. Allegations Concerning Ms. Lopez Guzman and Mr. Martinez. ............ 14

D. The Claims and Alleged Predicate Acts. ............ 15

III. LEGAL STANDARD ............ 15

IV. ARGUMENT ............ 17

A. The RICO Claims (Counts I and II) Must Be Dismissed. ............ 17

1. Plaintiffs Fail to State a Claim for Violation of 18 U.S.C. § 1962(c) ............ 17

i. The FAC Does Not Adequately Plead Conduct or Participation. ............ 18

ii. Plaintiffs' Allegations Are Insufficient to Establish a RICO Enterprise. ............ 19

iii. Plaintiffs Fail to Plead Any Predicate Act and Therefore Do Not Allege a Pattern of Racketeering Activity. ............ 21

(a) The Wire- and Mail-Fraud Predicates Are Not Pleaded with Particularity. ............ 22

(b) The FAC Does Not Plead a Scheme to Defraud Furthered by Any Mailing or Wire ............ 28

(c) The FAC Does Not Plead Witness Tampering. ............ 33

iv. Plaintiffs Fail to Plead Causation. ............ 36

2. Plaintiffs Fail to State a RICO Conspiracy Under Section 1962(d). ............ 40

3. The Mail-Fraud Predicate Fails to the Extent it Rests on Petitions Submitted to USCIS Because the Noerr-Pennington Doctrine Forecloses Such Theories. ... 43

B. Count III Fails Because Ohio Does Not Recognize an Independent Breach of Fiduciary Duty Claim Against an Attorney Acting in a Professional Capacity. ........ 45

C. The CCPA Claim (Count IV) Must Be Dismissed. .................................................. 48

1. The FAC Fails to Plead Actionable Misrepresentations. .................................... 49

2. The FAC Fails to Plead the Required Knowledge, Recklessness, or Intent. ........ 50

3. The FAC Fails to Plead a Causal Link Between Advertisement and Injury. ....... 51

4. The FAC Fails to Plead a Significant Public Impact. .......................................... 52

5. The Colorado Subclass Cannot Recover Treble Damages Under the CCPA. ...... 53

D. Plaintiffs Lack Standing for Their Requested Permanent Injunction. ........................ 55

V. CONCLUSION ............................................................................................................ 56

**TABLE OF AUTHORITIES**

**Cases**

*Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Ga.*,
768 F. App'x 446 (6th Cir. 2019) .......... 30

*Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n*,
176 F.3d 315 (6th Cir. 1999) .......... 13, 18

*Allstate Ins. Co. v. Cruz*,
733 F. Supp. 3d 1098 (D. Colo. 2024 .......... 43, 44

*Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*,
702 F. App'x 416 (6th Cir. 2017) .......... 7, 18, 21, 30

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) .......... 26, 27, 28

*Arthur Andersen LLP v. United States*,
544 U.S. 696 (2005) .......... 24, 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*,
No. 2:11-cv-427, 2015 WL 12999664 (S.D. Ohio Mar. 12, 2015) .......... 34

*BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*,
848 F. Supp. 2d 818 (S.D. Ohio 2012) .......... 31

*Bar Processing Corp. v. Barnes*,
No. 1:19CV2841, 2021 WL 3679505 (N.D. Ohio Aug. 19, 2021) .......... 37

*Bar Processing Corp. v. Barnes*,
No. 21-3814, 2022 WL 1262004 (6th Cir. Apr. 28, 2022) .......... 37

*BE & K Constr. Co. v. NLRB*,
536 U.S. 516 (2002) .......... 33

*Beck v. Prupis*,
529 U.S. 494 (2000) .......... 33

*Begala v. PNC Bank, Ohio, Nat'l Ass'n*,
214 F.3d 776 (6th Cir. 2000) .......... 9, 10, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 5, 6, 8, 31

*Bender v. Southland Corp.*,
749 F.2d 1205 (6th Cir. 1984) .......... 13

*Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*,
819 F.2d 151 (6th Cir. 1987) .......... 6, 13, 18

*Boyle v. United States*,
556 U.S. 938 (2009) .......... 9, 11

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) .......... 7, 28

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .......... 33

*Carter v. Amica Mut. Ins. Co.*,
No. 17-cv-02156-RM-MEH, 2018 WL 3093320 (D. Colo. June 22, 2018) .......... 44

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 45

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .......... 40

*Craighead v. E.F. Hutton & Co.*,
899 F.2d 485 (6th Cir. 1990) .......... 13, 32

*Crowe v. Tull*,
126 P.3d 196 (Colo. 2006) .......... 38, 39, 40

*Drake v. B.F. Goodrich Co.*,
782 F.2d 638 (6th Cir. 1986) .......... 27

*Duran v. Clover Club Foods Co.*,
616 F. Supp. 790 (D. Colo. 1985) .......... 6, 37, 38

*EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*,
No. 19-13698, 2021 WL 843145 (E.D. Mich. Mar. 5, 2021) .......... 33, 34

*Faulhaber v. Petzl Am., Inc.*,
656 F. Supp. 3d 1257 (D. Colo. 2023) .......... 44

*First Choice Chiropractic, LLC v. DeWine*,
969 F.3d 675 (6th Cir. 2020) .......... 43

*Frank v. D'Ambrosi*,
4 F.3d 1378 (6th Cir. 1993) .......... 9, 10

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ........................................................................................ 19

*Fred Siegel Co., L.P.A. v. Arter & Hadden*,
85 Ohio St. 3d 171 (1999) ............................................................................................ 36

*Gen. Steel Domestic Sales, LLC v. Hogan & Hartson, LLP*,
230 P.3d 1275 (Colo. App. 2010) ................................................................................... 42

*GMA Cover Corp. v. Saab Barracuda LLC*,
No. 4:10-CV-12060, 2012 WL 642739 (E.D. Mich. Feb. 8, 2012) .............................. 34

*Grubbs v. Sheakley Grp., Inc.*,
807 F.3d 785 (6th Cir. 2015) ........................................................................................ 31

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989) ...................................................................................................... 11

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
668 F.3d 393 (6th Cir. 2012) ........................................................................ 19, 20, 21, 31

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) .......................................................................................... 26, 27, 28, 29

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992) .............................................................................................. 26, 27, 33

*Hoover v. Langston Equip. Assocs., Inc.*,
958 F.2d 742 (6th Cir. 1992) ........................................................................................ 32

*Huff v. FirstEnergy Corp.*,
972 F. Supp. 2d 1018 (N.D. Ohio 2013) ................................................................ 12, 21, 31

*In re ClassicStar Mare Lease Litig.*,
727 F.3d 473 (6th Cir. 2013) ...................................................................................... 7, 9

*Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) ........................................................................................ 33

*Kann v. United States*,
323 U.S. 88 (1944) ................................................................................................ 12, 22, 29

*Kerrigan v. ViSalus, Inc.*,
112 F. Supp. 3d 580 (E.D. Mich. 2015) ........................................................ 11, 21, 26, 30

*Lefkowitz v. Ackerman*,
No. 2:16-CV-00624, 2017 WL 4237068 (S.D. Ohio Sept. 25, 2017) ......................... 27

*Melton v. Blankenship*,
No. 08-5346, 2009 WL 87472 (6th Cir. Jan. 13, 2009) .......... 7

*Monson v. Country Preferred Ins. Co.*,
No. 17-cv-02130-RBJ, 2018 WL 11016704 (D. Colo. Sept. 28, 2018) .......... 43, 44

*Moon v. Harrison Piping Supply*,
465 F.3d 719 (6th Cir. 2006) .......... 7

*Muir v. Hadler Real Est. Mgmt. Co.*,
4 Ohio App. 3d 89 (1982) .......... 35, 37

*Omega Riggers & Erectors, Inc. v. Koverman*,
65 N.E.3d 210 (Ohio Ct. App. 2016) .......... 35

*Ouwinga v. Benistar 419 Plan Servs., Inc.*,
694 F.3d 783 (6th Cir. 2012) .......... 8

*Park Rise Homeowners Ass'n, Inc. v. Res. Constr. Co.*,
155 P.3d 427 (Colo. App. 2006) .......... 39, 41

*Pearson v. Geico Cas. Co.*,
No. 17-cv-02116-CMA-MEH, 2018 WL 2096348 (D. Colo. May 7, 2018) .......... 44

*Penn, LLC v. Prosper Bus. Dev. Corp.*,
No. 2:10-CV-993, 2011 WL 2118072 (S.D. Ohio May 27, 2011) .......... 8, 21

*Pertile v. Gen. Motors, LLC*,
No. 15-CV-0518-WJM-NYW, 2017 WL 4237870 (D. Colo. Sept. 22, 2017) .......... 38

*Peterson v. USAA Life Ins. Co.*,
353 F. Supp. 3d 1099 (D. Colo. 2018) .......... 41

*Peterson v. USAA Life Ins. Co.,*
814 F. App'x 408 (10th Cir. 2020) .......... 41

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
654 F.3d 618 (6th Cir. 2011) .......... 37

*Prater v. Livingston Ave. Child Care, LLC*,
No. 2:14-cv-490, 2015 WL 1439322 (S.D. Ohio Mar. 27, 2015) .......... 6, 8, 19

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) .......... 33

*Puckett v. Tenn. Eastman Co.*,
889 F.2d 1481 (6th Cir. 1989) .......... 24

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) .......... 8

*RevoLaze LLC v. Dentons US LLP*,
191 N.E.3d 475 (Ohio Ct. App. 2022) .......... 35

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
62 P.3d 142 (Colo. 2003) .......... 41

*Rumley v. Buckingham, Doolittle & Burroughs*,
129 Ohio App. 3d 638 (1998) .......... 36

*Salinas v. United States*,
522 U.S. 52 (1997) .......... 30, 31

*Shields v. UnumProvident Corp.*,
415 F. App'x 686 (6th Cir. 2011) .......... 10, 11

*Taborac v. NiSource, Inc.*,
No. 2:11-CV-498, 2011 WL 5025214 (S.D. Ohio Oct. 21, 2011) .......... 25, 26

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,
838 F.3d 750 (6th Cir. 2016) .......... 6

*United States v. Burns*,
298 F.3d 523 (6th Cir. 2002) .......... 8, 23

*United States v. DeSantis,*
134 F.3d 760 (6th Cir. 1998) .......... 12

*United States v. Driver*,
535 F.3d 424 (6th Cir. 2008) .......... 32

*United States v. Faulkenberry*,
614 F.3d 573 (6th Cir. 2010) .......... 7, 12, 18

*United States v. Householder*,
137 F.4th 454 (6th Cir. 2025) .......... 11, 26

*United States v. Householder*,
224 L. Ed. 2d 526 (Apr. 27, 2026) .......... 11

*United States v. Maze*,
468 F.2d 529 (6th Cir. 1972) .......... 12

*United States v. Ogbazion*,
No. 3:15-cr-104, 2021 WL 3847829 (S.D. Ohio Aug. 27, 2021) .......... 21

*United States v. Sinito,*
723 F.2d 1250 (6th Cir. 1983) ........................................................ 30

*United States v. Turner*,
465 F.3d 667 (6th Cir. 2006) ........................................................ passim

*United States v. Young*,
916 F.3d 368 (4th Cir. 2019) ........................................................ 25

*Well Augmentation Subdistrict of Cent. Colo. Water Conservancy Dist. v. City of Aurora*,
221 P.3d 399 (Colo. 2009)........................................................ 43

*Westmac, Inc. v. Smith*,
797 F.2d 313 (6th Cir. 1986) ........................................................ 33

*Wozniak v. Sinsel*,
No. 1:07 CV 2927, 2007 WL 4510262 (N.D. Ohio Dec. 18, 2007)........................................ 20

*Yuhasz v. Brush Wellman, Inc.*,
341 F.3d 559 (6th Cir. 2003) ........................................................ 13, 18

**Statutes**

18 U.S.C. § 1512........................................................ 23

18 U.S.C. § 1515(a) ........................................................ 24

18 U.S.C. § 1962........................................................ *passim*

18 U.S.C. § 1964(c) ........................................................ 26

C.R.S. § 6-1-101 *et seq* ........................................................ 37, 39, 40, 43

**Rules**

Fed. R. Civ. P. 9(b) ........................................................ *passim*

Fed. R. Civ. P. 12(b)(6)........................................................ 5, 6, 44

**INTRODUCTION**

Plaintiffs seek to turn a dispute over the quality of legal representation into a federal racketeering case. Each retained LLF, an experienced immigration law firm serving clients nationwide, to pursue immigration benefits before U.S. Citizenship and Immigration Services ("USCIS"), and each was dissatisfied with the representation and outcome. The FAC challenges how LLF marketed its services, staffed its intake process, delegated work, and prepared and submitted immigration filings. But allegations of deficient or allegedly deceptive legal services do not, without more, establish a racketeering enterprise. Even accepted as true, the FAC's allegations fail to supply the facts necessary to bridge that gap.

Plaintiffs' RICO claims fail at every critical step. Their alleged predicate acts—wire fraud, mail fraud, and witness tampering—are not pleaded with the particularity Rule 9(b) demands. Indeed, although the FAC reproduces a catalog of LLF social-media videos, it does not identify what statement in any video any Plaintiff relied upon; it alleges only that Plaintiffs "were exposed to and relied upon representations of *this kind*." FAC ¶ 96 (emphasis added). Nor does the FAC plausibly allege the existence of an association-in-fact enterprise distinct from LLF's own operations, Ms. Lisinski's conduct of the affairs of that enterprise, a pattern of racketeering activity, or a direct causal connection between any alleged predicate act and Plaintiffs' injuries. Count II is no stronger. The RICO conspiracy claim rests on the perfunctory assertion that "[e]ach Defendant explicitly agreed to the overall structure of the racketeering conspiracy," but this is a legal conclusion, not a well-pleaded fact. *Id.* ¶ 248. As to Mr. Chinchilla, who is named only in Count II, the FAC identifies only one telephone call he allegedly made, yet summarily asserts such conduct "continue[s] today," without any factual support. *Id.* ¶¶ 139–44. Count II further fails to identify any federal proceeding in which testimony would be offered, much less facts showing Mr.

Chinchilla's alleged intent to influence testimony. Nor does a single call show that he agreed to any other racketeering act. Labels and conclusions cannot fill those pleading gaps.

The state-law claims fail for the same basic reason: artful labeling and the assertion of bare legal conclusions cannot replace missing elements. Count III repackages a legal-malpractice theory as breach of fiduciary duty. While Plaintiffs expressly disclaim malpractice (*id.* ¶ 258), Ohio law does not recognize an independent fiduciary-duty claim against an attorney based on conduct undertaken in the course of representation. Count IV likewise fails because the FAC does not plausibly allege an actionable misrepresentation, knowing deception, causation, or the significant public impact required under the Colorado Consumer Protection Act ("CCPA"). Because amendment has not cured the fundamental defects in Plaintiffs' claims, and no further amendment can transform what is, at its core, a malpractice claim into a RICO enterprise, the Court should dismiss the FAC in its entirety and with prejudice.

## STATEMENT OF FACTS

### The Parties and LLF's Alleged Organizational Structure.

LLF is an immigration law practice headquartered in Powell, Ohio. FAC ¶ 35. Its work includes petitions under the Violence Against Women Act ("VAWA") and applications for T nonimmigrant status ("T visas"). *Id.* ¶ 7. The FAC alleges Ms. Lisinski is LLF's sole owner, managing member, and principal figurehead; Mr. Chinchilla, her husband, holds the title of Business Manager; and Rea Singh served as an in-house associate and ethics and compliance trainer. *Id.* ¶¶ 41, 46, 50.

The FAC further alleges LLF divides its ordinary law-firm functions among units responsible for scheduling, intake, drafting, collections, and offshore writing. *Id.* ¶ 75. Non-attorney Legal Intake Specialists conduct initial client screenings, and LLF advertises on TikTok

and YouTube under the "Abogada Ángeles" brand. *Id.* ¶¶ 82, 97. The FAC defines the alleged association-in-fact RICO "enterprise" to encompass LLF's owners, officers, employees, contractors, affiliated entities, and outside businesses supposedly affiliated with LLF, including Ms. Lisinski, Mr. Chinchilla, Ms. Singh, and Alexandra Lozano and her related entities. *Id.* ¶ 237.

**Allegations Concerning Ms. Acevedo Ortega.**

In August 2024, Ms. Acevedo Ortega's employer told her upcoming corporate document audits required a renewed Employment Authorization Document ("EAD"). *Id.* ¶ 145. She alleges that, on or about August 20, 2024, she viewed an unidentified "@AbogadaAngel" TikTok video, which she characterizes as conveying false outcome guarantees and minimizing the statutory requirements for humanitarian relief. *Id.* ¶ 146. The FAC neither quotes the video nor identifies the statement on which Ms. Acevedo Ortega allegedly relied. *See id.* She called LLF on August 28, 2024, and attended an intake consultation at LLF's Denver office the following day. *Id.* ¶ 147.

Ms. Acevedo Ortega alleges that, during the consultation, an unidentified male sales representative conducted a one-hour screening and represented LLF's strategy would result in an EAD within six to eight months and a green card within three years. *Id.* ¶¶ 150, 152. She further alleges that, after leaving and returning to the room, the representative stated that Ms. Lisinski had personally reviewed her file and authorized a VAWA strategy. *Id.* ¶¶ 153–54. That same day, Ms. Acevedo Ortega signed a Contract for Legal Services for a total fee of $12,000.[2] *Id.* ¶ 157.

On or about May 28, 2025, Defendants allegedly mailed Ms. Acevedo Ortega a packet containing signature pages marked with bright neon "ALTO" stickers. *Id.* ¶ 161. She returned the signed pages by FedEx on June 2, 2025, and LLF submitted her Form I-360 that month. *Id.* ¶¶ 162, 168. The FAC does not allege other methods of communication between Ms. Acevedo Ortega and

[2] The FAC elsewhere alleges that Ms. Acevedo Ortega paid "a total of $10,500 in flat fees," *id.* ¶¶ 28, 173; Defendants cite the itemized payments in paragraph 158, which total $12,000.

LLF, such as email transmittals of documents for signature. *See generally id.* On February 12, 2026, she received USCIS rejection notices for her Forms I-485, I-765, and I-131. *Id.* ¶ 171.[3] She alleges that she subsequently lost her employment authorization and her job. *Id.* ¶ 174.

**Allegations Concerning Ms. Lopez Guzman and Mr. Martinez.**

Ms. Lopez Guzman alleges she first contacted LLF after a friend referred her to the firm following a robbery in 2023. *Id.* ¶ 170 (Lopez Guzman). She retained LLF at its Powell office on or around May 11, 2023. *Id.* ¶ 29. At her intake consultation, a non-attorney staff member identified as "Maggie" or "Margie" advised that both U visa and T visa relief were available and recommended the T visa as the easier and faster option. *Id.* ¶¶ 171, 173–74 (Lopez Guzman). The FAC does not allege any statement was made to Mr. Martinez directly, nor does it allege he attended the intake consultation. *Id.* ¶¶ 170 (Lopez Guzman) 196. The alleged assurances concerning his removal order were made to Ms. Lopez Guzman. *Id.* ¶ 199.

Ms. Lopez Guzman and Mr. Martinez entered into a $12,500 flat-fee agreement with LLF covering both matters. *Id.* ¶¶ 177–78. The FAC alleges Defendants generally obtained their signatures electronically and, on unspecified occasions, mailed them only signature pages. *Id.* ¶ 201. It does not identify when any such mailing occurred or connect a particular mailing to a particular payment. *See id.* ¶¶ 201–02. Nor does the FAC discuss Ms. Lopez Guzman's and Mr. Martinez's other communications with, and means of providing signatures to, LLF, such as via email and DocuSign. *See generally id.*

Plaintiffs allege the T visa application was denied, and Ms. Lopez Guzman was directed to appear in immigration court on September 8, 2025. *Id.* ¶ 206. LLF then prepared to refile the

[3] The FAC repeats paragraph numbers 170 through 174: the first sequence appears in Section H (Ms. Acevedo Ortega), and the second in Section I (Ms. Lopez Guzman and Mr. Martinez). Citations to the second sequence are designated "(Lopez Guzman)" — *e.g.*, FAC ¶ 171 (Lopez Guzman).

application, but Ms. Lopez Guzman did not return the refiling packet and instead retained new counsel. *Id.* ¶¶ 208, 211. Plaintiffs allege they paid LLF approximately $16,000 in total. *Id.* ¶ 216.

**The Claims and Alleged Predicate Acts.**

Count I attempts to assert a substantive RICO claim under 18 U.S.C. § 1962(c) against Ms. Lisinski only. Count II attempts to assert a RICO conspiracy claim under Section 1962(d) against all Defendants, including Ms. Singh. The FAC identifies only three categories of alleged predicate acts, specifically:

- **Wire fraud** by (1) supposedly "transmitting deceptive marketing broadcasts, false legal assurances, and scripted sales representations across wires via TikTok and cellular communications to induce fee payments," and (2) "[t]he receipt and processing of payments from clients through wire transfers and/or electronic payment methods." *Id.* ¶ 243.
- **Mail fraud** by "utilizing interstate postal carriers to transmit immigration packets that were not reviewed by a U.S. licensed attorney." *Id.* ¶ 243.
- **Witness tampering**, allegedly "executed by Defendant Juan Chinchilla," based on a single May 1, 2026 telephone call with an unnamed "aggrieved client." *Id.* ¶¶ 139–43.

In support of the alleged conspiracy, the FAC points to Ms. Lisinski's management of LLF's TikTok page and submission of filings allegedly lacking attorney review and to Mr. Chinchilla's alleged witness intimidation. *Id.* ¶ 249. The FAC does not identify when or how any Defendant allegedly agreed to participate in the supposed racketeering conspiracy. Count III, for breach of fiduciary duty under Ohio law, and Count IV, under the CCPA, are asserted against Ms. Lisinski and LLF only.

## LEGAL STANDARD

Dismissal is proper under Federal Rule of Civil Procedure 12(b)(6) when a complaint "fail[s] to state a claim upon which relief can be granted." To survive dismissal, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a motion to dismiss, courts accept well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id*. However, this presumption of truth does not extend to "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* A plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

For fraud claims, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard, which requires the plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The plaintiff must, at a minimum, "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Prater v. Livingston Ave. Child Care, LLC*, No. 2:14-cv-490, 2015 WL 1439322, at *4 (S.D. Ohio Mar. 27, 2015) (internal citation omitted). Rule 9(b)'s "particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 771 (6th Cir. 2016) (internal citation omitted).

RICO claims predicated on mail or wire fraud must satisfy Rule 9(b)'s heightened pleading standard. *Id.*; *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.,* 819 F.2d 151, 152–53 (6th Cir. 1987) ("[f]raud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact made by the defendant . . ."). Similarly, claims for violations of the CCPA

are subject to Rule 9(b)'s particularity requirements because such claims are fraud claims at their core. *See Duran v. Clover Club Foods Co.*, 616 F. Supp. 790, 793 (D. Colo. 1985).

**ARGUMENT**

**The RICO Claims (Counts I and II) Must Be Dismissed.**

Plaintiffs' allegations concerning LLF's legal services must satisfy RICO's distinct requirements. As the Sixth Circuit has recognized, it is "extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks." *Melton v. Blankenship*, No. 08-5346, 2009 WL 87472, at *3 (6th Cir. Jan. 13, 2009) (internal citation omitted). The issue here is whether the FAC's allegations, accepted as true, plead the requisite elements, including the specificity Rule 9(b) demands for the fraud predicates. They do not, and Counts I and II must be dismissed.

**Plaintiffs Fail to State a Claim for Violation of 18 U.S.C. § 1962(c)**

To state a claim under 18 U.S.C. § 1962(c), Plaintiffs must establish that Defendants (i) conducted or participated in (ii) an enterprise (iii) through a pattern of racketeering activity including at least two racketeering acts, and (iv) caused injury to business or property. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006); *Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*, 702 F. App'x 416, 421 (6th Cir. 2017). As the Sixth Circuit has explained, plaintiffs "attempting to assert an injury 'by reason of' a RICO violation must demonstrate both but-for causation and proximate causation." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653–54 (2008)). Failure to plead any one element requires dismissal.

Moreover, to plead mail or wire fraud as a RICO predicate, Plaintiffs must allege that a defendant "devised or willfully participated in a scheme to defraud," used the mails or an interstate

wire communication "in furtherance of the scheme," and "intended to deprive a victim of money or property." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotations omitted); *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006). Because these predicates sound in fraud, they must be pleaded with particularity under Rule 9(b). *Prater*, 2015 WL 1439322, at *4. Separately, to plead witness tampering, Plaintiffs must allege that a defendant "(1) corruptly persuade[d] (2) a witness in an official federal proceeding (3) with the intent to influence that witness's testimony." *United States v. Burns*, 298 F.3d 523, 540 (6th Cir. 2002). As explained below, the FAC does not adequately plead any of these predicate offenses, and the RICO claims therefore should be dismissed.

**The FAC Does Not Adequately Plead Conduct or Participation.**

Each RICO defendant "must participate in the operation or management of the enterprise itself" in order to be subject to Section 1962(c) liability. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Likewise, a defendant must "conduct[] or participate[] in the conduct of the '*enterprise's* affairs,' not just [her] *own* affairs." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792 (6th Cir. 2012) (emphasis in original); *see also Penn, LLC v. Prosper Bus. Dev. Corp.*, No. 2:10-CV-993, 2011 WL 2118072, at *13 (S.D. Ohio May 27, 2011) (concluding provision of traditional legal services does not constitute operation or management of enterprise for RICO purposes).

In substance and as described below, the alleged enterprise is LLF itself. *See* § IV.A.1.ii, *infra*. The FAC alleges only that Ms. Lisinski managed LLF's marketing and legal-services operations, not that she directed, conducted, or participated in the affairs of a distinct RICO enterprise. Her alleged roles, including directing macro-marketing and serving as the primary certifying authority, concern LLF's business operations. *See Penn, LLC*, 2011 WL 2118072, at *13. The FAC also does not identify any enterprise, separate from LLF, whose affairs Ms. Lisinski

allegedly conducted. *See Ouwinga*, 694 F.3d at 792. Instead, it merely asserts that Ms. Lisinski "actively participated in the conduct of the Enterprise's affairs," a conclusory allegation the Court need not accept as true. FAC ¶ 241; *see Twombly*, 550 U.S. at 555. Because the FAC does not plausibly allege that Ms. Lisinski conducted the affairs of a distinct RICO enterprise, Count I must be dismissed.

**Plaintiffs' Allegations Are Insufficient to Establish a RICO Enterprise.**

Plaintiffs additionally fail to allege a plausible common purpose among alleged members of the enterprise or cohesiveness among members to establish a RICO enterprise separate and apart from LLF's ordinary operations as a law firm. A RICO enterprise must have three "structural features": (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 944, 946 (2009). A pattern of racketeering activity does not necessarily establish the existence of a RICO enterprise. *Id.* at 947. Rather, an association-in-fact enterprise "must be an ongoing organization, its members must function as a continuing unit, and it must be separate from the pattern of racketeering activity in which it engages." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993) (internal citation omitted). But "[a]n organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000). Accordingly, an entity "may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members." *Id.*; *In re ClassicStar*, 727 F.3d at 490.

The FAC's alleged "enterprise" consists of LLF itself and its owners, officers, employees, contractors, affiliates, and service providers. FAC ¶ 237. The named participants in the supposed enterprise are LLF's "sole owner, managing member, and principal figurehead," *id.* ¶ 41; LLF's

"Business Manager," *id.* ¶ 46; and a former "in-house associate and ethics/compliance trainer," *id.* ¶ 50. The FAC attempts to draw in LLF's unnamed employees, offshore staff, and contract attorneys, but those are the firm's own personnel or vendors performing ordinary business functions. *Id.* ¶ 237. Likewise, the "separate lines of commercial authority, distinct decision-making workflows, and segregated corporate functions" through which the supposed enterprise allegedly operates are principally LLF's own departments: "scheduling, legal intake (sales), drafting, collections, and offshore writing teams." *Id.* ¶¶ 75, 239. These allegations therefore describe LLF's organizational structure and regular business relationships—not a distinct association whose members function as a continuing unit apart from LLF—and thus are insufficient to establish a RICO enterprise. *See Shields v. UnumProvident Corp.*, 415 F. App'x 686, 691 (6th Cir. 2011) (holding that plaintiffs failed to state a RICO claim by merely listing a company's subsidiaries, affiliates, customers, contractors, and regulators without alleging facts showing those entities were "coordinated in such a way that they function as a continuing unit"). The FAC does what *Begala* forbids: paragraph 237 lists LLF's owners, employees, contractors, and "affiliated" outsiders, while paragraph 243 lists categories of predicate acts, without alleging facts showing that those persons coordinated as a unit apart from LLF's ordinary operations. *See Begala*, 214 F.3d at 781–82 (rejecting a complaint that "essentially lists a string of entities allegedly comprising the enterprise, and then lists a string of supposed racketeering activities"). That Ms. Lisinski is legally distinct from LLF does not relieve Plaintiffs of the obligation to plead an association-in-fact that functions as a continuing unit separate from the alleged pattern of racketeering activity. *See Frank*, 4 F.3d at 1386.

The FAC's allegations regarding the supposed enterprise's remaining participants do not cure this defect. Allegations that unidentified "subsidiaries, affiliates . . . independent contractors,"

and other third parties comprise an association-in-fact are insufficient absent facts showing those actors actually operated with Defendants as a "continuing unit." *See Shields*, 415 F. App'x at 691. As to third-party vendors in particular, more is required than allegations that they maintained a "business relationship" with, or "perform[ed] services" for, the alleged enterprise, but the FAC pleads no facts showing such coordination. *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 603 (E.D. Mich. 2015) (holding that providing ordinary services to the alleged enterprise did not constitute conducting its affairs). Indeed, Ms. Lozano is alleged only to have licensed "operational blueprints, pre-packaged training templates, and case-processing workflows" to LLF. FAC ¶ 74. Such allegations are insufficient to show Ms. Lozano shared a common purpose, or even had any continuing relationship, with Defendants. *See Boyle*, 556 U.S. at 944-45. Plaintiffs therefore have not adequately pled an association-in-fact enterprise. *Begala*, 214 F.3d at 781-82; *Shields*, 415 F. App'x at 691.

**Plaintiffs Fail to Plead Any Predicate Act and Therefore Do Not Allege a Pattern of Racketeering Activity.**

To successfully allege a pattern of racketeering activity, a plaintiff must plead facts showing the defendants committed at least two predicate acts that are "related *and* that . . . amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). Under Section 1962(c), each defendant must personally commit two predicate acts creating a pattern of racketeering activity. *United States v. Householder*, 137 F.4th 454, 486 (6th Cir. 2025), cert. denied, 224 L. Ed. 2d 526 (Apr. 27, 2026); *see also Kerrigan*, 112 F. Supp. 3d at 604–06 (in a multi-defendant § 1962(c) action, "a plaintiff must allege that *each defendant* individually committed at least two predicate acts.") (emphasis in original). The FAC does not adequately plead even one of the alleged predicate offenses, much less the two necessary to establish a pattern. Count I therefore fails at this threshold.

Plaintiffs allege three predicate acts: mail fraud, wire fraud, and witness tampering. Plaintiffs do not adequately plead facts supporting any of them. The fraud predicates are not pleaded with particularity, the FAC does not plead a scheme to defraud furthered by any mailing or wire, and the FAC does not plead witness tampering.

**The Wire- and Mail-Fraud Predicates Are Not Pleaded with Particularity.**

To plead either fraud predicate, Plaintiffs must allege a scheme to deprive a victim of money or property and use of the mails or interstate wires in furtherance of that scheme. *See Faulkenberry*, 614 F.3d at 581; *Turner*, 465 F.3d at 680. Plaintiffs must also plead scienter by alleging facts supporting a plausible inference that the defendant acted either with a specific intent to defraud or with recklessness regarding potentially misleading information. *United States v. DeSantis,* 134 F.3d 760, 764 (6th Cir. 1998). Critically, mailings must be "for the purpose of executing" the alleged scheme. *Kann v. United States*, 323 U.S. 88, 94 (1944). The mail fraud statute does not reach mailings that occur after the defendants have already "received the money intended to be obtained by their fraud." *Id.*; *see also Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1036-37 (N.D. Ohio 2013) (finding that no deprivation of money or property defeated a mail fraud claim); *United States v. Maze*, 468 F.2d 529, 534 (6th Cir. 1972) (reaffirming that mailings occurring after the defendant has obtained the victim's money are not in furtherance of the scheme).

The FAC attempts to allege wire and mail fraud through (i) "transmitting deceptive marketing broadcasts, false legal assurances, and scripted sales representations across wires via TikTok and cellular communications to induce fee payments," (ii) "[t]he receipt and processing of payments from clients through wire transfers and/or electronic payment methods," and (iii) mailing Plaintiffs "entirely blank or isolated signature pages." FAC ¶¶ 161, 201–02, 208, 243(1)(1)–(2).

Plaintiffs' allegations lack the particularity required to plead fraud and separately fail to adequately plead a scheme to defraud.

To satisfy Rule 9(b), a plaintiff asserting a RICO claim must plead fraudulent predicate acts with particularity; vague and conclusory allegations will not suffice. *Advoc. Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999); *see also Bender v. Southland Corp.*, 749 F.2d 1205, 1215–16 (6th Cir. 1984) (affirming dismissal of RICO claims predicated on mail fraud for failure to satisfy Rule 9(b)'s particularity requirements). Generalized allegations that defendants used the mails or wires to commit fraud are insufficient to satisfy Rule 9(b) absent allegations specifically identifying the false statements, the speakers, and why the statements were false. *See Blount*, 819 F.2d at 152–53. Additionally, the failure to identify specific parties or fraudulent acts requires dismissal. *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 564 (6th Cir. 2003) ("The failure to identify specific parties, contracts, or fraudulent acts requires dismissal.").

Put differently, for each category of alleged wire and mail fraud, Rule 9(b) requires Plaintiffs to identify the speaker, the content of the statement, when and where it was made, and why it was false—element by element—not merely in the aggregate. *See Bender*, 749 F.2d at 1216; *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 489–90 (6th Cir. 1990). The FAC fails to meet this standard. It quotes excerpts from LLF's social-media videos, but it does not allege any Plaintiff saw them. FAC ¶¶ 85–96. Only Ms. Acevedo Ortega alleges she viewed a video at all, and the FAC neither quotes nor describes what it said. *Id.* ¶ 146. Ms. Lopez Guzman alleges she came to LLF through a friend's referral, i*d.* ¶ 170 (Lopez Guzman), and neither she nor Mr. Martinez alleges seeing any video. The FAC instead alleges only that Plaintiffs "were exposed to and relied upon representations of this kind." *Id.* ¶ 96. Figure 1 below illustrates the pleading deficiencies in

each category of allegedly fraudulent conduct identified in the FAC and shows that even the allegations specific to Plaintiffs themselves—which are considerably more developed than the anonymous, class-wide anecdotes recounted at paragraphs 218 through 221—fail to satisfy Rule 9(b):

**Figure 1. Alleged Fraud and Rule 9(b) Pleading Deficiencies**

| **Category of Alleged Fraud** | **FAC's Allegations** | **Missing Rule 9(b) Elements** |
|---|---|---|
| **Alleged Wire Fraud** via TikTok videos containing alleged false statements | Transcripts and translations appear in FAC ¶¶ 85–96. However, for brevity, the transcripts are not reproduced here.<br><br>The FAC alleges that "[e]ach of the foregoing statements was made by Attorney Lisinski or by Defendants' agents acting within the scope of their agency," and that "Plaintiffs and members of the putative class were exposed to and relied upon representations of this kind in deciding to retain Defendants and to pay Defendants' fees." *Id.* at ¶ 96.<br><br>The FAC alleges that Ms. Lisinski "operates the @AbogadaAngel Tiktok channel" without acknowledging the actual speakers in the various videos cited. *Id.* at ¶ 42, ¶¶ 85–96. | **WHO:** The FAC alleges that each quoted statement "was made by Attorney Lisinski or by Defendants' agents acting within the scope of their agency," but it does not identify who made which statement or who actually transmitted or published the allegedly fraudulent wire communications. FAC ¶ 96. The FAC likewise does not allege which Plaintiffs were exposed to which statements. Without those allegations, it fails to plead the "who" of the alleged fraud with the particularity Rule 9(b) requires.<br><br>Ms. Acevedo Ortega alleges she viewed one date-stamped video (¶ 146) but does not identify which of the catalogued videos it was or quote it; no other Plaintiff alleges viewing any specific video. *Id.* ¶¶ 85–96, 146.<br><br>**WHY FALSE:** The FAC characterizes the quoted statements but does not tie any of them to a Plaintiff, and many are statements of opinion, predictions or comparative advertising. |
| **Alleged Wire Fraud** via TikTok video viewed August 20, 2024, and additional, undated TikTok videos | Ms. Acevedo Ortega viewed a "specific, date-stamped '@AbogadaAngel' TikTok video" "on or about August 20, 2024" that was "broadcast across interstate wires, which delivered false outcome guarantees and minimized the statutory requirements for humanitarian relief." *Id.* ¶ 146. | **WHO:** The FAC identifies the @AbogadaAngel account but does not identify who was speaking in the video. *Id.* ¶ 146.<br><br>**WHEN:** The FAC alleges only when the video was viewed "on or about August |

| | | |
|---|---|---|
| | Plaintiffs allege Defendants engaged in wire fraud by "transmitting deceptive marketing broadcasts, false legal assurances, and scripted sales representations across wires via TikTok and cellular communications to induce fee payments." *Id.* ¶ 243. | 20, 2024." It provides no time of day or further specificity. *Id.*<br><br>**WHY FALSE:** The video's content is neither quoted nor described beyond the FAC's characterization. *Id.* |
| **Alleged fraud**, though no mail or wire transmission is identified, via Ms. Acevedo Ortega's Denver Office intake consultation | "A male sales representative conducted a one-hour screening" where he allegedly "assured [Ms. Acevedo Ortega] that a routine work permit renewal was an inferior option" and "guarantee[d] her an EAD within six to eight months and a green card within three years." *Id.* ¶¶ 150, 152. He allegedly stated Ms. Lisinski "had personally vetted her file and authorized a VAWA strategy." *Id.* ¶ 154. The representative further "overrode [Ms. Acevedo Ortega's] objections stating that under the firm's specialized method, 'typical family problems' were entirely sufficient." *Id.* ¶ 156. | **WHO:** The unnamed "male sales representative" is never identified.<br><br>**NO WIRE OR MAIL TRANSMISSION ALLEGED:** These statements were made in person at the Denver office; the FAC does not allege that they were transmitted by wire or mail. *Id.* ¶¶ 147–54, 243. |
| **Alleged fraud**, though no mail or wire transmission is identified, via Ms. Lopez Guzman's Powell Office intake consultation | "Maggie steered Ms. Lopez Guzman away from the U visa, telling her that a U visa based on the robbery could take up to ten years, required a great deal of paperwork, and probably would not be granted. Maggie steered her toward the T visa, telling her that it was much easier and much faster, that it was in substance her word against theirs, and that on that basis 'we have it won.'" *Id.* ¶ 174 (Lopez Guzman). | **WHO:** The only identified speaker is an alleged non-attorney staff member at LLF named "Maggie" or "Margie." The other speaker is an unnamed staff member. *Id.* ¶ 171 (Lopez Guzman).<br><br>**WHEN:** Not alleged. Although the FAC alleges that Ms. Lopez Guzman retained LLF "in or around May 11, 2023," there was a clear gap between retention of LLF and Ms. Lopez Guzman's intake consultation (time of alleged misrepresentations), as the FAC alleges that Ms. Lopez Guzman and Mr. Martinez got "married shortly" after the intake consultation in order to secure a lower "$12,500 flat fee covering both cases." *Id.* ¶¶ 29, 177.<br><br>**WHY FALSE:** Describing a U visa application as slower than a T visa is a |

| | | |
|---|---|---|
| | | comparative assessment, and "we have it won" is a prediction, not a statement of existing fact. *Id.* ¶ 174 (Lopez Guzman).<br><br>**NO WIRE OR MAIL TRANSMISSION ALLEGED:** These were made in person at the Powell office (*id.* ¶ 171 (Lopez Guzman)); the FAC does not allege that they were transmitted by wires. *Id.* ¶ 243. |
| **Alleged Wire Fraud** via payment processing | "Ms. Acevedo Ortega made payments to Defendants via debit card and through electronic withdrawals by Lisinski Law from her bank account." *Id.* ¶ 27.<br><br>Allegation of "payments via electronic processing to Lisinski Law," including two initial payments of $2,500.00 each and subsequent monthly payments of $389.00 from October 11, 2024, to March 10, 2026. *Id.* ¶ 158.<br><br>"The receipt and processing of payments from clients through wire transfers and/or electronic payment methods." *Id.* ¶ 243(1)(2).<br><br>Ms. Lopez Guzman "arrived and paid the $12,500 in full by check drawn on Mr. Martinez's business account." *Id.* ¶ 178. | **WHERE:** Not alleged for Ms. Acevedo Ortega. *Id.* ¶ 158.<br><br>**CONNECTION TO THE ALLEGED SCHEME:** The FAC does not tie any specific payment to a particularized fraudulent inducement or explain how the payment furthered the alleged scheme, rather than satisfying the fee obligation under the legal services agreement. *Id.* ¶¶ 157–58.<br><br>**NO WIRE TRANSMISSION ALLEGED:** For Ms. Lopez Guzman and Mr. Martinez, the FAC identifies the retainer as paid by check and does not allege that any later payment was made by wire. *Id.* ¶ 178. |
| **Alleged Mail Fraud** via mailing signature packets | Defendants allegedly mailed Ms. Acevedo Ortega "entirely blank or isolated signature pages overlaid with bright neon 'ALTO' stickers via the United States Postal Service (USPS)" around May 28, 2025. *Id.* ¶ 161.<br><br>The FAC further alleges "representatives forced [Ms. Acevedo Ortega] to sign completely blank pages and mailed her document packages overlaid with bright 'ALTO' (STOP) stickers, ordering her to blindly execute highlighted signature blocks in English | **WHO:** Not alleged. The FAC refers only to unnamed "Defendants" or "representatives" and never identifies who prepared or transmitted the mail packets. *Id.* ¶¶ 161, 201, 210.<br><br>**WHEN:** Not alleged for Ms. Lopez Guzman or Mr. Martinez. *Id.* ¶¶ 201–02.<br><br>**CONNECTION TO THE ALLEGED SCHEME:** The FAC alleges the packets contained signature pages and instruction sheets (*id.* ¶¶ 125–27, 201); it does not explain how obtaining those signatures |

<table>
<tr><td></td><td>without ever providing an explanation or detailed review of the text by an attorney.” Id. ¶ 167.<br><br>The FAC alleges mail fraud occurred “by utilizing interstate postal carriers to transmit immigration packets that were not reviewed by a U.S. licensed attorney.” Id. ¶ 243(2). The FAC also alleges that declarations submitted to USCIS contained a “fabricated narrative of adult domestic abuse.” Id. ¶ 165.<br><br>Defendants allegedly prepared and filed a declaration that was a “federal human-trafficking petition” that contained several exaggerations or false statements as detailed in ¶ 185. Id. ¶¶ 184–85.<br><br>“Defendants collected Plaintiffs’ signatures almost entirely by electronic signature” and “[w]hen Defendants did mail physical documents, they mailed signature pages only, fronted by the standardized ‘ALTO’ cover sheet and ‘¡IMPORTANTE!’ instruction sheets described above.” Id. ¶ 201.</td><td>furthered a scheme to obtain Plaintiffs’ money or property, rather than the preparation and submission of the immigration filings for which Plaintiffs had retained LLF.</td></tr>
<tr><td>Purported fraud via anonymous client anecdotes, though no RICO predicate act is alleged</td><td>FAC ¶¶ 218–221 describe anecdotal experiences of a “Father,” a “Daughter,” and two other unnamed, male “Applicant[s],” all of whom purportedly interacted with LLF.</td><td>WHO: Neither the speaker who allegedly made the misrepresentations nor the recipient is identified. Id. ¶¶ 218–221.<br><br>WHEN: No date is provided for any of the anonymous alleged clients’ alleged encounters. Id.<br><br>WHERE: No office or location is specified for any of the anonymous clients. Id.<br><br>NOT A PREDICATE ACT: These statements are not independently pled as wire fraud, mail fraud, or witness tampering. FAC ¶ 243.</td></tr>
</table>

As the foregoing chart demonstrates, the FAC's fraud allegations—including those specific to the named Plaintiffs—are precisely the type of vague averments and conclusory allegations that courts find insufficient under Rule 9(b). *See Auto Club*, 176 F.3d at 322*; see also Blount Fin. Servs.*, 819 F.2d at 152–53 (requiring 9(b) pleading for predicate act sounding in fraud). Nor can Plaintiffs excuse these gaps on the ground that the missing details lie within Defendants' control. Plaintiffs allege that they "have preserved and transcribed Defendants' videos," FAC ¶ 84, and what the August 20, 2024 video said and what was said during Ms. Acevedo Ortega's August 28, 2024 intake call are matters within her own knowledge, yet the FAC pleads neither. FAC ¶¶ 146–47; *see Yuhasz*, 341 F.3d at 566 (affirming dismissal where information was not within the *exclusive* possession of defendant). The same is true of the mailings: the dates, contents, and envelopes of the packets Plaintiffs received, and what they were told on the calls they participated in, are within Plaintiffs' own knowledge. *See* FAC ¶¶ 161, 201–02. Ultimately, Plaintiffs' own allegations cannot satisfy Rule 9(b) after amendment and a seventy-page pleading, and the anonymous, unattributed anecdotes recounted at paragraphs 218 through 221—which lack even a date, place, or identified speaker—fare no better. *See Am. BioCare*, 702 F. App'x at 422–23 (affirming Rule 9(b) dismissal of RICO claims against a law firm and others where, "[d]espite its 76 pages," the complaint's allegations did not tie "an alleged misrepresentation, a medium of communication, a time, and a perpetrator . . . to a single occurrence of fraud," even though they "cobble[d] together a few details"). The RICO claims should be dismissed on this basis alone.

**The FAC Does Not Plead a Scheme to Defraud Furthered by Any Mailing or Wire.**

Plaintiffs also fail to plead a scheme to defraud. *See Faulkenberry*, 614 F.3d at 581; *Turner*, 465 F.3d at 680. Their allegations concerning TikTok videos and cellular communications do not identify a specific fraudulent statement conveyed to any Plaintiff. Although Rule 9(b) permits intent to be alleged generally, a plaintiff must still "(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quotations omitted); *see also Prater*, 2015 WL 1439322, at *5 (dismissing wire fraud predicate based on telephone calls where the complaint "fail[ed] to identify any fraudulent statement Defendants used to induce Plaintiff to sign the note, fail[ed] to explain why such statements were fraudulent, and fail[ed] to provide where and when the fraudulent statements were made"). The FAC quotes a catalog of videos without alleging that any Plaintiff viewed them. FAC ¶¶ 85–96. And many of the quoted statements are opinions, predictions, generalized assessments of legal risk, or comparative advertising—not specific false statements of fact, *e.g.*, *id.* ¶¶ 85, 86, 91.

The allegations concerning the one video Ms. Acevedo Ortega allegedly viewed suffer from the same defect. The FAC neither quotes it nor describes its content beyond a generalized characterization. *Id.* ¶ 146. The FAC also identifies no misrepresentation made during her August 28, 2024 intake call: it alleges only that she placed the call and attended an in-person consultation the next day, without identifying whom she spoke with, what was said, or why any statement was false. *Id.* ¶ 147. Absent a specific fraudulent statement conveyed to any Plaintiff through the wires or mail, the FAC does not plead a scheme to defraud that those communications furthered. *See* Figure 1, *supra*.

Additionally, the telephone calls alleged in ¶¶ 170 (Lopez Guzman) and 178 prior to payment cannot support a wire fraud predicate. The FAC does not identify who placed or participated in those calls, what specific false statement was made, or why any such statement was false, as Rule 9(b) requires. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012); *Prater*, 2015 WL 1439322, at *4. The alleged urgency does not cure that

deficiency. The FAC alleges only that LLF pressured Ms. Lopez Guzman to act quickly; it does not allege that the $12,500 "offer" would not, in fact, have expired. FAC ¶ 178; *cf. Heinrich*, 668 F.3d at 407–08 (characterizing an instruction to act before a child became unavailable as "hard bargaining or a pressure sales tactic," rather than extortion, where the plaintiffs alleged no facts showing the urgency was unwarranted). Separately, the FAC does not allege that the calls traveled in interstate commerce: every participant is alleged to have been in Ohio. *See Wozniak v. Sinsel*, No. 1:07 CV 2927, 2007 WL 4510262, at *3 (N.D. Ohio Dec. 18, 2007) (requiring a wire fraud predicate based on telephone calls to be *inter*state, not *intra*state, and recognizing that when all phone calls are made between Ohio residents, "telephone calls are presumed to be intrastate and, absent any indication otherwise, the predicate of wire fraud is not stated").

*Heinrich* is not to the contrary. Each of the four predicate acts sustained there identified the couple, the month, and the facts showing why the representation was false—for instance, foster-care fees billed for a child the plaintiffs later learned "remained in an orphanage and had never lived in foster care." 668 F.3d at 401–02, 408–09. By contrast, the court rejected "promissory fraud" claims concerning the defendants' "timeliness and ability to complete adoptions," including an assurance that an adoption would "be completed in 4–6 months," because the plaintiffs had not alleged facts rendering those claims "plausible, as opposed to merely possible." *Id.* at 401, 409. Ms. Acevedo Ortega's allegations resemble the claims *Heinrich* rejected, not those it sustained. The FAC does not identify what the August 20, 2024 video said, who spoke with her during the August 28 intake call, or what that person said. FAC ¶¶ 146–47. The assurances she does identify were made face-to-face at LLF's Denver office, not by mail or wire. *Id.* ¶¶ 150–56. To the extent she relies on the assurance that the firm's strategy would produce an EAD within six to eight months and a green card within three years, *id.* ¶ 152, that is a representation about the timing of

future results—the same type of "promissory" assurance about the "timeliness and ability to complete adoptions" that *Heinrich* rejected. 668 F.3d at 409.

Ms. Lisinski's January 30, 2024 Facebook post likewise does not establish a scheme to defraud because it contains no false statement to any client. FAC ¶ 123; *see Huff*, 972 F. Supp. 2d at 1036. Plaintiffs' payment-processing and mail-fraud theories suffer from the same basic defect: the FAC does not adequately connect the transactions to a particularized fraudulent scheme. Mail and wire fraud require "use of the mails [or wires] in furtherance of the scheme." *Heinrich*, 668 F.3d at 404. The FAC identifies payments and signature mailings, but identifying those transactions does not supply the missing allegations of what fraudulent inducement they implemented or how they furthered it. The FAC also fails to identify which Defendant caused any payment to be processed or any packet to be mailed, referring only to unnamed "Defendants" and "Lisinski Law." FAC ¶¶ 27, 131, 158, 167; *see Am. BioCare*, 702 F. App'x at 422–23 (allegations failed Rule 9(b) where they did not tie the alleged fraud to a particular perpetrator); *Kerrigan*, 112 F. Supp. 3d at 600–02 (rejecting "shotgun" allegations against "the Defendants" collectively because "each Defendant is entitled to an individualized analysis of his, her, or its own RICO liability").

Collecting fees for legal services does not become wire fraud merely because a client later becomes dissatisfied with those services. *See Penn*, 2011 WL 2118072, at *13; *cf. United States v. Ogbazion*, No. 3:15-cr-104, 2021 WL 3847829, at *11 (S.D. Ohio Aug. 27, 2021) (finding insufficient evidence to support the wire-fraud counts because "there is a possibility that none of the fees contained in the transfers charged in Counts 3-7 were fraudulently obtained"). The payment-processing theory has an additional defect as to Ms. Lopez Guzman and Mr. Martinez: the FAC alleges that they paid their retainer by check and does not identify how they made any

later payment. FAC ¶ 178. Without an alleged wire transmission, those payments cannot support a wire-fraud predicate.

Additionally and separately, the FAC's own timeline does not explain how the mailing furthered the alleged scheme as to Ms. Acevedo Ortega: she executed her Contract for Legal Services on August 29, 2024, agreeing to pay $12,000 in installments, and *had already paid* a total of $8,112 before the May 28, 2025 mailing. FAC ¶¶ 157–158. Ms. Acevedo Ortega's remaining payments continued on the same fixed schedule for another ten months after the mailing. *Id.* ¶ 158. The FAC does not allege that the mailing induced an additional payment, altered her existing payment obligation, or was used to secure continued payments through any identified representation or concealment. Its chronology thus does not explain how the mailing was "for the purpose of executing" the alleged scheme to obtain her fees, rather than performing the representation for which she had already contracted. *See Kann*, 323 U.S. at 94–95 (mail fraud does not reach mailings that merely follow, rather than facilitate, a defendant's acquisition of the victim's money).

The allegations concerning Ms. Lopez Guzman are similarly deficient. The FAC does not identify when the alleged mailings occurred or who sent them, FAC ¶¶ 201–02, except that the refiling packet bore a preparer certification dated August 25, 2025—more than two years after she paid the $12,500 retainer in full following her 2023 intake consultation—and she never returned that packet. *Id.* ¶¶ 29, 178, 208, 211. Those allegations neither satisfy Rule 9(b) nor plausibly show that any mailing was made to obtain money.

The FAC's secondary mail-fraud theory—that Defendants used interstate mail to transmit immigration packets purportedly "not reviewed by a U.S. licensed attorney"—fares no better. FAC ¶ 243(2). To the extent this theory rests on the mailings to Plaintiffs, the FAC alleges only that

they contained signature pages and instruction sheets; it does not identify who sent them or, as to Ms. Lopez Guzman, when. *Id.* ¶¶ 201–02; *see* Figure 1, *supra*. Nor does it explain how the alleged absence of attorney review made those mailings a means of obtaining Plaintiffs' fees by fraud. And to the extent the theory rests on the content of petitions submitted to USCIS, *see id.* ¶¶ 165, 184–85, 192–93, the FAC must connect the alleged falsifications to the asserted scheme to obtain Plaintiffs' money. Mail fraud requires a scheme "to deprive a victim of money or property." *Turner*, 465 F.3d at 680. The allegation that a petition contained false statements does not, without facts explaining its role in obtaining or retaining Plaintiffs' fees, establish that connection.

The FAC's remaining allegations about the signature process do not supply a mail-fraud predicate. The FAC objects to how documents were presented to Plaintiffs for signature, alleging that the packets were "unvetted" and contained "entirely blank or isolated signature pages." FAC ¶¶ 160–61, 201. Those allegations challenge how LLF administered the document-signing and submission process, but they do not explain how the challenged signature procedures furthered a scheme to deprive Plaintiffs of money or property. *See Turner*, 465 F.3d at 680.

**The FAC Does Not Plead Witness Tampering.**

To plead witness tampering as a predicate act, the plaintiff must plead facts showing the defendant "(1) corruptly persuade[d] (2) a witness in an official federal proceeding (3) with the intent to influence that witness's testimony." *Burns*, 298 F.3d at 540; *see also* 18 U.S.C. § 1512. Plaintiffs' purported witness-tampering predicate act fails because Plaintiffs do not identify any official federal proceeding, nor do they plead facts showing Mr. Chinchilla acted with the intent to influence testimony in any such proceeding. Rather, Plaintiffs' witness tampering theory rests entirely on a single telephone call in which Mr. Chinchilla allegedly used "coercive rhetoric to suppress complaints" from an unnamed "aggrieved client." FAC ¶¶ 139, 141, 143. The FAC perfunctorily labels the call an effort to "persuade victims to abandon their legal remedies" and

discourage participation in "impending class action litigation against the firm," but lacks any facts supporting this characterization. *Id.* ¶¶ 139, 141, 143.

The FAC identifies no official federal proceeding in which Mr. Chinchilla allegedly sought to influence participation; it connects the call only to contemplated litigation. Section 1512 protects only federal proceedings: those before a federal court, grand jury, Congress, or federal agency. *See* 18 U.S.C. § 1515(a)(1); *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1490 (6th Cir. 1989). The only proceeding the FAC ties to Mr. Chinchilla's alleged call is this litigation. FAC ¶ 143. While a class action may be brought in state or federal court, this action was not even filed until nearly a month after the alleged call. The FAC does not allege that any federal action existed or had been threatened when the call took place, that the caller raised one, or even the identity of the caller.

Even if a qualifying proceeding could be identified, the FAC fails to plead the required nexus and intent. Although the proceeding need not be pending at the time of the alleged tampering, the defendant must at least have contemplated a particular, foreseeable proceeding. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707–08 (2005) (making clear Section 1512 does not reach conduct undertaken when no particular official proceeding is contemplated). A defendant who "lacks knowledge that his actions are likely to affect the judicial proceeding . . . lacks the requisite intent to obstruct." *Id.* at 708. The FAC's timeline underscores this deficiency: it places the call on or about May 1, 2026, FAC ¶ 139, almost four weeks before this action was filed, *see* ECF No. 1. It does not allege that Mr. Chinchilla knew of any planned lawsuit or proceeding, much less a federal one. Nor does the FAC allege Mr. Chinchilla knew of any USCIS inquiry, that the caller was a witness in any such inquiry, or that the call was intended to affect it. *See id.* ¶ 135.

At most, the FAC alleges Mr. Chinchilla knew an unidentified, dissatisfied client might pursue some unspecified remedy at some unspecified time. That is not a "particular, foreseeable proceeding." *See United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019); *see also Arthur Andersen,* 544 U.S. at 707–08. Indeed, in *Taborac v. NiSource, Inc.*, the Court dismissed a Section 1512 claim containing comparable allegations because such threadbare assertions failed to show consciousness of wrongdoing or a nexus to a federal proceeding. No. 2:11-CV-498, 2011 WL 5025214, at *6 (S.D. Ohio Oct. 21, 2011). The Court should do the same here.

Plaintiffs' allegations also fail to plead corrupt persuasion of a ***witness***. The FAC alleges Mr. Chinchilla gave "pretextual administrative excuses for billing and operational breakdowns" and discouraged the caller from pursuing complaints. FAC ¶ 141. It does not identify any ***testimony*** he sought to influence, alter, or withhold. *Id.* ¶¶ 139–44. The allegation that he sought to discourage complaints does not, without facts connecting that conduct to testimony in a federal proceeding, plausibly establish corrupt persuasion of a witness. Because Plaintiffs fail to identify any federal proceeding and plead no facts supporting nexus, foreseeability, or corrupt intent, the witness-tampering predicate act fails. *See Taborac*, 2011 WL 5025214, at *6.

The FAC's allegations concerning a USCIS investigation do not cure these defects. The FAC alleges, "[u]pon information and belief," that "in or around late 2024" unidentified "Defendants"—not Mr. Chinchilla—engaged in a "campaign of investigation tampering," and that "[t]he firm" coached clients and sent "firm employees" to their USCIS interviews. *Id.* ¶¶ 135–37. But the FAC does not allege that Mr. Chinchilla even knew of the USCIS investigation, much less that he participated in the alleged coaching scheme. Instead, the witness-tampering predicate is based solely on conduct allegedly "executed by Defendant Juan Chinchilla" through "interstate cellular transmissions" intended to make victims "decline civil participation." *Id.* ¶ 243(3). The

only such transmission identified in the FAC is the alleged May 1, 2026 call concerning "impending class action litigation." *Id.* ¶¶ 139–43. Thus, even if true, the allegations in paragraphs 135 through 137 are entirely untethered to both Mr. Chinchilla and the conduct underlying the purported witness-tampering predicate. Indeed, Mr. Chinchilla is neither a lawyer nor a member of LLF's legal-services staff.

The FAC's generic assertion that "the Enterprise actively deployed Defendant Juan Chinchilla" for "proactive witness intimidation," identifies no witness Mr. Chinchilla contacted in connection with the USCIS inquiry, no testimony he sought to influence, and no act he took in that inquiry—much less one connecting it to a call made roughly a year and a half later. *See id.* ¶¶ 135, 138, 139. To be sure, the *sole allegation* against Mr. Chinchilla is that he made a phone call to a dissatisfied client. This is not witness tampering, or evidence of participation in a RICO enterprise; it is customer service.

Because the FAC does not adequately plead any predicate act, it necessarily fails to allege that Ms. Lisinski personally committed the two predicate acts required to establish a pattern of racketeering activity. *See Householder*, 137 F.4th at 486; *Kerrigan*, 112 F. Supp. 3d at 604–06. Count I must be dismissed on this basis.

**Plaintiffs Fail to Plead Causation.**

To state a civil RICO claim, a plaintiff must plead injury to "business or property" "by reason of" the alleged RICO violation. 18 U.S.C. § 1964(c). That standard requires both but-for and proximate causation. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–68 (1992). Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268. A causal link that is "too remote," "purely contingent," or "indirec[t]" is insufficient. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, *9 (2010) (plurality opinion) (quoting *Holmes,* 503 U.S. at 271, 274). "When a court evaluates a RICO claim for proximate

causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Plaintiffs allege two categories of injury: immigration-related harms and fee payments. The FAC does not plausibly connect either category to an alleged predicate act.

Plaintiffs' alleged immigration-related injuries include adverse agency decisions and resulting emotional distress. Ms. Acevedo Ortega alleges USCIS rejected her applications and scheduled a biometrics appointment in Ohio. FAC ¶¶ 169, 171. Ms. Lopez Guzman alleges USCIS denied her petition and placed her in removal proceedings. *Id.* ¶¶ 206, 213. Both allege anxiety and fear arising from these events. *Id.* ¶¶ 169, 217. Those emotional injuries fail at the threshold because Section 1964(c) permits recovery only for injury to "business or property." Anxiety, fear, "extreme logistical distress," and exposure to removal proceedings are not themselves injuries to business or property. *Id.* ¶¶ 169, 213, 217; *see Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir. 1986) (holding "injury to business or property" under Section 1964(c) does not include personal injuries).

Plaintiffs' reliance on adverse immigration outcomes also conflicts with the limits they place on their own claims. Plaintiffs expressly plead that this action "does not depend on the merits or outcomes of any individual immigration petition," FAC ¶ 11, that it does not seek to "review, overturn, or interfere with any administrative eligibility determinations made by" USCIS, *id.* at 3, and that "no individualized inquiry into individual petition merits or immigration outcomes is required," *id.* ¶ 227. Plaintiffs cannot disclaim any inquiry into those outcomes while relying on the same outcomes to establish their injuries.

Any claimed economic losses resulting from those immigration outcomes independently fail for lack of proximate causation. USCIS's adjudications stand between the alleged predicate

acts and the resulting losses. *See Hemi*, 559 U.S. at *11 (no proximate cause where "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud"); *Anza*, 547 U.S. at 457–58; *Holmes*, 503 U.S. at 261–63, 271 (holding that SIPC, suing as subrogee of broker-dealers' customers, could not recover because the customers' injuries were contingent on the broker-dealers' insolvency rather than directly caused by the alleged stock manipulation); *cf. Lefkowitz v. Ackerman*, No. 2:16-CV-00624, 2017 WL 4237068, at *6 (S.D. Ohio Sept. 25, 2017) (independent adjudicator's findings made it "all but impossible to determine" harm attributable to defendant's conduct "as distinct from other factors"). Ms. Acevedo Ortega's claimed job loss likewise depends on the intervening agency decision. *See* FAC ¶¶ 145, 174.

Plaintiffs' fee-payment theory fares no better. "[T]he compensable injury flowing from a [RICO] violation . . . 'necessarily is the harm caused by [the] predicate acts.'" *Hemi*, 559 U.S. at 13 (quoting *Anza*, 547 U.S. at 457). The FAC does not plead facts establishing a direct causal connection between a specific predicate act and Plaintiffs' fee payments. Plaintiffs allege that they were deceived into paying LLF. Their theory therefore requires facts connecting those payments to the alleged fraudulent scheme executed through the pleaded mails or wires. *Cf. Bridge.*, 553 U.S. at 639 (noting that a plaintiff alleging injury from mail fraud ordinarily must show that someone – though not necessarily the plaintiff – relied on the misrepresentations). Yet the FAC's own causal-chain allegations focus on the in-person intake consultations, without explaining how the identified mailings or wire transactions furthered the alleged inducement or caused a distinct payment-related loss. *See* § IV.A.1.iii(b), *supra*, Fig. 1; FAC ¶ 173 (alleging chain running from "deceptive marketing inducements to the non-attorney intake protocol"); *id.* ¶ 215 (alleging chain running "from the non-attorney intake protocol and the non-attorney eligibility determination").

Ms. Acevedo Ortega's allegations illustrate the problem. The FAC does not connect her payments to any pleaded wire or mailing. The specific statements she challenges—the purported "guarantee" of an EAD and a green card and the assurance that her file had been "personally vetted"—were made in person at LLF's Denver office. *Id.* ¶¶ 150–54. As to marketing, the FAC alleges that she viewed a video on August 20, 2024, but supplies no specific content from which the Court could infer that the video induced her to pay. *Id.* ¶¶ 146, 150–54. Nor does the FAC plead any facts about the August 28, 2024 intake call connecting it to any inducement. *Id.* ¶ 147. Likewise, Ms. Acevedo Ortega's electronic payments show only that transactions occurred, not that any misrepresentation induced them. *Id.* ¶ 158. And the mailing on which the mail-fraud theory principally relies came after her fee obligation was fixed: she had already signed a $12,000 contract and paid $8,112 before the May 28, 2025 mailing. *Id.* ¶¶ 157–58, 161. The later mailing could not have induced her to undertake a payment obligation she had already assumed. *See Kann*, 323 U.S. at 95.

Ms. Lopez Guzman's and Mr. Martinez's allegations present the same problem. Ms. Lopez Guzman alleges that a friend referred her to LLF. FAC ¶ 170 (Lopez Guzman). The statements she principally challenges were made in person at LLF's Powell office, where she paid the retainer by check drawn on Mr. Martinez's business account. *Id.* ¶¶ 171–74 (Lopez Guzman), 178. The FAC identifies no mailing before that payment. The earlier wire communications consist of a brief call during which an unidentified person stated, "in substance," that she had "a ready path to status," and later calls warning that the $12,500 "offer" would expire if she did not return soon. *Id.* ¶¶ 170 (Lopez Guzman), 178. As explained above, the FAC does not identify the speakers, plead a particularized false statement, or allege that the calls traveled outside Ohio. *See* Fig. 1 &

accompanying text, *supra*. Nor does it plead facts connecting either communication to the decision to retain and pay LLF, as distinct from the referral and in-person consultation.

The distinction matters. In *Hemi Group*, the City's injury was insufficiently direct because "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes[,] [while] the conduct constituting the alleged fraud was [the company's] failure to file [the required] reports." 559 U.S. at 4–6, 11. Here, too, the FAC attributes the alleged inducement to an in-person consultation without plausibly connecting the resulting payment to a pleaded wire or mailing. The later "appeal" fee allegations likewise identify no mailing or wire that induced those payments. FAC ¶¶ 205, 216. And the generic allegation that Plaintiffs "were exposed to and relied upon representations of this kind" does not connect any particular communication to any particular payment. *Id.* ¶ 96. Although a RICO plaintiff need not always plead first-party reliance, Plaintiffs still must allege "a logical theory directly linking each Defendant's predicate acts" to the injury. *Kerrigan*, 112 F. Supp. 3d at 608–09. There, the court held that allegations that plaintiffs were merely within the "class" of individuals targeted by promotional materials they never alleged they "personally received or viewed" were "not a close enough connection." *Id.* The FAC's allegation that Plaintiffs were exposed to unspecified "representations of this kind" is no closer. FAC ¶ 96. Because the FAC does not plausibly allege that a predicate act proximately caused injury to Plaintiffs' business or property, the RICO claims fail.

**Plaintiffs Fail to State a RICO Conspiracy Under Section 1962(d).**

To state a claim for RICO conspiracy under 18 U.S.C. § 1962(d) ("Section 1962(d)"), a plaintiff must allege each defendant "objectively manifested an agreement to participate directly or indirectly in the affairs of an enterprise through the commission of two or more predicate crimes." *United States v. Sinito,* 723 F.2d 1250, 1261 (6th Cir. 1983). Without "the existence of an illicit agreement to violate the substantive RICO provision," there is no RICO conspiracy,

meaning that the conspiracy claim necessarily fails if the substantive RICO claim fails. *Id.* at 1260; *see also Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Ga.*, 768 F. App'x 446, 459 (6th Cir. 2019) (affirming dismissal of § 1962(d) claim because plaintiffs "failed to plausibly allege a violation of § 1962(b) or (c)"); *Am. BioCare*, 702 F. App'x at 423 ("Given that ABI cannot prove the underlying RICO violation, it follows that ABI cannot prove a RICO conspiracy."). Because, as shown above, the FAC fails to plead the enterprise, pattern, and causation elements of a § 1962(c) violation, Count II fails for this reason alone. *See* § IV.A.1, *supra*.

That agreement need not include a commitment by any Defendant personally to commit two predicate acts. *Salinas v. United States*, 522 U.S. 52, 65 (1997). But the FAC must still plead facts making it plausible that each Defendant agreed to facilitate conduct that, if completed, would constitute a substantive RICO violation. *Id.* at 65. Although *Salinas* arose in the criminal context, the Sixth Circuit has applied the same agreement standard in civil RICO cases. *See Heinrich*, 668 F.3d at 411 (applying *Sinito*'s agreement requirement to a civil RICO conspiracy claim). A bare assertion that defendants "conspired" or "agreed" does not suffice. *See Twombly*, 550 U.S. at 556–57. A conclusory allegation that fails to identify "'when, where, or between whom any alleged illicit agreement was made'" is "inadequate to plead a valid [RICO conspiracy] claim." *Huff*, 972 F. Supp. 2d at 1040 (internal citations omitted). Yet that is all the FAC offers. It alleges that Defendants "knowingly, willfully, and intentionally conspired, combined, and agreed together" and that "[e]ach Defendant explicitly agreed to the overall structure of the racketeering conspiracy." FAC ¶¶ 247–48. Those allegations merely restate the elements of a RICO conspiracy without providing a factual basis from which such an agreement could plausibly be inferred. The FAC does not allege when any agreement was reached, where or how it was formed, or between whom. *Cf. Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 790 (6th Cir. 2015) (complaint described

dated meetings and weeks of e-mail and telephone coordination planning the alleged scheme). Nor does it allege facts permitting the inference that any Defendant agreed to facilitate predicate acts. *See BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*, 848 F. Supp. 2d 818, 829 (S.D. Ohio 2012) (finding plaintiff "must plead facts presenting an illicit agreement to violate another substantive RICO provision" to sustain a RICO conspiracy claim).

The "operational tasks" the FAC attributes to individual Defendants do not fill the gap. FAC ¶ 249. Managing the firm's marketing and filings describes a role within a law firm's business, not an agreement to commit federal crimes. *Id.* ¶ 249(1). The deficiency is particularly acute as to Mr. Chinchilla, against whom Count II is the only claim. Mr. Chinchilla's supposed role in the alleged conspiracy—"direct witness intimidation"—rests entirely on a single call on or about May 1, 2026, during which he allegedly discouraged an unidentified "aggrieved client" from pursuing complaints. *Id.* ¶¶ 47, 138-44, 249(3). The FAC does not allege that the caller was any named Plaintiff. *See id.* ¶¶ 139–41. The FAC's further assertion that "[s]uch interference and attempted intimidation continue today" adds nothing: it identifies no other call, date, recipient, or statement. *Id.* ¶ 144.

Plaintiffs plead no facts suggesting Mr. Chinchilla knew of, much less agreed to, the marketing or mailing predicates on which the alleged scheme depends. Even if the call could be read as evidence that he agreed to commit that single act, it would not show that he agreed that he or anyone else would commit a second racketeering act. *See United States v. Driver*, 535 F.3d 424, 432–33 (6th Cir. 2008) (reversing a RICO conspiracy conviction where the defendant's commission of one predicate act supported an inference that he agreed to that act, but no evidence showed he agreed to any other, and holding that "mere association" with the enterprise "is not sufficient").

The FAC's collective allegations do not cure these deficiencies. That conclusory attribution does not identify what any Defendant knew or agreed to. FAC ¶ 248; *see Craighead,* 899 F.2d at 495 (affirming dismissal of a § 1962(d) claim where the plaintiffs "pleaded the conclusory allegation that the defendants 'conspired'" but "failed to plead the elements of a conspiracy"); *cf. Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992) (affirming Rule 9(b) dismissal of securities fraud claim where complaint attributed misrepresentations to "the defendants" collectively and did "not enable a particular defendant to determine with what it is charged"). Participation in law firm operations does not itself establish an agreement to participate in a racketeering conspiracy, and the FAC alleges no facts plausibly supporting that agreement.

Count II independently fails as to Mr. Chinchilla for lack of causation. The FAC does not allege that the May 1, 2026 call caused any Plaintiff to pay a fee or forgo a claim, and it could not have induced payments that preceded it. *See* FAC ¶¶ 29, 139–44, 157–58; *Holmes*, 503 U.S. at 268. Further, if, as shown above, the call is not a properly pleaded witness-tampering predicate, it is not "independently wrongful under RICO" and cannot support a § 1964(c) conspiracy claim. *Beck v. Prupis*, 529 U.S. 494, 505–06 (2000). Count II therefore should be dismissed.

**The Mail-Fraud Predicate Fails to the Extent it Rests on Petitions Submitted to USCIS Because the Noerr-Pennington Doctrine Forecloses Such Theories.**

The Noerr-Pennington doctrine protects the right to petition the government, and its protection "extends to all departments of the Government," *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002), including "the channels and procedures of state and federal agencies and courts," *EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*, No. 19-13698, 2021 WL 843145, at *4 (E.D. Mich. Mar. 5, 2021) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972)). Although the Sixth Circuit has not addressed the question, the courts of appeals that have considered it have held that the doctrine applies to RICO claims. *See id.* (collecting cases and

dismissing RICO claim with prejudice); *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc*., 196 F.3d 818, 826 (7th Cir. 1999) (doctrine's "rationale is equally applicable to RICO suits"). The principal exception is for "sham" petitioning, which is "a 'narrow one,'" *EQMD*, 2021 WL 843145, at *5 (quoting *Westmac, Inc. v. Smith*, 797 F.2d 313, 318 (6th Cir. 1986)), and requires that the petition be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). To the extent Plaintiffs' mail-fraud predicate rests on the transmission of "immigration packets" to USCIS, it targets petitioning activity. FAC ¶ 243(2).

Plaintiffs do not plead the sham exception. The FAC nowhere alleges that any petition LLF submitted on Plaintiffs' behalf was objectively baseless; it alleges only that USCIS rejected related applications or denied relief. FAC ¶¶ 171, 206. "Courts in the Sixth Circuit have routinely dismissed claims under the Noerr-Pennington doctrine for failure to adequately plead the sham litigation exception." *EQMD,* 2021 WL 843145, at *6 (quoting *Ashley Furniture Indus., Inc. v. Am. Signature, Inc.,* No. 2:11-cv-427, 2015 WL 12999664, at *4 (S.D. Ohio Mar. 12, 2015)); *see id.* at *6 n.2 (sham exception must be pleaded with Rule 9(b) particularity) (quoting *GMA Cover Corp. v. Saab Barracuda LLC*, No. 4:10-CV-12060, 2012 WL 642739, at *11 (E.D. Mich. Feb. 8, 2012)). Even setting that deficiency aside, Plaintiffs could not plausibly plead objective baselessness consistent with their own allegations. They allege that this action "does not depend on the merits or outcomes of any individual immigration petition" and that "no individualized inquiry into individual petition merits or immigration outcomes is required." FAC ¶¶ 11, 227. Having disclaimed any challenge to the merits of their petitions, Plaintiffs cannot simultaneously contend that those petitions were objectively baseless.

To the extent Plaintiffs instead rely on alleged misstatements in the declarations, *see* FAC ¶¶ 165, 185, the Supreme Court has left open whether a fraud exception exists, and *EQMD* noted that the plaintiff there "cite[d] no Sixth Circuit case acknowledging" one. *EQMD*, 2021 WL 843145, at *6–7. Even where courts have assumed such an exception might exist, frauds that "do not infect the core" of the proceeding remain protected, and the alleged fraud must be pleaded with particularity. *Id.* In any event, whether a given VAWA or T visa declaration was materially false depends on the specific applicant's history, the evidence submitted, and the governing eligibility standard. As to Ms. Acevedo Ortega, it turns on the events of her family life and how her declaration described them. FAC ¶¶ 155, 165. As to Ms. Lopez Guzman, it turns on which form of relief her circumstances best supported. *Id.* ¶ 212. Yet Plaintiffs disclaim exactly that inquiry, alleging that this action does not "seek to review, overturn, or interfere with any administrative eligibility determinations made by" USCIS or the Executive Office for Immigration Review and "requires no interpretation of federal immigration law or individual petition merits." *Id*. p. 3, ¶ 11. Plaintiffs cannot disclaim any inquiry into their petitions' merits while relying on alleged misrepresentations in those petitions to support a mail-fraud predicate. Nor does the FAC explain how the submissions to USCIS were a means of obtaining Plaintiffs' fees, rather than part of the representation for which those fees had already been paid or committed. *See Turner*, 465 F.3d at 680; § IV.A.1.iii, *supra*. The mail-fraud predicate therefore fails to the extent it rests on petitions submitted to USCIS.

**Count III Fails Because Ohio Does Not Recognize an Independent Breach of Fiduciary Duty Claim Against an Attorney Acting in a Professional Capacity.**

Count III alleges breach of fiduciary duty under Ohio common law. But Ohio law is clear: "Ohio does not recognize an independent claim for breach of fiduciary duty against an attorney acting in his capacity as attorney and counselor." *Omega Riggers & Erectors, Inc. v. Koverman*,

65 N.E.3d 210, 223 (Ohio Ct. App. 2016). This rule reflects the long-standing principle that "[m]alpractice by any other name still constitutes malpractice." *Muir v. Hadler Real Est. Mgmt. Co.*, 4 Ohio App. 3d 89, 90 (1982); *see also RevoLaze LLC v. Dentons US LLP*, 191 N.E.3d 475, 486-89 (Ohio Ct. App. 2022) (treating a law firm's undisclosed conflict of interest, a classic breach-of-loyalty grievance, as a breach of the professional standard of care actionable in legal malpractice, and affirming malpractice verdict where firm failed to obtain informed written consent under Prof.Cond.R. 1.7(b)). Plaintiffs' duty-of-loyalty theory is no different. Count III challenges Ms. Lisinski's and LLF's performance of legal services, and Plaintiffs cannot avoid the elements a malpractice claim requires by labeling it a breach of fiduciary duty.

The allegations underlying Count III confirm that it challenges Defendants' performance of their professional duties. Plaintiffs allege an attorney-client relationship "existed between each class member and Defendants throughout the Class Period," and Defendants breached an "absolute, non-delegable fiduciary duty of loyalty" by "designing or advancing an automated, entrepreneurial system that the attorney knew was structurally incapable of delivering individualized legal representation" and "engineer[ing] an operational architecture that systematically separates the client from licensed counsel." FAC ¶¶ 252–53, 256, 260. These allegations describe precisely the type of professional-conduct grievances that give rise to malpractice claims: failures of attorney supervision, delegation of professional responsibilities, inadequate case review, and breach of professional standards. *Rumley v. Buckingham, Doolittle & Burroughs*, 129 Ohio App. 3d 638, 641 (1998) (finding when "all of plaintiff's claims are premised upon defendant's alleged acts or omissions committed in its representation of plaintiff," all "claims sound in legal malpractice, regardless of his attempt to label his causes of action as something other than legal malpractice").

Allegations that Defendants acted "knowingly" or with deceptive intent do not change the nature of the claim. *See* FAC ¶¶ 256, 260. An allegation that an attorney knew the representation was deficient does not convert a claim arising from that representation into a different tort. *See Rumley*, 129 Ohio App. 3d at 641. Nor do alleged violations of the Rules of Professional Conduct create an independent cause of action. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 178 (1999) (holding that a "violation of the Disciplinary Rules does not, in itself, create a private cause of action"). Allegations of inadequate supervision, improper delegation to non-attorneys, and failure to communicate with clients may support disciplinary proceedings or malpractice claims, but they do not establish a separate tort merely because the conduct allegedly violated professional rules. *See id.*; *see also Bar Processing Corp. v. Barnes,* No. 1:19CV2841, 2021 WL 3679505, at *4 (N.D. Ohio Aug. 19, 2021), *aff'd*, No. 21-3814, 2022 WL 1262004 (6th Cir. Apr. 28, 2022) ("Violation of a rule should not itself give rise to a cause of action against a lawyer.").

Plaintiffs' demand for fee forfeiture does not change that analysis. They seek forfeiture of all fees LLF collected during the Class Period, "without offset for the purported value of any services rendered, and without requiring individual proof of harm." FAC ¶ 264 (second paragraph so numbered); *see also id.* ¶ 10 (seeking forfeiture "without the need to prove that the breach caused actual damages"). That demand would require LLF to return fees even to clients whose USCIS petitions were granted. But the requested remedy does not change the nature of the underlying claim. Indeed, the demand to forfeit fees without proof of causation or harm confirms that Count III seeks malpractice relief without malpractice's elements, and "[m]alpractice by any

other name still constitutes malpractice." *Muir*, 4 Ohio App. 3d at 90. Count III therefore cannot proceed as an independent claim for breach of fiduciary duty.[4]

**The CCPA Claim (Count IV) Must Be Dismissed.**

Count IV attempts to assert a claim for violation of the CCPA, C.R.S. § 6-1-101 *et seq.* The Colorado Supreme Court has held "[a] private claim for relief under the CCPA against an attorney must allege that the attorney or law firm knowingly engaged in a deceptive trade practice, which occurred in the course of the attorney or firm's business, vocation, or occupation, significantly impacting the public as actual or potential consumers of legal services, and causing injury in fact to a legally protected interest of the plaintiff." *Crowe v. Tull*, 126 P.3d 196, 200 (Colo. 2006). The FAC fails to adequately plead these elements, much less with the particularity Rule 9(b) demands for such claims, which sound in fraud. *See Duran.*, 616 F. Supp. at 793 (D. Colo. 1985).

The FAC alleges Defendants engaged in deceptive trade practices by "knowingly misrepresenting the characteristics, uses, and benefits" of their services and "advertising services with the intent not to sell them as advertised." FAC ¶ 271(1)–(2). These claims sound in fraud and thus must be pleaded with particularity, meaning Plaintiffs must allege the who, what, when, where, and how of the supposed fraud. *See Duran*, 616 F. Supp. at 793; *Pertile v. Gen. Motors, LLC*, No. 15-CV-0518-WJM-NYW, 2017 WL 4237870, at *9 (D. Colo. Sept. 22, 2017) (granting summary judgment on CCPA claim because neither complaint nor final pretrial order satisfied Rule 9(b)'s requirement that plaintiff "'set forth the time, place and contents of the false

[4] Defendants reserve all arguments that Count III, and Plaintiffs' demand for class-wide fee forfeiture without offset or individual proof of harm, cannot be certified under Rule 23. *See, e.g.*, *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 631 (6th Cir. 2011).

representation, the identity of the party making the false statements and the consequences thereof'").

The FAC does not satisfy this standard. Ms. Acevedo Ortega merely alleges that she viewed an unidentified TikTok video on August 20, 2024, that "delivered false outcome guarantees and minimized the statutory requirements for humanitarian relief," but she does not quote any of its actual language, identify the video's publication date, or tie it to any of the videos catalogued at paragraphs 85 through 95. FAC ¶ 146. The FAC quotes other videos but fails to allege any Plaintiff watched them, alleging only that Plaintiffs relied on "representations of this kind." *Id.* ¶¶ 85–93, 96. That does not satisfy Rule 9(b). Further, and as explained below, the statements the FAC does identify are inactionable puffery.

**The FAC Fails to Plead Actionable Misrepresentations.**

Colorado law distinguishes actionable misrepresentations from non-actionable "puffery," *i.e.*, general statements of opinion, quality, or optimism that no reasonable consumer would interpret as specific, verifiable factual claims. One court held that a description of "quality construction" was mere "puffing" and thus "not actionable under the CCPA." *Park Rise Homeowners Ass'n, Inc. v. Res. Constr. Co.*, 155 P.3d 427, 435 (Colo. App. 2006).

The representations Plaintiffs point to in paragraphs 85–93 are non-actionable puffery. Paragraph 85 contains videos promoting services based on the American dream and the experience of motherhood. Paragraph 86 contains statements that LLF takes cases other firms have declined. Paragraph 89's videos describe the VAWA process as fast. Paragraph 91's videos state LLF is more experienced than competitor law firms. To the extent the FAC relies on broader marketing language about LLF's ability to help immigrants (such as general optimistic statements about obtaining status), these statements fall squarely within the category of non-actionable promotional puffery. *See Park Rise*, 155 P.3d at 435. And the FAC does not allege any Plaintiff saw the more

specific statements it quotes, such as those in paragraph 92, so those statements cannot supply the misrepresentation element of any Plaintiff's claim. *See* FAC ¶¶ 92, 96, 146.

**The FAC Fails to Plead the Required Knowledge, Recklessness, or Intent.**

To state a CCPA claim, a plaintiff must allege facts showing the defendant engaged in a deceptive trade practice with the mental state required by the particular subsection invoked. *See Crowe*, 126 P.3d at 204; C.R.S. § 6-1-105(1). The subsections the FAC invokes impose different standards. Subsections (1)(e) and (1)(rrr) reach conduct undertaken "knowingly or recklessly," and the statute defines "recklessly" as "a reckless disregard for the truth or falsity of a statement or advertisement." C.R.S. § 6-1-105(1)(e), (1)(rrr), (4)(b). Subsection (1)(g) applies only where the defendant "knows or should know" goods or services are of a different standard, quality, or grade than represented. *Id.* § 6-1-105(1)(g). Although the FAC attributes its "intent not to sell" theory to subsection (1)(e), that theory tracks subsection (1)(i), which reaches one who "[a]dvertises goods, services, or property with intent not to sell them as advertised." *Id.* § 6-1-105(1)(i); *see* FAC ¶ 271(2). As *Crowe* explains, the "CCPA does not create liability for those who intend to live up to the pronouncements of their advertisements" but fail to do so. 126 P.3d at 204.

The FAC satisfies none of these standards. It does not identify what the TikTok video Ms. Acevedo Ortega viewed actually said. FAC ¶ 146; *see* Figure 1, *supra*. It also alleges no facts supporting an inference that any Defendant knew or should have known that any statement in the video was false, or recklessly disregarded its truth or falsity. *See* C.R.S. § 6-1-105(1)(e), (1)(g), (4)(b). Nor does it allege facts showing that any Defendant advertised services with the intent not to provide them as advertised. *See id.* § 6-1-105(1)(i); *Crowe*, 126 P.3d at 204.

The allegations concerning LLF's intake staffing, attorney review, and preparer certifications fail for the same reason: they challenge the practices themselves but allege no facts supporting the required mental state. FAC ¶ 271(2)–(3); C.R.S. § 6-1-105(1)(i), (1)(rrr). These are

the same practices underlying Count III. *Compare* FAC ¶ 271(2)–(3), *with id.* ¶¶ 260–62. As to Ms. Lisinski, the FAC alleges that Ms. Singh knew certain protocols were "designed to deceive clients into believing that a licensed attorney had evaluated their case," but it alleges no facts connecting that knowledge to Ms. Lisinski. *Id.* ¶¶ 52–53; *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 690 n.34 (6th Cir. 2005) (acknowledging that a corporation's collective knowledge cannot be assumed as the knowledge of each individual officer). Without more, those allegations do not show that Ms. Lisinski knew of, or recklessly disregarded, the alleged deception.

Separately but similarly, the client contracts Plaintiffs allege contained "unconscionable fee routing provisions explicitly designed to bypass traditional lawyer trust account (IOLTA) protocols" cannot support a CCPA claim because a breach of contract, without additional conduct, is not actionable under the CCPA. FAC ¶ 270; *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 148 (Colo. 2003) ("A breach of contract claim, without additional conduct, cannot constitute an actionable claim under the CCPA."). At most, this allegation could support a claim for breach of contract or a violation of professional conduct rules, not a violation of the CCPA.

**The FAC Fails to Plead a Causal Link Between Advertisement and Injury.**

"If a plaintiff cannot show a causal link between a defendant's deceptive trade practices and the plaintiff's injury, the plaintiff cannot recover damages under the CCPA." *Peterson v. USAA Life Ins. Co.*, 353 F. Supp. 3d 1099, 1114 (D. Colo. 2018), *aff'd*, 814 F. App'x 408 (10th Cir. 2020). This element requires Plaintiffs to plead facts demonstrating that a *specific* deceptive practice *caused* the particular injury. As discussed in detail in Section IV.A.1.iv, Plaintiffs fail to allege any social media post caused their retention of LLF or their supposed damages. Plaintiffs also have not alleged any damages arising from LLF's supposed bypassing of IOLTA protocols.

FAC ¶ 270. Plaintiffs therefore have failed to plead causation as required to state a claim under the CCPA, and Count IV must be dismissed for this reason alone. *See Peterson*, 353 F. Supp. 3d at 1114 (granting summary judgement on CCPA claim for lack of "'causal link' between the 'deceptive trade practices and the injury'").

**The FAC Fails to Plead a Significant Public Impact.**

Finally, the CCPA requires Plaintiffs to demonstrate the alleged deceptive practices had a "significant" public impact. Practices with merely a "de minimis impact on the public" are "outside the scope of the CCPA as a matter of law." *Id.* at 1113-14 (granting summary judgment and noting that "an impact on at most one percent of the policyholders could not constitute public impact") (citations omitted).

The FAC alleges the firm "claims to have assisted over 55,000" individuals. FAC ¶ 18. Yet the FAC identifies precisely one Colorado consumer—Ms. Acevedo Ortega—who was allegedly harmed by the advertising at issue. The anonymous anecdotes in paragraphs 218–221 do not identify Colorado residents or particular advertisements viewed and do not establish the scale of Colorado-resident-specific impact. Nor does the purported existence of a "Colorado Subclass" cure this deficiency: Plaintiffs' class definition is not evidence, and the FAC's numerosity allegation addresses the nationwide class, not the supposed Colorado Subclass's size or its members' actual exposure to the challenged advertising. *Id.* ¶ 225. The allegation that the Denver office generated substantial monthly sales likewise says nothing about how many Colorado consumers viewed, relied upon, or were deceived by any particular video. *Id.* ¶ 269. Indeed, the FAC lacks any factual allegations demonstrating a significant number of Colorado consumers actually viewed particular deceptive content, relied on it, and were injured as a result.

Furthermore, "in the context of a CCPA claim, even mass advertising cannot be considered to create a public impact unless it contains misrepresentations or deceptive information." *Gen.*

*Steel Domestic Sales, LLC v. Hogan & Hartson, LLP*, 230 P.3d 1275, 1279 (Colo. App. 2010). The "mass advertising" at issue here cannot be analyzed for its misrepresentations or deceptive information because Plaintiffs have not pleaded, much less with particularity, any misrepresentation in any advertising a Plaintiff is alleged to have viewed. *See* FAC ¶¶ 96, 146. The conclusory assertion that Defendants' practices "targeted a massive, distinct, and uniquely vulnerable pool of undocumented consumers across the State of Colorado" is entirely bare without an accompanying allegation that there were *actual misrepresentations* in such targeted advertisements or that the undocumented consumers actually viewed this content. *Id.* ¶ 272(1); *General Steel*, 230 P.3d at 1279. Accordingly, Count IV should be dismissed.

**The Colorado Subclass Cannot Recover Treble Damages Under the CCPA.**

Even if Count IV states a claim, the Colorado Subclass's request for "statutory treble damages upon proof of bad faith" should be dismissed with prejudice. FAC ¶ 272. The CCPA provides different remedies for individual and class actions. Section 6-1-113(2) provides that, "[e]xcept in a class action," a defendant found liable in a private civil action is liable for the greater of actual damages, $500, or "[t]hree times the amount of actual damages sustained, if it is established by clear and convincing evidence that such person engaged in bad faith conduct." C.R.S. § 6-1-113(2). By contrast, § 6-1-113(2.9) provides that "[i]n a case certified as a class action, a successful plaintiff may recover actual damages, injunctive relief allowed by law, and reasonable attorney fees and costs." *Id.* § 6-1-113(2.9). That list does not include treble damages or the statutory minimum.

In construing the CCPA, this Court applies Colorado's rules of statutory construction. *See First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 680 (6th Cir. 2020) (applying the state judiciary's rules of statutory construction). Under Colorado law, "[w]hen the General Assembly includes a provision in one section of a statute, but excludes the same provision from another

section, [courts] presume that the General Assembly did so purposefully." *Well Augmentation Subdistrict of Cent. Colo. Water Conservancy Dist. v. City of Aurora*, 221 P.3d 399, 419 (Colo. 2009). The omission of treble damages and the statutory minimum from subsection (2.9) is therefore deliberate. Consistent with that rule, courts in the District of Colorado have treated the CCPA's enumerated remedies as exclusive. *See Monson v. Country Preferred Ins. Co.*, No. 17-cv-02130-RBJ, 2018 WL 11016704, at *6-8 (D. Colo. Sept. 28, 2018) (applying § 6-1-113(2)'s class-action exception at the pleading stage and dismissing class-wide CCPA damages claims with prejudice because further discovery could not cure the defect), superseded in part by statute, C.R.S. § 6-1-113(2.9); *Allstate Ins. Co. v. Cruz*, 733 F. Supp. 3d 1098, 1110–11 (D. Colo. 2024) (following *Carter v. Amica Mut. Ins. Co.*, No. 17-cv-02156-RM-MEH, 2018 WL 3093320, at *8–10 (D. Colo. June 22, 2018), and *Monson*).

The 2022 amendment adding subsection (2.9) does not authorize the relief Plaintiffs seek. As *Cruz* explained, the amendment "bolsters" the conclusion that remedies omitted from a CCPA remedial provision are unavailable. 733 F. Supp. 3d at 1111. Although subsection (2.9) permits a certified class to recover actual damages, it does not authorize treble damages or the statutory minimum.

The Colorado Subclass's treble-damages demand can be resolved now under Rule 12(b)(6). Defendants do not ask the Court to decide whether the Colorado Subclass can be certified. The question is purely legal: whether the CCPA permits a class to recover treble damages. It does not, and no fact developed in discovery or at certification can change that result. Courts applying § 6-1-113 have resolved the availability of class-wide monetary relief at the pleading stage, before certification. *See Carter*, 2018 WL 3093320, at *8–10 (recommending, in the alternative, dismissal under Rule 12(b)(6) of a putative class's claims for "actual and triple

monetary damages"); *Pearson v. Geico Cas. Co.*, No. 17-cv-02116-CMA-MEH, 2018 WL 2096348, at *9–10 (D. Colo. May 7, 2018) (recommending, in the alternative, dismissal with prejudice of a putative class's claims for statutory damages). Although subsection (2.9) now authorizes class-wide actual damages, it does not authorize treble damages. Plaintiffs expressly seek certification of a Colorado Subclass and request treble damages on its behalf. FAC ¶¶ 223, 272. The relief sought here is narrower than the relief addressed in *Carter* and *Pearson* and does not require dismissal of the class allegations. *Cf. Faulhaber v. Petzl Am., Inc.*, 656 F. Supp. 3d 1257, 1271, 1275 (D. Colo. 2023) (granting a Rule 12(f) motion to strike class allegations in an action asserting a CCPA claim). Defendants do not seek dismissal of any class claim for actual damages or a ruling on the relief a named Plaintiff may pursue individually if certification is denied. They ask only that the Court dismiss with prejudice the Colorado Subclass's demand for the one remedy the statute forecloses: "statutory treble damages upon proof of bad faith." FAC ¶ 272.

Alternatively, the Court should strike the Colorado Subclass's treble-damages demand as immaterial under Rule 12(f), for the reasons set forth in Defendants' Motion to Strike.

**Plaintiffs Lack Standing for Their Requested Permanent Injunction.**

Lastly, Plaintiffs seek a permanent injunction "immediately halting Defendants' non-attorney sales pipelines, prohibiting the automated electronic execution of unreviewed signature blocks, and compelling Defendants to immediately produce complete client files to all class members." FAC, Prayer for Relief (E), p. 68. However, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons,* 461 U.S. 95, 96, 102 (1983) (citations omitted). Plaintiffs' alleged injuries arise from past representation. The FAC does not

allege facts showing that any named Plaintiff faces a real and immediate threat of again being subjected to the challenged intake or signature practices.

**CONCLUSION**

Even as amended, the FAC fails to plead the essential elements of Plaintiffs' RICO and state-law claims. Regardless of whether any claims proceed against LLF or Ms. Lisinski, the FAC fails to state a claim against Mr. Chinchilla, and Count II should therefore be dismissed as to him. For the reasons set forth above, Defendants respectfully request that the Court dismiss the FAC in its entirety and with prejudice.

Dated: October 26, 2026

By: /s/*David M. DeVillers*
David M. DeVillers
Ohio Bar No. 0059456, Trial Counsel
Barners & Thornburg LLP
41 S. High Street Suite 3300,
Columbus, OH 43215
(614) 628-1446
DDeVillers@btlaw.com

Jason P. Mehta (*pro hac vice* forthcoming)
Florida Bar No. 106110
Foley & Lardner LLP
100 N. Tampa St., Suite 2700
Tampa, FL 33602-5810
813.225.5424
jmehta@foley.com

Tam C. Wheat (*pro hac vice* forthcoming)
California Bar No. 352916
Foley & Lardner LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2418
213.972.4500
twheat@foley.com

Michelle A. Freeman (*pro hac vice* forthcoming)
Michigan Bar No. P79790
Foley & Lardner LLP
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
313.234.7100
mfreeman@foley.com

*Attorneys for Defendants The Lisinski Law Firm, LLC; Angelyne E. Lisinski and Juan Chinchilla*